PEDRO P. AGRAVANTE, JR., Pro se
and CORITA B, AGRAVANTE, Pro se
P.O. Box 22281
Guam Main Facility
Barrigada, Guam 96921
Phone no. 671.646/8453, 4537
Cell Phone no.671.788/7291

**FILED**

DISTRICT COURT OF GUAM

APR - 9 2007

MARY L.M. MORAN
CLERK OF COURT

## IN THE DISTRICT COURT OF GUAM

PEDRO P. AGRAVANTE, JR.
CORITA B. AGRAVANTE

          Plaintiffs

    Vs

JAPAN AIRLINES INTERNATIONAL
  CO. LTD.,

          Defendant

_____/

CIVIL CASE NO. CIV04-00036

TRIAL BRIEF OF PLAINTIFFS
AGRAVANTE

1.    FACTUAL CONTENTIONS.

    The flights that night at Narita Airport, Japan including ours Japan Airlines International

Co. Ltd. ("JAL") JO 981, at about 10.20 p.m., Saturday, on July 20, 2002 could be observed as

the airport's last run for the day. Smaller and Larger sizes of aircraft destined to different parts

of the world were lined up on the runway taking their turns as instructed to take-off to the air.

Mr. del Rosario seated in 1H, an aisle seat on the right side of the aircraft sitting next to his

daughter, Christy seated in 1-I at the window side observing the number of aircraft leaving the

airport. He mentioned our aircraft is the 13th in the line. The JAL aircraft I boarded on when

leaving Narita Airport bound for Guam was a smaller aircraft. Upon boarding, I noticed the amenity of comfort in the cabin is missing and passengers seats are smaller and congested. I paid JAL first class ticket for the flight. My boarding pass seat assignment was 2G, behind a Japanese passenger, Mr. Susum Nito seated in 1G, an aisle seat in the center section of the aircraft. My business partner, Mr. del Rosario and I had been in Japan on a business trip.

I could feel the aircraft was slowly moving then stopped. I, at that time was talking to Mr. del Rosario about 3 feet away. Because of the noise of the aircraft engine and passengers were talking loud, I leaned about 1 foot forward to hear Mr. del Rosario's responses, We were discussing about the outcome of our business meeting with our Japanese partners in Yokohama, Japan. The aircraft started rattling and shaking hard and followed by scary banging sounds coming from the food galley in front and "suddenly jolted and went fast-forward and took-off to the air. In aviation industry this manner of pilots flying maneuver is known as a "static take-off" which involves setting the aircrafts brakes and at the same time giving fuel to the aircraft's engine to reach 70% power before releasing the brakes then applying full force and taking a sudden take-off to the air. Because of this JAL's pilot manner of flying maneuver, I slammed hard backward to my seat giving me a strong tingling sensations from my lower back climbing to my spinal cord, back, shoulders, neck and a big headache like a whiplash. I felt immediately numbness in those areas.

Seconds later on took-off, while the aircraft was still ascending to the air, 3 metal food carts became dislodged from the galley's cabinet panels. The passengers and I as required were wearing seat belts and cannot moved became terrified and screamed at the sight of 3 carts coming down towards us. 1 cart struck seat 1G, where Mr. Susum Nito was seated about 1 foot

near my right leg and because of the strong force of impact chipped and damaged the side of the seat. But none of these runaway carts had struck and injured me.

About 5 minutes after and when the aircraft leveled off, three (3) female cabin attendants came out to move the runaway carts back where they belonged.

I was very upset realizing that JAL has exposed me to a possibility of death or a life time suffering pain of injuries especially at that time I was feeling numbness of my back, neck, shoulders and having a big headache. I wanted to file a complain directly to JAL management office in Guam that their people on board flight JO 981 are incompetent, irresponsible, disrespectful and arrogant. The Captain did not even show his face in the cabin to assess the situation of his passengers after the incident and to ask for an apology. I raised my hand to get attention from cabin attendants that were attending Mr. del Rosario. 1 lady cabin attendant came, a skinny and shorter in stature. I asked her for JAL writing pad to write my Incident Report. She came back while holding a haft sheet pad with JAL logo on it, and asked how many sheets, I responded 4 sheets. And I complained, this incident is a wrongful deed and warned her 1 metal food cart may be an accident, but 3 carts is already a complete negligence and a violation of safety to protect JAL paying passengers. She turned her back and joined the others. I did not speak to her after the event to complain about the numbness of my back, shoulders and neck and a big headache. I did not have any visible bruises, lacerations or noticeable broken bones. At that time, Mr. del Rosario's daughter, Christy was taking pictures to her Dad's left foot and leg, and asked me to take also a picture from a further distance and angle and I did.

Upon arrival in Guam, my wife and my daughter Mariecor who was on vacation at that time met me at the airport. They were looking at me worried because they have seen Mr. del

Rosario in a wheel chair pushed by a lady airport attendant. They asked me if I was okay? What happened to you? I responded; I have numbness of my back, neck, shoulders and a big headache because the aircraft I boarded "suddenly jolted and went fast forward" and took-off to the air. 3 metal food carts came down towards the passengers cabin area and hit Mr. del Rosario's foot. I urged them to hurry home because I have to transcribe my hand written report into a formal written Incident Report to complain to JAL management in Guam.

When we arrived home, I asked my wife to type the report because my arms started to get numbed also. About an hour after, we went back to Guam International Airport to submit my complaint at the baggage area to an attending JAL employee working at that time and asked him to stamp received my personal Incident Report explaining what happened on board JAL flight no.JO981 that night. He accepted the report and went to JAL's Office and stamped acknowledged receipt dated July 21, 2002, that morning. Because I was hurrying, I was not able to write my telephone number incase JAL would contact me. On the other hand, Mr. del Rosario had his separate Irregularity Report prepared by a JAL cabin attendant.

On the night of my arrival, I started to feel the pain in my back, neck, shoulders, and arms. I asked my wife to rub me with oil, alcohol and vicks vapor rub to those areas. I was relieved of pain and numbness every time she did this therapeutic massaging. She is the best Chiropractor in our family doing massaging to me and my children when we are ill for years. There is nothing in the law that forbid my wife to provide personal care to members of her family, especially in my case because I was in need of her care because of the injury I suffered that previous night. Besides, for some they say chiropractor therapy has not much credence as evidence in court. In fact, there are some practicing Attorneys we know of attaching negative statement or

names to this profession as "Quackery' or "Hoax" or the practice was used during the medieval times. The practice is also largely being complained by patients that it did not permanently cured their sufferings and pains. And some complained their claim for injury is not enough to cover the cost.

My wife did this caring of me until she told me to see a Doctor because she felt something going on wrong with my body. Your legs and arms are shaking while you are asleep. This is unnatural of you. For over 2 years my wife was attending my injuries without complain, only this time she has these words to me. My wife kept on telling me, whatever happened on your flight on board JAL aircraft on July 20, 2002 is causing you pain and the suffering of your family. You have to file complaint of injury against JAL because that is the right thing to do.

On July 9, 2004, I saw Attorney William Gavras of the Law Offices of Gorman & Gavras in Agana and explained the situation of my case to him, and that I would like to file a complaint for injuries I suffered on board JAL flight no. JO 981 on July 20, 2002. He accepted the case based on its merits and later filed the Complaint for Damages vs. Japan Airlines International Co., Ltd. on July 20, 2004, before the expiration of the Warsaw Convention Statute of Limitation of 2 years.

On September 8, 2004, I went to see Dr. Donald Preston, Internal Medicine, at the Guam Adult-Pediatric Clinic in Dededo. He examined me. He said my neck movement is abnormal and my shoulder joints are abnormal and I needed X-ray and later, MRI Scanning examinations in those areas. Because of the cost of the referral examinations we cannot afford, I asked my wife to kept on massaging my injuries. I was also given by Dr. Donald Preston, Naprosyn 500 milligrams, 5 times refill for my pain. Because I was not familiar of the effects of the medicine,

I decided to continue what I was taking for my pain since July 21, 2002, one tablet of Aspirin 325 Milligrams daily, and increase the dosage to 2 tablets a day, one tablet in the morning after breakfast and one tablet in the evening before going to bed for a total dosage of 650 Milligrams daily. It helped to ease the pain when combined with a daily walking exercise.

On August 2, 2005, almost one year passed, because of my worsening condition, I went Back to see Dr. Donald Preston. He referred me to LMR X-ray Pro at Oka, in Tamuning for my back pain. The result of my X-ray revealed, showing that there is narrowing of the disc spaces of C-5-6, and C-6-7 and encroachment in the neuroforamina bilaterally at C-5-6 and C-6-7, C-3-4 on the left. The interpreting Radiologist at LMR, X-ray Pro was Dr. Vincent Lizama, MD. On August 9, 2005, I was referred by Dr. Alix Chenet, Internal Medicine of the same clinic with Dr. Donald Preston who was on vacation at that time, a follow up for MRI Scanning to a Imaging Lab near Guam Memorial Hospital, in Tamuning for Scanning. He said, I have a tear of my shoulder rotator cup referred for MRI Scanning also. The run down of the cost were as follows; Cervical Spinal $ 1,234.78, Lumbar Spine $ 1,251.94 and right shoulder MRI, injury to right shoulder cup, $1,189,.07 for a total cost of $3,675.79. With our present financial condition, we cannot afford to have the MRI Scanning examinations. My wife and I decided again to suspend the examinations.

On the other hand, after a year from signing the Attorney/Client Contingency Fee Contract with Attorney William Gavras of July 9, 2004, he started various inconsistencies in handling my case. I was not informed for a year of any activity he did on my case that is in the contract. And in the latter part of June 2005, I found out Defendant JAL counsel, Attorney David Ledger had sent him its First Request for Interrogatories and First Request for

Documentation and needed an immediate responses as part of Preliminary Discovery.

On February 8, 2005, a letter from Attorney David Ledger had asked Attorney William Gavras, saying that I would normally consider a request to enlarge the thirty (30) day response time to forty five (45) or even sixty (60) days, to response. In the early part of July 2005, he tried to put together with me to respond to Defendant JAL Request, but later give up. In the last meeting we had he was laughing and continued insulting my religious belief, because there were few responses I had that mentioned intervention of God. Should he like to respond, he could easily edited or omitted the religious inclination of the responses and changed them to his liking to fit to his judgment. He was my counsel. Instead, he said I do not believe in this case and urged me to withdraw. I was looking at him and wondering what had happened to his mind acting very strange. Obviously, he did not even look in his files Mr. Antonio Tuano's testimony regarding Static Take-Off that caused by injuries submitted to him on May 31, 2005 and another copy on June 20, 2005. He did not even ask for my medical records.

I believe he abandoned my case because he was not able to ask for an extension from JAL for additional time to respond, it had been longed over due of over 120 days. Enough for Defendant JAL to construe as an action of abandonment and could be grounds for dismissal of the case in court.

On August 5, 2005, I decided to terminate his services. After this date, my wife and I were Left to fend for ourselves and represent this action in court Civil Case no CIV04-00036, Pro se in the District Court of Guam.

I filed this case CIV04-00036 vs. JAL in the District Court of Guam for injuries I suffered in my spinal cord as shown by my X-Ray caused by the manner JAL pilot maneuver the aircraft

With "static-take-off and was not caused by runaway carts.

The X-ray showed that I was injured in various parts of my spinal cord. This was submitted to Defendant JAL as part of Discovery and was reviewed by one medical doctor, Dr. Peter Diamond, JAL's medical expert witness and has given his personal medical opinion regarding the cause of my injury. But, one expert witness opinion or disclosure is not sufficient enough to justify the circumstances that caused my injury.. The X-ray film should also be opened to other medical doctors to examine for a second and even a third opinion to gather a common grounds of opinions or diagnosis. The Medical and Health Encyclopedia, Deluxe Edition, Edited by Dr. Richard J. Wagman, M.D., F.A. C. P., provided information for laymen to understand that the consequences of this kind of injury is very serious. The human Spinal cord is one of the basic central unit of the Central Nervous System, aside from the brain. When both working together are often described as being so much more intricate and complex than an existing imagined computer that thorough knowledge seem very remote. The spinal cord is the master track or trunk in our body and consist of millions of nerve fibers bundled together. The spinal cord is made up of hundreds of thousands of individual fibers, each fiber is part of a single nerve cell or "Neuron". There are 12 to 15 billion of them. The basic structure unit of the brain and nervous system, the tubes and transistors and circuits of which our personal computer in our body is built.

My X-ray shows there is a mild narrowing of the disc spaces of C-5-6, and C-6-7, there is a moderate encroachment into the neuroforamina bilateral at C-5-6 and C-6-7 and a lesser degree at C-3-4 on the left. In other words, with so many places injured in my spinal cord because of my accident on board JAL flight no. JO 981 on July 20, 2002, would mean havoc

to communication systems in many parts of my body. Because of this condition, expert medical doctors viewing my X-ray will not have a common ground of opinion, including from Dr. Peter Diamond's.

At present, I am suffering numbness and pain of both hands, mild tremor of my right leg and right arm, loss of coordination, cramps in my leg and fingers of my hands and twitching on my left face, sign of spinal injury consistent to airline accidents.

The Defendant JAL Second Motion to extend Scheduling Order Deadlines (Docket no.65) filed on November 15, 2006, had mentioned JAL previously moved the Court to extend the Scheduling Order Deadlines in order to permit sufficient time to locate difficult-to-find aircraft Flight Take-Off-Data, a key item of evidence in this action. In this motion, Defendant JAL admitted, one of the reasons such data is rare is that the flight in question was in 2002, and under normal circumstances, JAL retains the flight data for only six (6) months after the flight. Meaning, the actual flight data was erased as part of JAL's Standard Operating Procedure (SOP).

The Defendant JAL then Supplemented the motion asking for a further extension of the Scheduling Order Deadlines for reason of unavailability of the aircraft's captain and leading Flight attendant to assist and in locating, obtaining, and explaining the data. JAL was able to determine the identity of the captain. On October 4, 2006, the Court granted JAL's Supplemental Motion and allowed the extension of deadlines.

The aircraft captain was able to provide the necessary flight data and related information Because he had surprisingly entered this data in his personal diary. In the meantime, JAL asked for Boeing technical assistance, and it took for Boeing to examine the issue and to

give approval because the data to be released to Dr. Liptai contained information considered by the aircraft manufacturer, Boeing to be confidential trade information. Boeing gave approval for JAL to disclose certain data based on the simulation of the flight that occurred 4 years ago by the use of a flight simulator from JAL Simulator Engineering Company, Ltd., a wholly owned subsidiary of Japan Airlines International Company, Ltd.. The information and data was taken from the captain's personal diary. Although the simulator that was used on December 27, 2006 was approved by the civil aviation industry, The Japan Civil Aviation Bureau (JCAB) and the United States Federal Aviation Authority (FAA), does not mean an immediate authentication of the resulting data as evidence. The simulation was conducted for the purpose to imitate closely or as JAL explained in its Statement of Reliability of Flight Simulation Data, the use of a Flight Simulator to substantially replicate environmental conditions and aircraft characteristics for the purpose of pilot training which training can produce various output as requested. In short, the Flight Simulator was approved for pilot training purposes only. Should JAL decided to change the Flight Simulator systems programming for different purposes aside from it was approved to do, even with Boeing approval, like producing information and data for court evidentiary issues may need a different specific approval for this purpose from these government agencies. Without it, the information and data will have questions of legality.

JAL also admitted the testing of the information and data from the captain's diary was conducted in-house by its own people, namely; Mr. Shinichi Sugamoto, General Manager, JAL Simulation Engineering Co., Ltd. and Mr. Tsutumo Mabuchi, Vice President, Flight Crew Training. The procedure was conducted without check and balance, meaning without the presence of a witness for Plaintiffs.

It also means, there is no substitute to the original data that Defendant JAL has been trying to "clone", that was erased by JAL in its computer files. The most important key in this case.

II. LEGAL BRIEF.

Warsaw Convention, Art. 17.

The carrier shall be liable for damage sustained in the event of death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Warsaw Convention, Art. 25.

(1) The carrier shall not be entitled to avail himself of the provisions of this Convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as, in accordance with the law of the court to which this case is submitted, is considered to be equivalent to wilful misconduct.

(2) Similarly the carrier shall not be entitled to avail himself of the said provisions, if the damage is caused under the same circumstances by any agent of the carrier acting within the scope of his employment.

What is static take-off? In aviation industry, it is the manner of flying the aircraft which involves setting the aircraft brakes and at the same time giving fuel to the engine to reach 70% power before releasing, then applying full force and taking a sudden take-off to the air. In comparison, a good example on the ground a car racing at the race track. At the starting line while the signal flag is up, the driver steps on the brakes, and at the same time steps on the gas pedal to give the car a good starting power. When the flag is down, the driver releases the brakes

and steps on the gas pedal downward in full force. This manner of driving will cause injury to passenger

       While a rolling take-off utilizes a more gradual acceleration to reach take-off speed. Because many aviation accident are caused by improper operation, the starting point of Aviation Case should be a simple consideration whether the aircraft was properly operated. JAL pilot in this case did not properly operate the aircraft that caused my injuries.

       Narita Airport is an international airport with a longer runway of over 8 thousand feet. Should a pilot use a shorter runway for an international flight knowing that he is flying the aircraft in full gross weight, which means; full passenger, full cargo and full fuel and to use the manner of flying the aircraft by "static take-off" without further considerations of these very fragile and enormous weight being carried by the aircraft that may impede his operation is totally irresponsible and intentional. An egregious conduct or what the law regards as wanton, reckless or malicious behavior where intentional disregard of safety is involved. The injuries I am suffering in my spinal cord cannot be compared to a one would experience driving a car, because consequences in the air generally far greater than consequence of negligence on the ground.

III.      ATTORNEYS FEES.

      As Pro se Attorney, Plaintiff is entitled to attorneys fees.

IV.      EVIDENTIARY ISSUES.

      The Court should not allow the information and data generated by a Simulator to replace the computerized data that was erased and permanently lost. Allowing this evidence in court is injustice. This lost evidence is the key to this action in court.

V.    ABANDONMENT.

Plaintiffs are not aware of the abandonment of issues.

DATED: Hagatna, Guam _**9th**_, April 2007

PRO SE

_____
PEDRO P. AGRAVANTE, JR.
Plaintiff

PRO SE

_____
CORITA B. AGRAVANTE
Plaintiff