CARLSMITH BALL LLP

DAVID LEDGER
ELYZE MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Defendant
Japan Airlines International Co., Ltd.

**FILED**

DISTRICT COURT OF GUAM

APR 23 2007 *hba*

MARY L.M. MORAN
CLERK OF COURT

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| PEDRO P. AGRAVANTE, JR. and CORITA B. AGRAVANTE, <br><br> Plaintiffs, <br><br> vs. <br><br> JAPAN AIRLINES INTERNATIONAL CO., INC., <br><br> Defendant. | CIVIL CASE NO. CIV04-00036 <br><br> **DEFENDANT JAPAN AIRLINES INTERNATIONAL CO., LTD'S MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF ELYZE J. MCDONALD; EXHIBITS A-J; DECLARATION OF SERVICE** |

Defendant Japan Airlines International Co., Ltd. ("JAL") hereby moves for summary

judgment pursuant to Federal Rule of Civil Procedure 56. The motion is supported by the

attached Memorandum, declarations filed in support, and Exhibits A through J.

DATED: Hagåtña, Guam, April 23, 2007.

CARLSMITH BALL LLP

*Elyze V McDonald*

ELYZE J. MCDONALD
Attorneys for Defendant
Japan Airlines International Co., Ltd.

ORIGINAL

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Summary judgment is proper in favor of JAL on all claims asserted by Plaintiffs Pedro
Agravante and Corita Agravante. This case concerns an ordinary and routine incident onboard
an international flight from Japan to Guam. Thus, the Warsaw Convention and interpretive cases
provide rules of decision. In *Olympic Airways v. Husain*, 540 U.S. 644 (2004), the Supreme
Court reviewed the "Accident" requirement of Article 17 of the Convention, which sets forth the
requirement for liability on the part of the air carrier when a passenger asserts a claim. In
particular, the passenger must establish that an "accident" within the meaning of Article 17
caused the incident or injury. While referring to *Air France v. Saks*, 470 U.S. 392 (1985) the
Supreme Court majority clearly stated that an accident is an, "***unexpected* or *unusual event* or
*happening*** that is external to the passenger" and is not due to "the passenger's ***own internal
reaction*** to the usual, normal operation of the aircraft." *Olympic Airways*, 540 U.S. at 654-55
(emphases added).

Thus, in this case, Mr. Agravante must prove that he was injured and that if he was, his
injury was caused by an "unusual or unexpected event external" to him. However, as explained
below there is no genuine issue of material fact, nor could reasonable persons conclude
otherwise, that the JAL flight on which Mr. Agravante was a passenger operated perfectly
normal, and that Mr. Agravante's alleged injury was internal and personal to him in reaction to
the aircraft's normal operations. Moreover, due in part to the fact that Mr. Agravante did not
need or seek medical treatment *for over two years* after his flight on JAL,[1]  there is no evidence

---

[1] Not coincidentally, Mr. Agravante's first visit to any doctor with regard to his flight on JAL was two-plus years
after the incident and shortly after he retained counsel and filed suit in July 2004. Not long after reviewing the
medical records so generated and Mr. Agravante's answers to interrogatories, his legal counsel withdrew from the
case and Mr. Agravante is still acting *pro se.*

of any physical condition related in any way to the incident as described by Mr. Agravante. Rather, as unopposed medical expert testimony shows, Mr. Agravante's present-day complaints relate solely to chronic degenerative changes, that is, a change in his physical condition which has developed over a long period of time as opposed to as a result of an isolated incident on the JAL flight.

In addition, summary judgment is proper on Mrs. Agravante's loss of consortium claim because it is derivative and dependent on the success of her husband's claim.

## II.    BACKGROUND

### A.    FLIGHT NO. 981

Mr. Agravante was a first class passenger on Flight No. 981 from Narita to Guam on July 20, 2002. Mr. Agravante claims that as the plane was preparing for takeoff, he leaned forward to converse with his travel partner, Roberto J. Del Rosario, who was seated in a row forward of Mr. Agravante. Exs. A, B at Response No. 5. Mr. Agravante claims that he heard rattling sounds, and that the aircraft then moved forward to takeoff. Exs. A, B at Response No. 5. Mr. Agravante claims that the aircraft engaged in "static takeoff," otherwise known as a standing takeoff, and that during the static takeoff, the acceleration pushed him back against his seat and caused an injury. However, unopposed expert opinion shows that the force imparted by the plane's acceleration was less than a number of typical daily living activities such as sneezing, hopping off of a step, and plopping down in a chair.[2] Expert medical opinion described herein establishes the lack of any causal link between the claimed incident and present-day physical condition.

---

[2] JAL retained Dr. Laura Liptai as an expert to perform a BioMedical analysis of Mr. Agravante's claim. After examining JAL flight simulator and aircraft data, post-incident medical records, expert medical opinion, discovery responses, and the Incident Report, Dr. Liptai calculated that the static takeoff would impart acceleration force less than that which is imparted by a number of activities of daily living. *See* Ex. I.

Flight No. 981's Captain, Hideo Masuhara, has been a commercial pilot for 28 years and has accumulated approximately 5,920 hours in a Boeing 767 aircraft, the type of aircraft used for Flight No. 981. Ex. C at ¶¶ 3-4. Captain Masuhara's attached Declaration shows that the Boeing 767 he piloted to Guam is designed for standing takeoffs which are controlled by a computer installed by the aircraft manufacturer. Specifically, a standing takeoff is accomplished by the flight crew taxiing to the take-off location, setting the aircraft's brakes, setting the engines to a pre-determined power setting (70%N1), and then releasing the brakes. Ex. C at ¶ 5. Once the brakes are released, the aircraft's take-off roll and acceleration and commencement of flight are controlled by aircraft computers systems installed by the manufacturer, as opposed to manually by the cockpit crew. Ex. C at ¶ 5. Standing takeoffs are routine in the aviation industry, and are usual, normal, and expected operations of the aircraft. Ex. C at ¶ 7.

There is no genuine issue of fact to be taken with regard to Capt. Masuhara's statements because Mr. Agravantes does not disagree. In his trial brief, Mr. Agravante confirms that in the aviation industry, static takeoffs "involve[] setting the aircraft brakes and at the same time giving fuel to the aircraft's engine to reach 70% power before releasing the brakes then applying full force and taking a sudden take-off to the air." Pl.'s Trial Brief at 2, 11-12. As a lay person with no commercial pilot or aircraft design background, the key point Mr. Agravante understandably overlooks is that once the brakes are released, the manufacturer's on-board computer systems rather than the pilots control the rate of acceleration and the commencement of flight. Ex. C at ¶ 5.

There was nothing unusual or abnormal about Flight No. 981's standing takeoff. Ex. C at ¶¶ 5, 6. Rather, standing takeoffs are routine in the industry and are usual, normal and expected operations of aircraft. Ex. C at ¶ ¶ 6,7. Besides Mr. Agravante, no other person has complained

formally or informally about Flight No. 981's takeoff. Ex. D, ¶ 4.

## B.    PLAINTIFF'S ALLEGED INJURIES

Notwithstanding ample opportunity to do so during or immediately after the flight, Mr. Agravante did not report to any JAL personnel of his experiencing pain due to the plane's static takeoff. First, in an "Incident Report" received by JAL on the day following the incident, Mr. Agravante writes that as the plane was waiting to depart, it "suddenly jolted and went fast forward, and at the same time a big banging scary sound can be heard coming from the front of the airplane where food were prepared," and then three metal carts came loose hitting other passengers on the aircraft.[3] Ex. E. In the Incident Report, Mr. Agravante makes no note of any injuries that he suffered or experienced, even though he claims to have experienced tingling in his back and even greater pain within 24 hours after the flight. *See* Exs. A, B (Reponses to Interrogatory No. 9). Mr. Agravante even notes of the injuries sustained by his travel partner: "Result: 1. Passenger Robert J. Del Rosario suffered fractured left foot, complaining about pain, shortness of breathing, nervous & frighten by the incident." Ex. E. Again, no mention is made of any injuries sustained by Mr. Agravante. Second, during the flight Mr. Agravante spoke more than once with the lead Flight Attendant Reiko Asatani, yet never mentioned anything about rapid acceleration, being pushed back against his seat back, or any sort of incident involving himself. Rather, everything he said to Ms. Asatani was related solely to Mr. Del Rosario's situation, and in particular wanting Ms. Asatani to report *Mr. Del Rosario's injury* to JAL. Ex. J

---

[3] This is not in dispute as JAL has admitted, in a suit filed by Mr. Agravante's travel companion Robert Del Rosario, that flight attendants failed to lock the food carts into position prior to takeoff. Recognizing Warsaw Convention liability when they see it, JAL settled Mr. Del Rosario's claim for $175,000, only to have Mr. Del Rosario renege on the settlement and appeal to the Ninth Circuit on grounds that he never authorized his legal counsel to settle for less than seven figures. Mr. Agravante admits that "none of these runaway carts had struck and injured me." Pl.'s Trial Brief at 3. Thus, the issue of the carts is not relevant to Mr. Agravante's claim.

at 22:17-25, 23:1-25, 24:4-6, 33:10-15.[4] Third, during his deposition, Mr. Agravante testified that the Incident Report memorializes what happened on the flight, and that he filled it out in order to express accurately what happened on the flight. McDonald Decl., ¶ 5.[5]

Although Mr. Agravante claims to have suffered numbing and tingling within 24 hours after the flight, he did not see a doctor until <u>two years later</u>.[6] There is therefore no documentation of his injuries immediately after the incident, nor any documentation for two whole years.

In September 2004, Mr. Agravante saw Dr. Donald Preston and Dr. Alix Chinet, and also took x-rays. Exs. A, B (Response to Interrogatory No. 10). None of Plaintiff's doctors have linked Mr. Agravante's neck and back pain to the JAL incident. *See* Ex. F; Pl.'s Trial Brief at 5-6.

JAL's medical expert Dr. Peter Diamond[7] reviewed Mr. Agravante's case, medical reports, and x-ray films. Dr. Diamond found that the x-rays show marked degenerative disc disease changes (in lay terms this means changes occurring over a long period of time) not indicative of acute trauma linked to a single incident. Ex. G. Dr. Diamond notes that Dr. Preston's initial exam states that Mr. Agravante has a normal gait, which means that Mr. Agravante is not walking with a limp and likely does not have a spinal cord injury, and that he

---

[4] Ms. Asatani's testimony was not taken in this case but was taken by plaintiff in *Del Rosario v. Japan Airlines Intern. Co. Ltd.*, District Court of Guam Civil Case No. 04-00028. A number of questions about Pedro Agravante were posed to Ms. Asatani as it was known at the time of the testimony that Mr. Agravante and Mr. Del Rosario were traveling together. Ms. Asatani's testimony is particularly telling in stating what Mr. Agravante *did not* say to her during the flight, that is, that he himself had no complaint about the takeoff or any incident or physical discomfort related to it. Rather, everything he said during the flight concerned only Mr. Del Rosario.

[5] Deposition transcripts are still being transcribed as of the date of the filing of this motion.

[6] Mr. Agravante testified in his deposition that he was treated by his wife, however, his wife does not have any medical credentials or training. She is a bookkeeper at Greenhill, Inc. McDonald Decl., ¶ 5.

[7] Dr. Diamond will be unavailable to attend the trial in this case, thus, the attached transcript constitutes his entire testimony in this action.

has no sensory deficits. Ex. H at 17:2-25, 19:4-8, 22:8-10. Dr. Diamond's review of Mr. Agravante's x-rays revealed that Mr. Agravante's symptoms are indicative of arthritis, and "wear-and-tear changes" in the spine and joints. Ex. H at 23:4-18, 24:14-18, 25:4-13. However, the arthritic, wear-and-tear changes were not due to a sudden traumatic event but again are conditions which only develop over long periods of time. Ex. H at 24:19-22.

Also, in examining the x-rays, Dr. Diamond observed the development of spurs in Mr. Agravante's spine, again indicative of a long-standing and long-developing chronic problem. Ex. H at 28:1 - 29:2. Dr. Diamond also did not observe in the x-ray any abnormalities on Mr. Agravante's shoulder. Ex. H at 24:23 - 27:22, 30:15 - 31:22.

In general, Dr. Diamond saw "nothing in those [x-ray] films to indicate an acute trauma. There was no sign of a fracture of the spine. There was no sign of a disc location or a subluxation -- a significant subluxation." Ex. H at 29:6-9, 29:21 - 30:4. Instead, Dr. Diamond found that Mr. Agravante suffered from tendonitis. Ex. H at 32:22-25.[8] With the indications of long-term disease and absolutely no documentation of an isolated injury in 2002, Dr. Diamond concluded that the JAL incident was not causally related to Mr. Agravante's symptoms. Ex. H at 38:18 - 39:3.

JAL also retained Laura Liptai, Ph.D., as an expert to perform a biomedical analysis of Mr. Agravante's claims. Ms. Liptai is a Biomedical and Mechanical Engineer holding advanced degrees from University of California at Davis as well as specialty training in Ergonomics / Human Factors from Royal University of Denmark. Ms. Liptai also has held academic appointments at UCD School of Medicine and UCD School of Engineering. Additionally, Ms.

---

[8] Dr. Diamond diagnosed Mr. Agravante as have "'Neck pain, most likely secondary to degenerative disc disease without documentation of acute injury in 2002'; and the other was 'Possible right shoulder impingement tendonitis superimposed on degenerative joint disease of the acromioclavicular joint, without any evidence for shoulder trauma from the subject injury.'" Ex. H at 32:15-21.

Liptai has approximately eight years of clinical experience at various institutions including UCD Medical Center and UCD Coroner's Office. Ex. I. After examining JAL flight simulator and aircraft data, medical records, Dr. Diamond's report, discovery responses, and the Incident Report, Dr. Liptai found that trauma was unlikely, and that hyperextension of Mr. Agravante's spine was unlikely and probably within the normal range of motion. Ex. I. Dr. Liptai further found that the static takeoff would not impart accelerations greater than those of activities of daily living such as sneezing, plopping down in a chair, sitting, and hopping off of a step. Ex. I at 5.

## III. LEGAL DISCUSSION

### A. STANDARD FOR SUMMARY JUDGMENT.

Federal Rule of Civil Procedure 56 allows summary judgment if the pleadings, depositions, and interrogatories, together with affidavits on file show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). If a party opposing summary judgment has the burden of persuasion at trial, summary judgment is appropriate if the opposing party *lacks sufficient evidence* to carry its ultimate burden of persuasion at trial; i.e., it does not have evidence from which a jury could find an essential element of the opposing party's claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

### B. MR. AGRAVANTE'S PROOF FAILS BECAUSE HE IS UNABLE TO ESTABLISH THE ESSENTIAL ELEMENTS OF AN ACCIDENT AND CAUSATION UNDER THE WARSAW CONVENTION.

As this case involves an injury occurring during international air travel, the rules under the Warsaw Convention apply. *See El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 169 (1999). Article 17 of the Warsaw Convention provides that a "carrier shall be liable for

damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the *accident* which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." 49 Stat. 3018. The burden of proof is upon the plaintiff to establish that such an accident under the Warsaw Convention occurred. *Husserl v. Swiss Air Transport Co., Ltd.*, 351 F. Supp. 702, 706 (S.D.N.Y. 1972).

As previously noted, in *Olympic Airways*, the Supreme Court reviewed the "Accident" requirement of Article 17 of the Convention with regard to liability on the part of the air carrier when a passenger asserts a claim. In particular, the passenger must establish that an "accident" within the meaning of Article 17 caused the incident or injury. The standard for the plaintiff's prima facie accident case under Article 17 of the Warsaw Convention has been clearly established by the United States Supreme Court in *Air France v. Saks*: the Court majority clearly stated that an accident is an "***unexpected* or *unusual event or happening*** that is external to the passenger" and is not due to "the passenger's ***own internal* reaction to the *usual, normal operation*** of the aircraft." 470 U.S. at 405 (emphases added). In *Saks* an airline passenger became permanently deaf in one ear after experiencing severe pain and pressure in that ear during the plane's descent into the Los Angeles airport. The district court granted summary judgment for the airline, which the Ninth Circuit reversed. The Supreme Court reversed the Ninth Circuit.

The Supreme Court held that liability under the Warsaw Convention "arises only if a passenger's injury is caused by an unexpected or unusual event or happening that is external to the passenger. *Id.* at 405. However, "when the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been

caused by an accident, and Article 17 of the Warsaw Convention cannot apply." *Id.* at 406.

Thus, the conditions precedent to Article 17 liability are: (1) an abnormal or unusual event; (2) external to the passenger; (3) that causes the plaintiff's injury. *Caman v. Continental Airlines, Inc.*, 455 F.3d 1087, 1090 (9th Cir. 2006) (citing *Saks*, 470 U.S. at 405). In examining whether an event was unusual, courts pay attention to whether an air carrier departed from either industry standard or its own company policies. *Caman*, 455 F.3d at 1091.

In this case, there is no dispute that JAL's operation of Flight 981 complied with both industry standard and its own policies. Indeed, the flight crew operated the aircraft exactly as Boeing designed it to be operated. The undisputed evidence shows that the plane's takeoff was neither abnormal nor unusual. Rather, standing takeoff is a regular occurrence on the aircraft, and controlled by the aircraft's computer system. Capt. Masuhara, a 28 year veteran on commercial aircraft with almost 6,000 hours in a Boeing 767, has testified by the attached Declaration that the aircraft take off was according to industry standard and JAL policy. Ex. C at ¶¶ 3-7. Chief Purser/Lead Flight attendant Reiko Asatani similarly testified in another case, when Mr. Agravante's claim was not even the subject of her deposition. In particular, she testified that she remembered the takeoff, that it was not particularly more steep than normal, and that there was nothing unusual about that takeoff. Ex. J at 6:1-15. Mr. Agravante recognizes and admits that static takeoffs are done in the aviation industry. Pl.'s Trial Brief at 11-12. In this particular takeoff, Capt. Masuhara did nothing unusual or abnormal. Indeed, both Capt. Masuhara and Mr. Agravante agree that the engines were set to 70% power prior to release of the brakes. Moreover, no other passenger submitted complaints about the static takeoff of the aircraft and, as noted above, significantly Mr. Agravante said nothing about the takeoff affecting him in any way all the while he was speaking to Flight Attendant Reiko Asatani during the flight.

Ex. J. In essence, JAL's airplane was operated in a "usual, normal, and expected" manner, meaning that Mr. Agravante is unable to make a *prima facie* showing and is accordingly not entitled to recover for his alleged injuries. *Saks,* 470 U.S. at 406.

In the circumstances and in the light of the lack of any genuine issue of material fact as to the flight having acted in the normal and expected course, the only logical and reasonable conclusion possible after a trial is that there was no "accident" external to Mr. Agravante within the meaning of Article 17 of the Warsaw Convention and thus no liability on the part of JAL. On this basis, the summary judgment is appropriate.

Moreover, any actual condition which may have resulted derived from Mr. Agravante's own internal reaction to the usual and normal operation of the aircraft. In *Saks*, the Supreme Court held that the plaintiff's injuries resulted from an internal reaction because the normal pressurization of the cabin caused her to become permanently deaf in her left ear. 470 U.S. at 405-06. Such an injury results from some internal infirmity and cannot be attributed to the defendant under the Warsaw Convention. *Id.* Similarly, here, if Mr. Agravante had any reaction at all it must likewise be classified as an *internal* reaction to the normal operations of the aircraft. He claims to have suffered back pain and neck pain (even though there is no objective evidence to support such a claim), however, if real these conditions are due to his internal, personal reactions to the static takeoff, a usual occurrence on aircraft just like the normal pressurization of the aircraft in *Saks*. Furthermore, after examining JAL flight simulator and aircraft data, medical records, Dr. Diamond's report, discovery responses, and the Incident Report, Dr. Liptai found that found that the static takeoff would not impart acceleration force greater than those of activities of every-day normal living such as sneezing, plopping down in a chair, sitting, and hopping off of a step. Ex. I, at 5.

Finally, there is absolutely no credible evidence that the JAL incident caused Mr.

Agravante any injury. Mr. Agravante's "injury" claim went undocumented for more than two

years, and remained so until after he retained legal counsel for his personal injury lawsuit. Even

further than the lack of documentation to support Mr. Agravante's claim that his injuries are

caused by the JAL flight, when he finally did see a doctor and had x-rays done, *no doctor of his*

*own choosing indicated any acute or sudden trauma had occurred.* Rather, the x-rays showed

long-term degenerative diseases, such as arthritis and tendonitis, which is suitable for a man of

Mr. Agravante's age. Under the Warsaw Convention and *Saks*, the lack of causation between the

claimed injury and the incident signifies that Mr. Agravante cannot recover.

## C. MRS. AGRAVANTE CANNOT RECOVER FOR LOSS OF CONSORTIUM.

In Guam, a loss of consortium claim is derivative. *Duenas v. Department of Public*

*Works, Government of Guam*, 1992 WL 97213, \*1, 5 (D. Guam App. Div. 1992). When a loss

of consortium claim is derivative, all elements of the underlying injury must be proven.

*Mosakowski v. PSS World Medical, Inc.*, 329 F. Supp. 2d 1112, 1132 (D. Ariz. 2003). Because

Mr. Agravante has failed to demonstrate that he has suffered an accident under the Warsaw

Convention, Mrs. Agravante cannot prevail on her loss of consortium claim.

## IV. **CONCLUSION**

Summary judgment is appropriate in JAL's favor as there is no genuine issue of material

fact that JAL Flight No. 981 on July 20, 2002 operated normally and in accordance with industry

standard and JAL policy. If Mr. Agravante had any verifiable reaction to this it was internal and

not caused by the JAL flight. Moreover, summary judgment is appropriate in favor of JAL on

Mrs. Agravante's loss of consortium claims, which are derivate of Mr. Agravante's claims.

JAL respectfully requests summary judgment.

DATED: Hagåtña, Guam, April 2 3 , 2007.

CARLSMITH BALL LLP

_Ecersermede_

DAVID LEDGER
ELYZE J. MCDONALD
Attorneys for Defendant
Japan Airlines International Co., Ltd.

# DECLARATION OF ELYZE J. MCDONALD

I, ELYZE J. MCDONALD, declare under penalty of perjury that the following statements are true and correct:

1. I have personal knowledge of the facts stated in this declaration except as otherwise indicated.

2. I would testify competently as to these facts if called by the Court.

3. I am licensed to practice law before all courts in Guam.

4. I am an attorney for Defendant Japan Airlines International Co., Inc. ("JAL").

5. I conducted the depositions of Plaintiffs. The transcriptions of the depositions have not been completed as of the date of this Declaration. However, based on my memory and notes, I recall that the following testimony was provided:

    a. Mr. Agravante testified at his deposition that he completed the Incident Report to document what occurred on Flight No. 981.

    b. Mrs. Agravante is a bookkeeper at Greenhill, Inc. and does not have any medical training, education, or certification.

6. When the deposition transcripts are prepared, I will submit the appropriate references to the Agravantes' testimonies to the Court.

7. Attached hereto as Exhibit A is a true and correct copy of JAL's First Request for Answers to Interrogatories.

8. Attached hereto as Exhibit B is a true and correct copy of Plaintiff's Responses to JAL's First Request for Answers to Interrogatories.

9. Attached hereto as Exhibit C is a true and correct copy of a signed Declaration of Hideo Masuhara, Flight No. 981's pilot. Captain Masuhara's Declaration is also being submitted for filing via a request to file facsimile filing.

10. Attached hereto as Exhibit D is a true and correct copy of a signed Declaration of Naomi Nakahara, employed JAL's Department of Legal Affairs. Ms. Nakahara's Declaration is also being submitted for filing via a request to file facsimile filing.

11. Attached hereto as Exhibit E is a true and correct copy of the Incident Report filled out by Mr. Agravante, and produced during the discovery phase of this case.

12. Attached hereto as Exhibit F are true and correct copies of Mr. Agravante's medical reports produced during discovery.

13. Attached hereto as Exhibit G is a true and correct copy of the expert report of Dr. Peter Diamond.

14. Attached hereto as Exhibit H is a true and correct copy of the transcript of the videotaped deposition of Dr. Diamond.

15. Attached hereto as Exhibit I is a true and correct copy of Dr. Laura Liptai's expert report.

16. Attached hereto as Exhibit J is a true and correct copy of excerpts of the transcript of the testimony of Reiko Asatani. The testimony was taken in the case of *Del Rosario v. Japan Airlines Intern. Co., Ltd.*, District Court of Guam Civil Case No. 04-00028, which involved an incident onboard JAL's Flight No. 981 on July 20, 2002, the same flight at issue in this case. As opposed to having Ms. Asatani sworn in to testify as with a typical United States deposition, because Japanese citizens can only be deposed under certain circumstances not

present in that case, the parties agreed to the taking of the testimony pursuant to Ms. Asatani's swearing to tell the truth. *See* Ex. J at 9.

I declare under penalty of perjury under the laws of the United States that the foregoing is true, correct and complete.

DATED: Hagåtña, Guam, April 23, 2007.

_Elyze McDonald_
ELYZE MCDONALD

## DECLARATION OF SERVICE

I, Elyze J. McDonald, hereby declare under penalty of perjury of the laws of the United

States, that on the 23d day of April 2007, I will cause to serve, via certified mail with return

receipt requested, a true and correct copy of DEFENDANT JAPAN AIRLINES

INTERNATIONAL CO., LTD.'S MOTION FOR SUMMARY JUDGMENT;

MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF ELYZE

MCDONALD; EXHIBITS A-J; DECLARATION OF SERVICE upon Pro Se Agravantes as

follows:

> PEDRO P. AGRAVANTE
> CORITA B. AGRAVANTE
> Post Office Box 22281
> Guam Main Facility
> Barrigada, Guam 96921

Executed this 23d day of April, 2007 at Hagåtña, Guam.

_____
ELYZE J. MCDONALD



CARLSMITH BALL LLP

DAVID LEDGER
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Defendant
Japan Airlines International Co., Ltd.

IN THE DISTRICT COURT OF GUAM

PEDRO P. AGRAVANTE, JR.
and CORITA B. AGRAVANTE,

             Plaintiffs,

    vs.

JAPAN AIRLINES INTERNATIONAL
CO., LTD.,

             Defendant.

CIVIL CASE NO. CIV04-00036

**DEFENDANT JAPAN AIRLINES
INTERNATIONAL CO., LTD.'S FIRST
REQUEST FOR ANSWERS TO
INTERROGATORIES;
DECLARATION OF SERVICE**

**TO:  PLAINTIFFS AND THEIR ATTORNEY OF RECORD**
      **William L. Gavras, Esq.**
      **Law Offices of Gorman & Gavras**
      **2nd Floor, J&R Building**
      **208 Route 4**
      **Hagåtña, Guam 96910**

CALENDARED
FROM: EJM
DUE: MTC 04/12/2006
DATE: 05/12/2006

Defendant hereby requests that each named Plaintiff answer under oath, in accordance

with Rule 33 of the Federal Rules of Civil Procedure, the Interrogatories served upon them. Two

sets of interrogatories are served.

In answering the Interrogatories, Plaintiffs are required not only to furnish information

available from their own personal knowledge and records, but also information available to their

CALENDARED
ATTN: DAVID
BY: DUE 02/09/05
DATE: RESPONSE DUE

RECEIVED
FEB 08 2005

**EXHIBIT "A"**

attorneys, investigators, agents, or anyone else acting on their behalf.

The Interrogatories shall be deemed continuing so as to require supplemental answers if Plaintiffs obtain or recall further information between the time the answers are served and the time of trial. Answers must be inserted in the spaces provided. If additional space is necessary in answering any Interrogatory, complete the answer on additional sheets of paper and include a reference number to the Interrogatory being answered.

## DEFINITIONS AND INSTRUCTIONS

1. "Defendant" means Japan Airlines International Co., Ltd.

2. "Plaintiffs" and "you" and "your" refer to Plaintiffs and your Attorney and agents.

3. "Complaint" refers to the Complaint filed by you against the Defendant in the District Court of Guam.

4. "Claim" refers to any and all claims or allegations set forth in the Complaint.

5. As used herein, the term "documents" means and includes any and all:

    a. Tangible things or items, whether handwritten, typed, printed, tape recorded, electronically recorded, video-tape recorded, visually reproduced, stenographically reproduced or reproduced in any other manner;

    b. Originals and all copies of any and all communications;

    c. Writings of any kind or type whatsoever;

    d. Data compilations gathered through detection devices from which information can be obtained or translated by the respondent, if necessary, into a reasonably usable form as defined in Rule 34 of the Federal Rules of Civil Procedure;

    e. Books and pamphlets;

f. Microtape, microfilm, photographs, movies, records, recordings,

tape recordings, and video-tape recordings, stenographically or otherwise reproduced;

g. Diaries and appointment books;

h. Cables, wires, memoranda, reports, notes, minutes and interoffice

communications;

i. Letters and correspondence;

j. Drawings, blueprints, sketches, and charts;

k. Patents and patent applications;

l. Contracts or agreements;

m. Other legal instruments or official documents;

n. Deeds, leases, mortgages, assignments or other instrument relating

to real property or personal property;

o. Published material of any kind;

p. Engineering or scientific notebooks and data;

q. Financial statements, balance sheets, profit and loss statements,

statements of financial condition, income tax returns, worksheets, reports, projections, schedules,

ledgers, books, records, and journals;

r. Vouchers, expense accounts, receipts, invoices, bills, orders,

billings, bank account records, and checks;

s. Investigation or incident reports;

t. Files and records;

u. Proposals, feasibility studies, engineering studies, renderings,

plans, as-built drawings, progress schedules, change orders, estimates and projections;

v. Notes or summaries of conferences, meetings, discussions, interviews, or telephone conversations or messages;

w. Travel reports, ticket stubs, and vouchers;

x. Drafts or draft copies of any of the above.

6. "Communication," as used herein, shall include all oral, written, visual or other sensory means of transmitting information or statements.

7. "Identify," when used with respect to any document, means to describe the document in such a manner that all the following information is provided:

a. Its nature (e.g., letter, memorandum, contract, report, statement, recording, photograph, etc.);

b. Its title, if any;

c. The date the writing was prepared, drafted or recorded;

d. The identity of the person or persons who prepared, drafted or recorded the writing or participated therein;

e. The date the writing was sent and received (if applicable) and the identity of the person sending and the person receiving the writing;

f. A summary or description of the contents of the writing; and

g. The identity of the person who presently has custody or control of the writing.

8. "Identify" when used with respect to a person or entity shall mean, with respect to a person, to state the person's name, residence address, residence telephone number, employment position, employer, business address, business telephone number, relationship to you, and (if known) date of birth; and with respect to an entity, to state the name of the entity, its business address, business telephone number, and to identify its partners, officers, and directors.

9.     "Identify" when used with respect to a lawsuit shall mean to state the nature of the lawsuit, the full names of all parties contained on the caption of the lawsuit, the civil or docket control number of the lawsuit, the jurisdiction in which the lawsuit was filed, and the outcome of the case.

10.    "Identify" when used with respect to a claim shall mean to state the name of the party against whom the claim was made, the date the claim was made, the date of the injury or damage claimed, the nature of the injury or damage claimed, and the disposition of the claim.

11.    "Identify," when used with respect to a communication, shall mean to state each of the following: (1) the name and title of the person who made the communication; (2) the name and title of the person who received it; (3) the date of the communication; (4) the type of communication; and (5) a summary of the contents of the communication.

12.    If any of the Interrogatories cannot be answered in full, please answer to the extent possible, specifying the reasons for your inability to answer the remainder and stating whatever information or knowledge you have concerning the unanswered portion.

13.    If additional space is required for the answer to any Interrogatory, complete the answer on additional sheet(s) of paper bearing the same number as the number of the Interrogatory that is being answered.

14.    Please note that Plaintiff, pursuant to Fed. R. Civ. P. 26(e), is under a continuing duty to seasonably supplement its responses with information that is obtained or became available subsequent to the preparation and filing of the responses.

15.    Each of these definitions and instructions is hereby incorporated into each of the Interrogatories to which it pertains.

## INTERROGATORIES

INTERROGATORY NO. 1:  State your full name, date of birth, social security number, current residence address, and any other address you have had during the past ten years.

Answer:

INTERROGATORY NO. 2:  State the name and address of each of your employers from 1990 through the present, together with your job title, date(s) of employment, and describe your job duties at each place of employment.  If you have been self employed during this time, you should identify yourself or your company as your employer and provide the other information requested.

Answer:

INTERROGATORY NO. 3:  Identify each witness known to you who has any knowledge -- eye-witness or otherwise -- relating to the accident, your alleged injuries and claimed damages.

Answer:

INTERROGATORY NO. 4:  Give the name, address and phone number of everyone you have discussed the incident with.

Answer:

INTERROGATORY NO. 5:  State in detail your version of what happened to you while you were on the aircraft.

Answer:

INTERROGATORY NO. 6: For the duration of the flight following the alleged incident, state in detail your version of what you did, what cabin crew members said to you, and what you said to them.

Answer:

INTERROGATORY NO. 7: If you allege Defendant's aircraft was defective, state all facts and describe all conditions upon which you base that allegation.

Answer:

INTERROGATORY NO. 8: (omitted)

INTERROGATORY NO. 9: Since you claim to have been physically injured while on board the aircraft, you are required to state in detail the type and extent of the injury, including any:

a.    cuts or lacerations;

b.    fractures or dislocations;

c.    bruises or visible injuries;

d.    pain experienced during the first 24 hours after the injury;

e.    pain experienced during the week following the injury; and

f.    pain presently being experienced.

Answer:

INTERROGATORY NO. 10:        State the full name and complete physical address of each doctor and health care provider, including chiropractors, physical therapists, psychiatrists, psychologists who has examined or treated you for the injury allegedly sustained on board the aircraft.

Answer:

INTERROGATORY NO. 11:    On whose advice did you choose the health care provider(s) identified above ?  Said another way, why did you choose the doctors who treated you ?

Answer:

INTERROGATORY NO. 12:    Have you ever sustained an injury similar to the injury you allege to have sustained on board the aircraft ?  If yes, describe the type of injury, the date you sustained it, and the name and address of each doctor and/or health care provider you sought treatment from.

Answer:

INTERROGATORY NO. 13:    If you claim you have not fully recovered from the injury you allege you sustained on board the aircraft, identify each health care provider who has said that you have not recovered fully and summarize any medical advice given to you in this regard.

Answer:

INTERROGATORY NO. 14:    List the names and addresses of each doctor and medical care provider, if any, who has furnished you with a written report of their examination, care or treatment rendered to you.

Answer:

INTERROGATORY NO. 15:    State the number of days of work you allege you missed because of the injury referred to in your Complaint and/or the amount of income you claim you have lost.

Answer:

INTERROGATORY NO. 16:    Describe any physical condition or injury caused by

the alleged injury which you claim impairs or will impair your ability to work or earn income, and describe how the condition or injury impairs or will impair your ability to work or earn income.

Answer:


INTERROGATORY NO. 17: Referring to your filed tax returns, provide the following information:

Answer:

| Year | Gross (or business) income | adjusted gross income | net income |
|------|---------------------------|----------------------|------------|
| 2004 | | | |
| 2003 | | | |
| 2002 | | | |
| 2001 | | | |
| 2000 | | | |


INTERROGATORY NO. 18: As a result of the alleged injury, have you claimed or received insurance compensation, disability income payments, workers compensation benefits or any other like compensation or payments from any source whatsoever? If you answer yes, state the name and address of the source of each payment, the amount of each payment and what it was for.

Answer:

INTERROGATORY NO. 19: Describe all medical care which you paid for out-of-pocket. If you received medical care which was paid for in part or in full by insurance, state the full name and address of the insurance agent and company.

Answer:

INTERROGATORY NO. 20: State the total amount of damages you will seek at

trial and identify the amounts which you claim are for lost wages, out-of-pocket medical expenses, other special items of damages and general damages.

Answer:

INTERROGATORY NO. 21:     State all physical activities that you claim have been or will be restricted as a result of the alleged injury, and describe the alleged restriction.

Answer:

INTERROGATORY NO. 22:     (omitted)

Answer

INTERROGATORY NO. 23:     If you are claiming damages for loss of consortium, state in complete detail the facts which claim such loss is based, and how you have computed the amount of money damages being sought.

Answer:

INTERROGATORY NO. 24:     If you have sought any professional counseling regarding alleged loss of consortium, provide the name and address of each person you have seen for this purpose.

Answer:

INTERROGATORY NO. 25:     If you were ever involved in any legal action, either as a defendant or as a plaintiff, describe the legal action by court name and civil number and your involvement.

DATED: Hagåtña, Guam, February _8th_, 2005.

CARLSMITH BALL LLP

DAVID LEDGER
Attorneys for Defendant
Japan Airlines International Co., Ltd.

# DECLARATION OF SERVICE

I, David Ledger, hereby declare under penalty of perjury of the laws of the United States,

that on the 8TH day of February 2005, I will cause to be served, via hand delivery, a true and

correct copy of DEFENDANT JAPAN AIRLINES INTERNATIONAL CO., LTD.'S FIRST

REQUEST FOR ANSWERS TO INTERROGATORIES; DECLARATION OF SERVICE upon

Plaintiffs Counsel of record as follows:

> William L. Gavras, Esq.
> Law Offices of Gorman & Gavras, P.C.
> 2nd Floor, J&R Building
> 208 Route 4
> Hagåtña, Guam 96910

Executed this 8th day of February 2005 at Hagåtña, Guam.

DAVID LEDGER

# IN THE DISTRICT COURT OF GUAM

PEDRO P. AGRAVANTE, JR.          CIVIL CASE NO. CIV04-00036
And CORITA B. AGRAVANTE

             Plaintiff       ANSWERS TO INTERROGATORIES

Vs.

JAPAN AIRLINES INTERNATIONAL CO., LTD.

             Defendant

_____|


**INTERROGATORY NO. 1 :**    Name:  Pedro P. Agravante, Jr.
                               DOB:  October 5, 1946
                               SS: 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/ U.S. CITIZEN
                               Residential Address:
                               213 Calamendo Street
                               Liguan, Dededo Guam 96913

                               Mailing Address:
                               P.O. Box 22281
                               GMF, Guam 96921


**INTERROGATORY NO. 2 :**  1) TPO Guam, Inc.
                             P.O. Box 24628
                             GMF, Guam 96921
                            Nature of Business: Owner Avis Rent-a-Car
                            Job Title:  Vice President
                          Date of Employment:  August 24, 1990 to April 1991
                            Duties and Responsibilities:
                        1.  Responsible for research, planning and
                            Development
                      2.  Responsible for securing bank financing
                      3.  And adviser to the company's president
                          on fiscal matters.

                        2) Libra Taxi Services
                        P.O. Box 22281
                      GMF, Guam 96921
                      Nature of Business:Providing taxi and Limousines
                        transportation services

EXHIBIT "B"

Job Title: President and Business Owner (85%)
Date of Employment: Feb. 1992 to Sept. 1997
Duties and Responsibilities:
1. Hiring of taxicab operators
2. Coordinate functions of all managers at
   different
   Sites and location
3. Prepare Taxi Proposals to hotels and
   presentation
4. Secure financing from banks & other
   financial
   institutions
5. And responsible for business expansions.

3) Factor 5 Taxi Services
   Sherwood Hotel
   Tumon, Guam 96931
   Nature of Business: Taxi transportation services
   Job Title: Consultant
   Date of Employment: Jan. 1999 to Feb. 2000

4) Protocol Taxi Services
   Marriott Guam
   Tumon, Guam 96931
   Nature of Business: Taxi transportation services
   Job Title: Consultant
   Date of Employment: March 2000 to April 2001

5) KLS Co. LTD, Guam, USA
   Dba: Kyoto Limousines Services
   Hilton Guam Resort and Spa
   P.O. Box 7394
   Tamuning, Guam 96931
   Job Title: Vice President Local Affairs
   Date of Employment: June 2001 to October 2002
   KLS stopped to operate on this month due to
   Mr. Del Rosario and myself accidents on board
   Japan Airlines.


INTERROGATORY NO. 3 :  1. Corita B. Agravante, my wife.  2. Mariecor B.
Agravante, my daughter 3. Lani Del Rosario, wife of Mr. Del Rosario. 4. Dominador
C. Bruan , KLS Customer Traffic Control and Services Manager.


INTERROGATORY NO. 4 :   -Corita B. Agravante- ( wife)

P.O. Box 22281
GMF, Guam 96921
Tel. No. 646-8453/4537
Cell. No. 788-7291

-Mariecor B. Agravante- (daughter) –Off Island

-Lani Del Rosario (wife of Robert J. Del Rosario)
110 Calamendo Lane
Liguan, Dededo 96913
Work phone: 646-7076 SPE Tokyo Mart
Home phone: 637-8942

Dominador C. Bruan
182 Salisbury Street
Dededo, Guam 96912
Cell Phone: 787-7871
Home Phone: 637-5408

Capt. Antonio B. Tuano
139 N. Manzanita Court
Liguan Terrace, Dededo, Guam 96913
Work: Freedom Air, GAA
Tel: 472-8009

INTERROGATORY NO. 5 :    On July 20, 2002 at about 10:20 p.m. Narita, Japan time, Japan Airline Flight no. JO 981 bound for Guam was on the runway waiting for instructions from the tower. I was a passenger on this flight. I was talking to Mr. Del Rosario about the outcome of our meeting in Yokohama with our Japanese partners. The inside of the aircraft was so noisy because of the engine sound and passengers talking. I leaned about 1 foot forward to hear what Mr. Del Rosario's responses at the opposite side of the aisle seated at 1H. I was seated at 2G. Suddenly, there was rattling followed by shaking and scary banging sounds all over inside the aircraft. Then the aircraft moved fast-forward and took off. This sudden take-off, classified as "Static Take-off", to the air caused me to slam hard backwards to my seat giving me strong tingling sensations from my lower back climbing to my spinal cord, shoulders, neck and head like a whiplash. I felt numbness in those areas.


INTERROGATORY. 6 :  While the aircraft was still flying to reach its desired elevation, Mr. Del Rosario was about 3 feet away in the opposite side of the aisle. I tried to make a conversation with him in our own Language if he were okay.  I saw him pinned down by the 2nd and the 3rd carts. He responded: I guest so. He was complaining about pain, shortness of breathing, nervous and frighten and pain in his left foot. About 7 minutes later after the aircraft leveled off, 3 or more flight

attendants came out and took them about 15 minutes to clear the 3 metal food carts and provided first aid to Mr. Del Rosario and made a formal report about the incident. The flight attendants were very frightened and confused. I took the occasion of their presence and raised my hand, one lady flight attendant came, a skinny and shorter in stature. I asked her for JAL writing pad to write an Incident Report. She went and came back, asked me how many sheets. I said, 4 sheets and I added, this incident is a wrongful deed. I warned her, one (1) metal food card may be an accident, but 3 carts are already complete negligence and violations of safety to protect Japan Airlines paying passengers. She turned around and joined the others attending to Mr. Del Rosario's injury. I did not speak to her after that even to complain about the numbness in my back, neck, shoulder and a headache because I thought it was just minor. I did not have any visible bruises or noticeable broken bones.

INTERROGATORY. 7:

1. The unusual shaking of the aircraft
2. And the 3 metal food carts loosen from its holding panels.

INTERROGATORY 8. (Omitted)

INTERROGATORY 9. : My internal injuries in my neck, back (lower cervical spondylosis and disc space narrowing) and shoulder areas are caused by whiplash from JAL aircraft's sudden take-off or Static Take-off.

1. I did not have any lacerations or cuts;
2. Nor visible fractures or dislocation;
3. Nor bruises or visible injuries;
4. I had experienced slight numbness and pain that come and go in my right arm, shoulders, lower back and neck 24 hours after the injuries;
5. I had slight pain and little discomfort during the week following the injury, and
6. Pain and numbness in my right shoulder and pain and numbness in my right and left arms and neck areas and shaking of my right arm and numbness in my left and right legs are presently being experienced due to
   Disc space narrowing of C-5-6 and C-6-7 and encroachment into the neuroforamina bilaterally at C-5-6, and
   C-6-7, C-3-4 on the left.

INTERROGATORY 10. :

1. Mrs. Corita B. Agravante, my personal health provider and physical therapist for over 2 years massaging my right shoulder, right arms and neck area with alcohol and oil. Address: P.O. Box 22281, GMF, Guam 96921

2. Dr. Donald Preston, Internal Medicine, Guam Adult-Pediatric Clinic examined me on September 8, 2004 and he said, my neck movement is abnormal and my shoulder joints are abnormal and I needed x-ray and later MRI Scanning examination of the shoulders and neck areas. On August 2, 2005 I was given another referral for X-ray of my spinal cord. The pain and numbness are spreading to my right and left legs, fingers of both my left and right hands. The result of my X-ray came showing that there is narrowing of the disc spaces of C-5-6 and C-6-7 and encroachment into the neuroforamina bilaterally at C-5-6 and C-6-7, C-3-4 on the left. On August 5, 2005, he referred me for MRI Scanning of my C-spin to MRI Imaging Group Guam Memorial Hospital for further examination in Tamuning, His address is Guam Adult-Pediatric Clinic, 612 N. Marine Drive, Suite no. 8, Dededo, Guam 96929, Tel. No. (671) 633-4272.

3. Dr. Vicente Lizama, MD, Interpreting Radiologist, LMR X-Ray Pro, 241 Farenholt Avenue, Suite 107, Tamuning, Guam, 96911 (See attached X-Ray examination report)

4. Dr. Alix Chenet, MD, Internal Medicine, Guam Adult-Pediatric Clinic, referred me to LMR X-Ray Pro to have another X-ray for pain in my right shoulder and referred me on 8/16/05 further for MRI scanning on my right shoulder, Cervical Spine and Lumbar Spine. His address is 612 N. Marine Drive, Suite no. 8, Dededo, Guam 96929, /Tel. No. (671) 633-4272.

INTERROGATORY 11. : NO ONE'S ADVICE. My wife had been our family physical therapist. She had been massaging areas of my children and myself bodies every time we had any complaints for years. She is my physical therapist since the accident on July 20, 2002, massaging my arms, neck and shoulders with rubbing alcohol and oil. Besides that, I trusted by wife more than any therapist available around.

I CHOOSE Dr. Donald Preston, MD, Internal Medicine because of walking distance of his office from our house in Dededo and I walked -in into his office on September 8, 2004 at Guam Adult-Pediatric Clinic, because of continuing and disturbing pains in my arms, neck and shoulder areas and the unusual shaking of my arms since the accident on July 20, 2002 on board Japan Airlines JO 981.

I CHOOSE Dr. Alix Chenet, MD, Internal Medicine because he works with Dr. Donald Preston at Guam Adult-Pediatric Clinic, in Dededo, Guam. He referred me further MRI scanning of right shoulder, Cervical Spine and Lumbar Spine.

I CHOOSE Dr. Vincent Lizama, M.D. as Interpreting Radiologist of LMR, X-ray Pro, he was referred to me by Dr. Donald Preston.

INTERROGATORY 12. : NO.

INTERROGATORY 13. : NO, I have not yet fully recovered. Dr. Donald Preston said, I still need further physical examinations. My neck movement is abnormal, and my shoulder movements are abnormal. That MRI scanning for narrowing of disc spaces of C-5-6 and C-6-7 is needed for further observations.

Dr. Alix Chenet has also referred me for another X-ray for probable tear in my shoulder and wrote a referral to Dr. Steven Hayashida a visiting Neurosurgeon from Hawaii to read and further observation of narrowing of disc spaces of C-5-6 and C-6-7, and encroachment into the neuforamina bilaterally at C-5-6, C-6-7 and C-3-4. He referred me to have MRI Scanning of my right shoulder, Cervical Spine and Lumbar Spine for further observations.

Dr. Vicente Lizama, Interpreting Radiologist, address LMR X-ray Pro, Tamuning, Guam 96911.


INTERROGATORY 14. : Dr. Donald Preston, Internal Medicine, Guam Adult-Pediatric Clinic, 612 N. Marine Drive, Suite no. 8, Dededo, Guam 96929, Telephone no. (671) 633-4272.

Dr. Alix Chenet, MD, Internal Medicine, Guam Adult-Pediatric Clinic, 612 N. Marine Drive, Suite no. 8, Dededo, Guam 96929, Telephone no. (671) 633-4272.

Dr. Vicente Lazama, Interpreting Radiologist, address LMR X-ray Pro, Tamuning, Guam 96911, Tel: 647-9776.


INTERROGATORY 15. :

The amount of income I have lost because of the injuries is about $120,000. This represents the salaries and wages that I have lost from KLS Co. Ltd., Guam USA for 23 months and 10 days.

INTERROGATORY 16. : My injury in the areas of my Cervical Spine and Lumbar Spine are causing numbness and pain in my back, shoulders, neck and arms and cause my hands and legs to shake. I have to continuously walk distances daily to maintain blood circulation. With this condition, I do not think I can hold a stable job.

INTERROGATORY 17. : See filed Income Tax Returns on file from: 2001, 2002, 2003, to 2004

INTERROGATORY 18. : No, I did not receive payments from any source whatsoever.

INTERROGATORY 19. : I do not have medical insurance. I personally pay my medical bills in the amount of $2,000.00. There is a possibility I will have surgery of my right shoulder, and further neurological examinations to check my spinal cord with a Specialist will cost me another $28,000.00. A total amount of $30,000.00.

INTERROGATORY 20. :   $150,000 for loss of Consortium
                       120,000 for loss of wages
                        30,000 for medical expenses
                       150,000 for special items damages and general damage
                      _____
                      $450,000 TOTAL

INTERROGATORY 21. : The daily physical activities that I have enjoy very much for so many years have been restricted and/or curtailed due to my injuries, are as follows:
   1. Jogging daily at Sta. Barbara Church Circle for 2 hours and at Barrigada Heights Hill.
   2. Help clean the house, cook and wash dishes because of the pain and numbness in my neck, shoulders and arms and legs.

INTERROGATORY 22. (Omitted)

INTERROGATORY 23. :

Loss of Consortium is about the whole meaning of your relationship with your wife. For us, it is love, being together and enjoying our very special moments like our sexual relationship that have been curtailed since the accident on board Japan Airlines on July 20, 2002.

Details:
   1. I cannot get total erection when I am on top because of the pain in my arms, neck, lower back and shoulders. I cannot use my arms to control my weight and my wife is complaining because she could not breath.
   2. Instead, we experimented many comfortable positions, like me in the bottom and her on top. But, I am the one who is feeling uncomfortable. Again, I could not get total erection because of the pain.
   3. Lately, because of experimenting, she gets lesion in her vaginal tract because of me trying to achieve the enjoyment I usual have every time we had sex. Instead of my wife enjoying sex, she detest it because of pain she is experiencing also.
   4. I also became frustrated because I hear my wife complaining and I recognizing my limitations.
   5. I am afraid, because of this usual activity my wife and I are engaging to satisfy our sexual needs, she might lost the respect and interest in me.

6. And all of these frustrations she is experiencing and going through were due to my physical injuries.

These intimate moments of our lives we lost are so dear to us. We believe is worth $150,000. It is about restrictions, loss of freedom, lost of affection and loss of enjoyment in life.

INTERROGATORY 24. : I have not sought any professional counseling for loss of consortium in the previous months because we are trying to correct our predicament in our own way. My wife is suffering because of me. It is about my body not responding to her needs because it was injured. Therefore, have given her unhappiness and frustrations.

INTERROGATORY 25. : The following are the legal action cases I got involve with:

### IN THE DISTRICT COURT OF GUAM

1. Pedro P. Agravante, Jr. vs. Japan Airlines International Co. Ltd. Civil Case no. CIV04-00036

### IN THE SUPERIOR COURT OF GUAM

1. Ionian Corporation dba Ionian Rent-a-Car vs. Pedro Agravante, Jr. SD. 120804

2. Cars Unlimited vs. Pedro P. Agravante, Jr. SD. 599-04

3. Guam Power Authority vs. Pedro P. Agravante SD. 184804

4. DKY CRUZ INC. vs. Pedro P. Agravante, Jr. CV0762-04

DATED: Hagatna, Guam, _____,_____, 2005

Plaintiffs :

_____
Pedro P. Agravante, Jr.

_____
Corita B. Agravante

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Defendant
Japan Airlines International Co., Ltd.

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| PEDRO P. AGRAVANTE, JR. and CORITA B. AGRAVANTE,<br><br>Plaintiffs,<br><br>vs.<br><br>JAPAN AIRLINES INTERNATIONAL CO., INC.,<br><br>Defendant. | CIVIL CASE NO. CIV04-00036<br><br>**DECLARATION OF HIDEO MASUHARA** |

I, HIDEO MASUHARA, declare under penalty of perjury that the following statements are true and correct:

      1.    I have personal knowledge of the facts stated in this declaration except as otherwise indicated.

      2.    I would testify competently as to these facts if called by the Court.

      3.    I am a captain for Japan Airlines and have been a commercial pilot for 28 years.

EXHIBIT "C"

4.     I was the captain on JALWAYS Flight No. 981 from Narita, Japan, to Guam on July 20, 2002, a Boeing 767 aircraft. I have approximately 5920 flight hours in this type of aircraft.

5.     The Boeing 767 I piloted on the Narita-Guam route was designed to do standing takeoff which involves taxiing to the take-off location, setting the aircraft's brakes, running up the engines to a pre-determined power setting (70%N1), and then releasing the brakes. On July 20, 2002, JALWAYS Flight No. 981 conducted a standing takeoff from one of Narita's two main runways. The mechanics of standing takeoffs are that once the brakes are released, the aircraft's take-off roll and commencement of flight are controlled by aircraft computer systems installed by the manufacturer, as opposed to manually by the cockpit crew.

6.     There was nothing unusual or unexpected about the standing takeoff of the aircraft on July 20, 2002, during Flight No. 981.

7.     Standing takeoffs are routine in the aviation industry. Standing takeoffs are usual, normal, and expected operations of the aircraft.

## DECLARATION UNDER 28 U.S.C. Section 1746

I, Hideo Masuhara, do hereby affirm under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge.

Dated: Apr 20, 2007.  /s/ _Hideo Masuhara_

2

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Defendant
Japan Airlines International Co., Ltd.

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| PEDRO P. AGRAVANTE, JR. and CORITA B. AGRAVANTE,<br><br>Plaintiffs,<br><br>vs.<br><br>JAPAN AIRLINES INTERNATIONAL CO., INC.,<br><br>Defendant. | CIVIL CASE NO. CIV04-00036<br><br>**DECLARATION OF NAOMI NAKAHARA** |

I, Naomi Nakahara, declare under penalty of perjury that the following statements are true and correct:

1.     I have personal knowledge of the facts stated in this declaration except as otherwise indicated.

2.     I would testify competently as to these facts if called by the Court.

3.     I am employed in the Department of Legal Affairs for Japan Airlines International Co., Ltd. and have been so employed since August 2004. My responsibilities include responding to incidents on board JAL flights which involve passengers and possible legal problems for JAL.

**EXHIBIT "D"**

4.    Besides the Complaint filed with the Guam District Court of Guam by Pedro Agravante, JAL's Department of Legal Affairs has not received any informal or formal complaints from any other passengers onboard JALWAYS Flight No. 981 from Narita, Japan, to Guam on July 20, 2002, with respect to the aircraft's standing takeoff on that particular flight.

### DECLARATION UNDER 28 U.S.C. Section 1746

I, Naomi Nakahara, do hereby affirm under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge.

Dated: _April 20, 2007.   /s/ _*Naomi Nakahara*_
                               NAOMI NAKAHARA

2.

Exhibit 1

INCIDENT REPORT

Flight no. JO 981

Bound from Narita to Guam

Time of incident: About 10:20 p.m.

Day/Date: 7/20/02, Saturday

21 JUL '02

GUAM

N: C&
710

   The plane was on standbye waiting for the control
tower for a "GO" signal.  The plane suddenly jolted and
went fast forward, and at the same time a big banging scary
sound can be heard coming from the front of the airplane
where food were prepared, then 3 large metal food handling
trays rolled out, dislodged from its holding panels running
out onto the passengers seats, hitting or striking seat nos.
1 G and 1 H, damaging the right side of seat no. 1 G and
hitting the left foot of one (1) passenger, Mr. Robert J.
Del Rosario who was seating in 1 H.

   It took 5 minute for 3 attendants to take out the 3
trays from the alley.

Result:

   1.  Passenger Robert J. Del Rosario suffered fractured
left foot, complaining about pain, shortness of breathing, nervous &
frighten by the incident.

   2.  Gross negligence on the part of the airline
attendants for not properly securing the 3 large metal
food handling trays.

WITNESSES:

Pedro P. Agravante, Jr.
A passenger, Flight no. JO 981
A companion of Robert J. Del Rosario during the flight
Seat no. 2 G, 3 feet away from the incident

Susum Nito
Japanese resident
Passenger seat no. 1 G

**EXHIBIT "E"**

# LMR, X-Ray Pro

647-XPRO (9776)
241 Farenholt Avenue, Suite 107  Tamuning, Guam 96911

X-Ray No: 21152

Patient Name:  AGRAVANTE, PEDRO            D.O.B.:  10/5/46

Examination:  C-SPINE, 4VS.                Date:  8/2/05

Relevant Diagnosis:  PAIN

Requesting Physician:  DR. PRESTON

**Findings:**

AP, lateral and oblique views of the cervical spine were obtained.  There is mild straightening of the normal lordotic curvature at the lower cervical spine.  The vertebral bodies are normal in height.  Small marginal osteophytes are noted at C-5,6 and 7.  There is mild narrowing of the disc spaces of C-5-6 and C-6-7.  There is moderate encroachment into the neuroforamina bilaterally at C-5-6 and C-6-7 and to a lesser degree at C-3-4 on the left.

**Impression:**

Mild to moderate lower cervical spondylosis with disc space narrowing as described above.

Interpreting Radiologist:


_____           _____
D. MICHAEL MUDD, M.D.                    VINCENT LIZAMA, M.D.
                                         VLjb 8/2/05

EXHIBIT "F"

# Guam Adult-Pediatric Clinic

612 N. Marine Drive, Suite #8, Dededo, Guam 96929
Phone: 671-633-GAPC (4272)

## Imaging Lab Request Form

☐ Don Preston, MD – *Internal Medicine*
☐ Alix Chenet, MD – *Internal Medicine*
☐ Antonio Apellanes, MD – *Pediatrics*
☐ Marina Apellanes, MD – *Pediatrics*

Patient: Pedro Agravante

Address:

DOB:

Age:

SSN:

Tel:

Sex: [ ✓ ] Male  [ ] Female *(date of Last Menstrual Period)*

Patient Signature:

Referring Physician / Facility: Chenet

**RELEVANT HISTORY**

Neck pain
lumbar pa
Rt Shoulder pain

TYPE of EXAM:

Cervical Spine Series
Lumbar Sacral Spine
Rt Shoulder MRI

| | |
|---|---|
| MRI | $1,234.78 |
| MRI | $1,251.94 |
| | $1,189.07 |
| | $3,675.79 |

Physician's Signature

Date 6/16/05

# Steven F. Hayashida, M.D.

Neurological Surgery
1329 Lusitana Street, Suite 702
Honolulu, Hawaii 96813
808-536-0630
fax 808-536-0251

## Chart Note

| | |
|---|---|
| Name | Del Rosario, Robert, 48 |
| | 110 Calamendo Loop, Liguan Terraces |
| | Dededo, GU |
| | 637-8942 |
| | 646-7076 |

| | |
|---|---|
| Physician | Gregory Miller |
| Insurance | Staywell |

| | |
|---|---|
| ICDM | |
| Birthdate | 02-06-1956     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 |
| Studies | MRI 11-21-2003 herniated disc L4-L5 |
| Injury | 07-20-2002 |

01-21-2004     Office visit Guam—Mr. Del Rosario was seen in the office at his request for evaluation of lower back pain. He was injured while flying on Japan Airlines. He had to hold the weight of 3 loaded food carts during take off. He began feeling lower back pain. He was studied with a lumbar x-ray on 09-16-2002. He has been having treatment for one year with some improvement. He had a lumbar MRI at St. Luke's Medical Center, that showed a disc herniation at L4-L5 and a filum terminale lipoma.

| | |
|---|---|
| Medications | |
| 01-21-2004 | Percocet for his right knee, colchicines, indocin |

| | |
|---|---|
| Allergy | none. |

| | |
|---|---|
| Medical | gout |
| Surgery | left foot and right knee |
| Transfusion | none |

# GUAM ADULT-PEDIATRIC CLINIC
## 612 N. Marine Drive, Suite #8, Dededo, Guam
### Phone: 671-633-GAPC (4272)/Fax: 671-633-2FAX (2329)

| APPT. TIME | | WALK IN | DATE | | | CHECK IN TIME: |
|---|---|---|---|---|---|---|
| PATIENT'S LAST NAME | | FIRST | | BIRTHDATE | | SEX |
| | | | | | | ( ) MALE  ( ) FEMALE |
| PATIENT'S MEDI-CAL/SEC # | | MAILING ADDRESS | | | | HOME NUMBER |
| RELATIONSHIP TO SUBSCRIBER | | PT EMPLOYER | | | | WORK NUMBER |
| PRIMARY INSURANCE | | INSURANCE ID NO. | | EFF. DATE | | CO-PAY |
| SECONDARY INSURANCE | | INSURANCE ID NO. | | EFF. DATE | | CO-PAY |

I authorize the release of my medical information/records for services rendered by Guam Adult-Pediatric Clinic including physician's services and supplies to my insurance carrier for payment rendered benefits. I am responsible for co-payments, deductibles and other charges not covered by my insurance. I am aware that Guam Adult-Pediatric Clinic may refer any unpaid charges and related fees therefrom to a collection agency to pursue payment.

PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE: _____ Date: _____

| DESCRIPTION | CODE | CODE | FEE | DESCRIPTION | CODE | FEE | DESCRIPTION | CODE | FEE |
|---|---|---|---|---|---|---|---|---|---|
| **OFFICE VISITS** | NEW | EST | | Irregular periods | 626.4 | | Lidocaine 1% | J2000 | |
| Problem focused, minor | 99201 | 99211 | | Lumbago | 724.2 | | Phenergan 50 mg. | J2550 | |
| Expanded prob. foc. minor | 99202 | 99212 | | Lupus, systemic | 710.0 | | Benadryl 50 mg. | J1200 | |
| Detailed, low complex. | 99203 | 99213 | | Menopause assoc. symptoms | 627.2 | | Rocephin 250 mg. | J0696 | |
| Comprehensive, mod. comp. | 99204 | 99214 | | Menstrual disorder | 626.9 | | Solumedrol 125 mg. | J2930 | |
| Comprehensive, high comp. | 99205 | 99215 | | Migraine, unspecified | 346.90 | | Kenalog ___ mg. | J3301 | |
| **PREVENTIVE CARE EXAMS** | | | | Mitral valve disorder | 424.0 | | Bicillin 1.2 LA | J0570 | |
| Adoles (12-17 Yrs.) Exam | 99384 | 99394 | | Murmur, heart | 785.2 | | Bicillin 1.2 CR | J0540 | |
| Adult (18-39 Yrs.) Exam | 99385 | 99395 | | Nasopharyngitis, acute | 460 | | Depo Provera 150 mg. | J1055 | |
| Adult (40-64 Yrs.) Exam | 99386 | 99396 | | Obesity, unspecified | 278.00 | | Toradol 15 mg. | J1885 | |
| Adult (65+) Exam | 99387 | 99397 | | Otitis media | 382.9 | | I & D Abscess simple | 10060 | |
| **OTHER PROCEDURES** | | | | Palpitations | 785.1 | | I & D of cyst | 10040 | |
| | | | | Panic attack | 300.01 | | Rep lac excl face 2.5 cm/less | 12001 | |
| **DIAGNOSIS** | ICD-9 | | | PAT | 427.0 | | Rep lac excl face 2.6-7.5 cm | 12002 | |
| Abdominal pain, loc. | 789. | | | Peptic ulcer disease | 533.90 | | Repair lac. 2.5 cm/less (face) | 12011 | |
| Abscess | 682. | | | Pharyngitis/Strep | 462/034.0 | | Repair lac 2.6 - 5 cm (face) | 12013 | |
| Allergic reaction | 995.3 | | | Pneumonia | 486 | | Exc lesion-5cm or less | 11400 | |
| Allergic rhinitis | 477.9 | | | Prostate Cancer | 185 | | Exc lesion-5cm or less | 11401 | |
| Asthma / exac | 493.9 | | | Psoriasis,except arthropathic | 696.1 | | Exc lesion 1.1 cm-2 | 11402 | |
| Atrial fibrillation | 427.31 | | | Pyelonephritis, NOS | 590.80 | | Skin tags removal | 11200 | |
| Breast mass/lump | 611.72 | | | Rash of skin, unspecified | 782.1 | | Therapeutic injection | 90782 | |
| Bronchitis, acute/chronic | 466.0 | 491.9 | | Renal failure, acute/chronic | 584.9/585 | | IM injection of antibiotic | 90788 | |
| Chest pain, unspecified | 786.50 | | | Rheumatoid arthritis | 714.0 | | Arthrocentesis/injection steroid | 20610 | |
| CAD | 414.01 | | | Rheumatic heart disease | 398.90 | | EKG | 93000 | |
| Cancer, Breast | 174.9 | | | Seizure disorder | 780.39 | | Rhythm Strip | 93040 | |
| Cancer, Prostate | 185 | | | Shortness of breath | 786.05 | | Stress test | 93015 | |
| Cardiomyopathy | 425.4 | | | Sinusitis, acute/chronic | 461.9 | 473.9 | O2/Breathing therapy | A4618 | |
| CHF | 428.0 | | | Syndrome, Carpa Tunnel | 354.0 | | Spirometry | 94010 | |
| Contraceptive management | V25.09 | | | Syndrome, Rotator cuff NOS | 726.10 | | Nebulizer | 94664 | |
| CCPD | 496 | | | Tendinitis, NOS | 726.90 | | Nebulizer, Subsequent | 94665 | |
| CVA | 436 | | | Thyroid nodule | 241.0 | | Pulse oximetry | 94760 | |
| Dermatitis, unspecified | 692.9 | | | Urticaria, unspecified | 708.9 | | Hearing test | 92551 | |
| Diabetes Mellitus/NIDDM | 250.00 | | | URI | 465.9 | | Removal of cerumen | 69210 | |
| NIDDM UnControlled | 250.02 | | | UTI | 599.0 | | Infusion therapy | 90780 | |
| IDDM Uncontrolled | 250.03 | | | Vaginitis/vulvovaginitis | 616.10 | | Therapeutic/diagnostic | 90784 | |
| Dizziness/Vertigo | 780.4 | | | | | | **LABORATORY** | | |
| Gastroenteritis, acute | 558.9 | | | **IMMUNIZATIONS** | | | Occult blood | 82270 | |
| GERD | 530.11 | | | Hep Vac B (Adult) | 90746 | | Urine pregnancy test | 81025 | |
| Heart Murmur, NOS | 785.2 | | | MMR | 90707 | | Urinalysis, dipstick | 81002 | |
| HTN (Ben., Mal., Unspe.) | 401. | | | TD (adult) | 90718 | | Blood sugar (accucheck) | 82962 | |
| Hypercholesterolemia | 272.0 | | | Pneumovax | 90732 | | **SUPPLIES** | | |
| Hypertriglyceridemia, pure | 272.1 | | | Influenza | 90657/8/9 | | Vaginal supplies/PAP | Q0091 | |
| Hyperlipidemia | 272.2 | | | PPD | 86580 | | Preparation kit IV | A4914 | |

Diagnosis

1. _____

2. _____   723.1   ICD-9 Codes

3. _____

4. _____

| | CODE | FEE |
|---|---|---|
| NSS 500 ml solution | J7040 | |
| Gauze dressing | A6216 | |
| Other supplies | 99070 | |
| TOTAL FEE | | |
| PLUS 2% GOVT SURCHARGE | | |
| Pt. CO-PAYMENT | | |
| PT. CO-PAYMENT BALANCE | | |
| TOTAL DUE FROM PATIENT | | |

PHYSICIAN'S OR AUTH PERSON'S SIGNATURE _____   NEXT APPT. DATE _____   TIME _____   RECEIPT

# GUAM ADULT PEDIATRIC CLINIC
## 612 N. Marine Drive, Suite #8, Dedado, Guam
## Phone: 671-633-GAPC (1272)/Fax: 671-633-2FAX (2329)

No. 03016

| ☐ APPT. /TIME | ☐ WALK IN | DATE: | CHECK IN TIME: |
|---|---|---|---|

| PATIENT'S LAST NAME | FIRST | M.I. | BIRTH DATE | SEX ( ) MALE ( ) FEMALE |
|---|---|---|---|---|
| PATIENT'S SOC. SEC. # | MAILING ADDRESS | | HOME NUMBER | |
| RELATION TO SUBSCRIBER | PT EMPLOYER | | WORK NUMBER | |
| PRIMARY INSURANCE | INSURANCE ID NO. | EFF. DATE | CO-PAY | |
| SECONDARY INSURANCE | INSURANCE ID NO. | EFF. DATE | CO-PAY | |

I authorize the release of my medical information/records for services rendered by Guam Adult-Pediatric Clinic including physician's services and supplies to my insurance carrier for payment medical benefits. I am responsible for co-payments, deductibles and other charges not paid for by my insurance. I am aware that Guam Adult-Pediatric Clinic may refer any unpaid charges and related fees therefrom to a collection agency to pursue payment.

PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE: _____  Date: _____

| DESCRIPTION | CODE | CODE | FEE | DESCRIPTION | CODE | FEE | DESCRIPTION | CODE | FEE |
|---|---|---|---|---|---|---|---|---|---|
| OFFICE VISITS | NEW | EST | | Irregular periods | 626.4 | | Lidocaine 1% | J2000 | |
| Problem focused, minor | 99201 | 99211 | | Lumbago | 724.2 | | Phenergan 50 mg | J2550 | |
| Expanded prob. foc. minor | 99202 | 99212 | | Lupus, systemic | 710.0 | | Benadryl 50 mg. | J1200 | |
| Detailed, low complex | 99203 | 99213 | | Menopause assoc. symptoms | 627.2 | | Rocephin 250 mg. | J0696 | |
| Comprehensive, mod. comp | 99204 | 99214 | | Menstrual disorder | 626.9 | | Solumedrol 125 mg. | J2930 | |
| Comprehensive, high comp. | 99205 | 99215 | | Migraine, unspecified | 346.90 | | Kenalog _____ mg. | J3301 | |
| PREVENTIVE CARE EXAMS | | | | Mitral valve disorder | 424.0 | | Bicillin 1.2 LA | J0570 | |
| Adoles (12-17 Yrs.) Exam | 99384 | 99394 | | Murmur, heart | 785.2 | | Bicillin 1.2 CR | J0540 | |
| Adult (18-39 Yrs.) Exam | 99385 | 99395 | | Nasopharyngitis, acute | 460 | | Depo Provera 150 mg. | J1055 | |
| Adult (40-64 Yrs.) Exam | 99386 | 99396 | | Obesity, unspecified | 278.00 | | Toradol 15 mg. | J1885 | |
| Adult (65+) Exam | 99387 | 99397 | | Otitis media | 382.9 | | I & D Abscess simple | 10060 | |
| OTHER PROCEDURES | | | | Palpitations | 785.1 | | I & D of cyst | 10040 | |
| | | | | Panic attack | 300.01 | | Rep lac excl face 2.5 cm/less | 12001 | |
| DIAGNOSIS | ICD-9 | | | PAT | 427.0 | | Rep lac excl face 2.6-7.5 cm | 12002 | |
| Abdominal pain, loc. | 789.___ | | | Peptic ulcer disease | 533.90 | | Repair lac. 2.5 cm/less (face) | 12012 | |
| Abscess | 682.___ | | | Pharyngitis/Strep | 462/034.0 | | Repair lac 2.6 - 5 cm (face) | 12013 | |
| Allergic reaction | 995.3 | | | Pneumonia | 486 | | Exc lesion-5cm or less | 11400 | |
| Allergic rhinitis | 477.9 | | | Prostate Cancer | 185 | | Exc lesion-5cm or less | 11401 | |
| Asthma / exac | 493.9 | | | Psoriasis,except arthropathic | 696.1 | | Exc lesion 1.1 cm-2 | 11402 | |
| Atrial fibrilation | 427.31 | | | Pyelonephritis, NOS | 590.80 | | Skin tags removal | 11200 | |
| Breast mass/lump | 611.72 | | | Rash of skin, unspecified | 782.1 | | Therapeutic injection | 90782 | |
| Bronchitis, acute/chronic | 466.0 | 491.9 | | Renal failure, acute/chronic | 584.9/585 | | IM injection of antibiotic | 90788 | |
| Chest pain, unspecified | 786.50 | | | Rheumatoid arthritis | 714.0 | | Arthrocentesis/injection steroid | 20610 | |
| CAD | 414.01 | | | Rheumatic heart disease | 398.90 | | EKG | 93000 | |
| Cancer, Breast | 174.9 | | | Seizure disorder | 780.39 | | Rhythm Strip | 93040 | |
| Cancer, Prostate | 185 | | | Shortness of breath | 786.05 | | Stress test | 93015 | |
| Cardiomyopathy | 425.4 | | | Sinusitis, acute/chronic | 461.9 | 473.9 | O2/Breathing therapy | A4618 | |
| CHF | 428.0 | | | Syndrome, Carpa Tunnel | 354.0 | | Spirometry | 94010 | |
| Contraceptive management | V25.09 | | | Syndrome, Rotator cuff NOS | 726.10 | | Nebulizer | 94664 | |
| COPD | 496 | | | Tendinitis, NOS | 726.90 | | Nebulizer, Subsequent | 94665 | |
| CVA | 436 | | | Thyroid nodule | 241.0 | | Pulse oximetry | 94760 | |
| Dermatitis, unspecified | 692.9 | | | Urticaria, unspecified | 708.9 | | Hearing test | 92551 | |
| Diabetes Mellitus/NIDDM | 250.00 | | | URI | 465.9 | | Removal of cerumen | 69210 | |
| NIDDM UnControlled | 250.02 | | | UTI | 599.0 | | Infusion therapy | 90780 | |
| IDDM Uncontrolled | 250.03 | | | Vaginitis/vulvovaginitis | 616.10 | | Therapeutic/diagnostic | 90784 | |
| Dizziness/Vertigo | 780.4 | | | | | | LABORATORY | | |
| Gastroenteritis, acute | 558.9 | | | IMMUNIZATIONS | | | Occult blood | 82270 | |
| GERD | 530.11 | | | Hep Vac B (Adult) | 90746 | | Urine pregnancy test | 81025 | |
| Heart Murmur, NOS | 785.2 | | | MMR | 90707 | | Urinalysis, dipstick | 81002 | |
| HTN (Ben., Mal., Unspe.) | 401.___ | | | TD (adult) | 90718 | | Blood sugar (accucheck) | 82962 | |
| Hypercholesterolemia | 272.0 | | | Pneumovax | 90732 | | SUPPLIES | | |
| Hypertriglyceridemia, pure | 272.1 | | | Influenza | 90657/8/9 | | Vaginal supplies/PAP | Q0091 | |
| Hyperlipidemia | 272.2 | | | PPD | 86580 | | Preparation kit IV | A4914 | |
| | | | | | | | NSS 500 ml solution | J7040 | |
| | | | | | | | Gauze dressing | A6216 | |
| | | | | | | | Other supplies | 99070 | |
| | | | | | | | TOTAL FEE | | |

Diagnosis

1. _____
2. _____
3. _____
4. _____

ICD-9 Codes _____

| PLUS 2% GOV'T SURCHARGE | |
|---|---|
| Pt CO-PAYMENT | |
| PT. CO-PAYMENT BALANCE | |
| TOTAL DUE FROM PATIENT | |
| RECEIPT NO. | |

PHYSICIAN'S OR AUTH PERSON'S SIGNATURE: _____  NEXT APPT. DATE: _____  TIME: _____  MD. _____

# X-Ray Pro

Sun Building, 241 Farenholt Avenue, Suite 107
Tamuning, Guam 96911 • Tel (671) 647-XPRO (9776)

X-RAY NO. 21132 14307 

☐ PACIFICARE ☐ STWL. BRONZE ☐ CALVO ☐ NANBO ☐ MULTICOVER ☐ FHP ☐ MEDICARE ☑ SELF-PAY

**PATIENT INFORMATION**

PATIENT LAST NAME: AGRAVANTE  FIRST: Pedru  INITIAL: P  INS'D. DOB: 10-5-46  TODAY'S DATE: 8-2-05

MAILING ADDRESS: P.O. Box 22271  CITY: Guam  INSURED'S NAME:  RELATIONSHIP TO PATIENT:

HOME ADDRESS: ___ CITY: Guam  ZIP: 96921  INSURANCE CARRIER: S/P

SEX: ☐ FEMALE ☒ MALE  EMPLOYER: SELF  INSURANCE ID NUMBER:

TELEPHONE NO. cell ___-4537  wk 646-845?  SOCIAL SECURITY NO. 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  OTHER HEALTH COVERAGE? ( ) NO ( ) YES  IDENTIFY

RM 788-7291

**ASSIGNMENT & RELEASE:**
I request that payment of authorized benefits the made either to me or on my behalf for any services furnished by me or in X-RAY PRO including Physician services. I authorize any holder or medical or other information about me to release to my insurance carrier or its agents any information needed to determine these benefits or benefits for related services. I am financially responsible for all co-payments, deductibles and services not covered by my insurance.

SIGNATURE X _____

| ✓ | DESCRIPTION | CODE | DX-LINK | FEE | ✓ | DESCRIPTION | CODE | DX-LINK | FEE | ✓ | DESCRIPTION | CODE | DX-LINK | FEE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1.** | **HEAD AND NECK** | | | | | Pelvis, 3 views | 72190 | | | | Foot, Complete | 73630 | | |
| | Foreign Body Eye | 70030 | | | | | 72200 | | | | Calcaneous | 73650 | | |
| | Mandible, 4 views | 70100* | | | | | 72202 | | | | Toe(s) | 73660 | | |
| | Mandible, Complete | 70110 | | | | Sacrum/Coccyx | 72220 | | | **5.** | **CHEST** | | | |
| | Mastoids, 3 views | 70120* | | | **3.** | **UPPER EXTREMITIES** | | RT./LT. | | | Chest, 1 view | 71010 | | |
| | Mastoids, Complete | 70130 | | | | Clavicle | 73000 | | | | Chest, 2 views | 71020 | | |
| | Int. Auditory Meati | 70134 | | | | Scapula | 73010 | | | | Chest w/ apical Lordotic | 71021 | | |
| | Facial Bones, 3 views | 70140* | | | | Shoulder, 1 view | 73020 | | | | Chest, 3 views | 71022 | | |
| | Facial Bones, Complete | 70150 | | | | Shoulder, Complete | 73030 | | | | Chest, 4 views | 71030 | | |
| | Nasal Bones, Min 3 views | 70160 | | | | Acromioclavicular | 73050 | | | | Chest, Special (w/ decubit) Views | 71035 | | |
| | Optic Foramina | 70190 | | | | Humerus | 73060 | | | | Ribs, Unilateral, 2 views | 71100* | | |
| | Orbits | 70200 | | | | Elbow, 2 views | 73070 | | | | Ribs, 3 views | 71101 | | |
| | Sinuses, 3 views | 70210* | | | | Elbow, 3 views | 73080* | | | | Ribs, Bilateral, 3 views | 71110* | | |
| | Sinuses, Complete | 70220 | | | | Forearm | 73090 | | | | Ribs, 4 views | 71111 | | |
| | Sella Turcica | 70240 | | | | Upper Extremity, Infant | 73092* | | | | Sternum, 2 views | 71120* | | |
| | Skull, Limited | 70250 | | | | Wrist | 73100 | | | | Sternoclavicular, 3 views | 71130* | | |
| | Skull, Complete | 70260 | | | | Wrist, Complete | 73110 | | | **6.** | **ABDOMEN** | | | |
| | TMJ Joints | 70330 | | | | Hand, 2 views | 73120 | | | | Abdomen, 1 view | 74000* | | |
| | Neck Soft Tissue | 70360 | | | | Hand, 3 views | 73130* | | | | Abdomen, 2 views | 74010* | | |
| **2.** | **SPINE AND PELVIS** | | | | | Finger | 73140 | | | | Abdomen, Complete (includes /scout, erect | 74020* | | |
| | Spine Entire Survey, views | 72010 | | | **4.** | **LOWER EXTREMITIES** | | RT./LT. | | | Abdomen, 3 views w/ PA Chest | 74022 | | |
| | Spine, Single View (specify level) | 72020 | | | | Hip, 1 view | 73500 | | | **7.** | **SPECIAL PROCEDURES** | | | |
| | Cervical Spine, 2 views | 72040 | | | | Hip, 2 views | 73510 | | | | Intravenous Pyegram, IVP | 74400 | | |
| ✓ | Cervical Spine, min, 4 views | 72050 | | | | Hips, Bilateral | 73520 | | | | Cholestyrogram, OCG | 74290 | | |
| | Cervical Spine, flex/ext/obs | 72052 | | | | Pelvis & Hips, Infant | 73540 | | | | Nose to Rectum, AP for foreign body (child) | 76010 | | |
| | Spine, Scoliosis, 1 view | 72069 | | | | Femur | 73550 | | | | Bone age studies | 76020 | | |
| | Thoracic Spine, 2 views | 72070 | | | | Knee, 2 views | 73560 | | | | Bone length studies | 76040 | | |
| | Thoracic Spine, w/Swimmers | 72072 | | | | Knee, 3 views | 73562 | | | | Osseous survey, Infant | 76065 | | |
| | Thoracic Spine, min 4 views | 72074* | | | | Knee, Complete | 73564 | | | | JT Survey, single view | 76065* | | |
| | Thoracolumbar Spine | 72080 | | | | Standing Knees | 73565 | | | | Radiologist reading (Consultation on X-ray made elsewhere) | 76140 | | |
| | Spine, Scoliosis, Complete | 72090* | | | | Tibia / Fibula | 73590 | | | | | | | |
| | Lumbosacral Spine, 2 views | 72100 | | | | Lower Extremity, Infant | 73592* | | | **8.** | **WRITE IN** | | | |
| | Lumbosacral Spine complete w/ oblique views | 72110* | | | | Ankle, 2 views | 73600 | | | | Pd CASH | | | |
| | Lumbosacral Spine complete w/ bending views | 72114* | | | | Ankle, 3 views | 73610* | | | | 130.00 | | | |
| | Lumbosacral Spine (bending views only) | 72120 | | | | Foot, 2 views | 73620 | | | | | | | |
| | Pelvis, AP | 72170* | | | | | | | | | | | | |

DIAGNOSIS: Pain

I CERTIFY THAT I AM NOT PREGNANT.

CONDITION RELATED TO
( ) ILLNESS ( ) ACCIDENT ( ) PREGNANCY ( ) OTHER

LMP _____  SIGNATURE _____

HOW DID INJURY OCCUR: _____

TECHNICIAN SIGNATURE:

DATE:

## INSTRUCTION TO PATIENT

1. COMPLETE UPPER PORTION OF THIS FORM.
2. SIGN AND DATE - GIVE TO RECEPTIONIST.
3. UPON COMPLETION OF VISIT, GIVE FORM TO CASHIER AND MAKE PAYMENT AT THE TIME. WE WILL PROCESS IT AND BILL YOUR INSURANCE CARRIER.

| | |
|---|---|
| TOTAL TODAY'S FEE | 135.00 |
| ADJUSTMENT | -5.00 |
| SUBTOTAL | |
| PT. CO-PAYMENT / PYMT. | 130.00 |
| BALANCE | |
| AMT. BILLED PT. | |
| TOTAL | 0 |

# X-Ray Pro

Oka Building, 241 Farenhot Avenue, Suite 107
Tamuning, Guam 96911 · Tel (671) 647-XPRO (9776)

X-RAY NO. 21132  14388

☐ PACIFICARE  ☐ ST.WL. BRONZE  ☐ CALVO  ☐ NANBO  ☐ MULTICOVER  ☐ FHP  ☐ MEDICARE  ☑ SELF-PAY

**PATIENT INFORMATION**

PATIENT'S LAST NAME: _____ FIRST: FELIX, SR. INITIAL: P

INS. CO. ___

TODAY'S DATE: 8-12-05
RELATIONSHIP TO PATIENT: ___

MAILING ADDRESS: ___ CITY: ___ ZIP: ___

INSURED'S NAME: SELF

HOME ADDRESS: ___ CITY: ___ ZIP: 96921

INSURANCE CARRIER: ___

SEX: ☐ FEMALE  ☑ MALE   EMPLOYER: SELF

INSURANCE ID NUMBER: ___

TELEPHONE NO.: 7921
HM: 7__-____   WK:
SOCIAL SECURITY NO.: ___-62-1132

OTHER HEALTH COVERAGE?  ( ) NO  ( ) YES  IDENTIFY

**ASSIGNMENT & RELEASE:**
I request that payment of authorized benefits be made either to me or on my behalf for any services furnished by me or in **X-RAY PRO** including Physician services. I authorize any holder or medical or other information about me to release to my insurance carrier or its agents any information needed to determine these benefits or benefits for related services. I am financially responsible for all co-payments, deductibles and services not covered by my insurance.

SIGNATURE: ___

| ✓ | DESCRIPTION | CODE | DX-LINK | FEE | ✓ | DESCRIPTION | CODE | DX-LINK | FEE | ✓ | DESCRIPTION | CODE | DX-LINK | FEE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **1.** | **HEAD AND NECK** | | | | ✓ | Pelvis, 3 views | 72190 | | | | Foot, Complete | 73630 | | |
| | Foreign Body Eye | 70030 | | | | | 72200 | | | | Calcaneous | 73650 | | |
| | Mandible, 4 views | 70100* | | | | | 72202 | | | | Toe(s) | 73660 | | |
| | Mandible, Complete | 70110 | | | | Sacrum/Coccyx | 72220 | | | **5.** | **CHEST** | | | |
| | Mastoids, 3 views | 70120* | | | **3.** | **UPPER EXTREMITIES** | | RT./LT. | | | Chest, 1 view | 71010 | | |
| | Mastoids, Complete | 70130 | | | | Clavicle | 73000 | | | | Chest, 2 views | 71020 | | |
| | Int. Auditory Meati | 70134 | | | | Scapula | 73010 | | | | Chest w/ apical Lordotic | 71021 | | |
| | Facial Bones, 3 views | 70140* | | | | Shoulder, 1 view | 73020 | | | | Chest, 3 views | 71022 | | |
| | Facial Bones, Complete | 70150 | | | ✓ | Shoulder, Complete | 73030 | RT | | | Chest, 4 views | 71030 | | |
| | Nasal Bones, Min 3 views | 70160 | | | | Acromioclavicular | 73050 | | | | Chest, Special /w/ decubit/ views | 71035 | | |
| | Optic Foramina | 70190 | | | | Humerus | 73060 | | | | Ribs, Unilateral, 2 views | 71100* | | |
| | Orbits | 70200 | | | | Elbow, 2 views | 73070 | | | | Ribs, 3 views | 71101 | | |
| | Sinuses, 3 views | 70210* | | | | Elbow, 3 views | 73080* | | | | Ribs, Bilateral, 3 views | 71110* | | |
| | Sinuses, Complete | 70220 | | | | Forearm | 73090 | | | | Ribs, 4 views | 71111 | | |
| | Sella Turcica | 70240 | | | | Upper Extremity, Infant | 73092* | | | | Sternum, 2 views | 71120* | | |
| | Skull, Limited | 70250 | | | | Wrist | 73100 | | | | Sternoclavicular, 3 views | 71130* | | |
| | Skull Complete | 70260 | | | | Wrist, Complete | 73110 | | | **5.** | **ABDOMEN** | | | |
| | TMJ Joints | 70330 | | | | Hand, 2 views | 73120 | | | | Abdomen, 1 view | 74000* | | |
| | Neck Soft Tissue | 70360 | | | | Hand, 3 views | 73130* | | | | Abdomen, 2 views | 74010* | | |
| **2.** | **SPINE AND PELVIS** | | | | | Finger | 73140 | | | | Abdomen, complete /lecubit, erect | 74020* | | |
| | Spine Entire Survey, views | 72010 | | | **4.** | **LOWER EXTREMITIES** | | RT./LT. | | | Abdomen, 1 view w/ PA Chest | 74022 | | |
| | Spine, Single View /specify view/ | 72020 | | | | Hip, 1 view | 73500 | | | **7.** | **SPECIAL PROCEDURES** | | | |
| | Cervical Spine, 2 views | 72040 | | | | Hip, 2 views | 73510 | | | | Intravenous Pyelram, IVP | 74400 | | |
| | Cervical Spine, min. 4 views | 72050 | | | | Hips, Bilateral | 73520 | | | | Cholecystogram, OCG | 74290 | | |
| | Cervical Spine, flex/ext/oblis | 72052 | | | | Pelvis & Hips, Infant | 73540 | | | | Nose to rectum (x/ray) for foreign body (x/ray) | 76010 | | |
| | Spine, Scoliosis, 1 view | 72069 | | | | Femur | 73550 | | | | Bone age studies | 76020 | | |
| | Thoracic Spine, 2 views | 72070 | | | | Knee, 2 views | 73560 | | | | Bone length studies | 76040 | | |
| | Thoracic Spine, w/Swimmers | 72072 | | | | Knee, 3 views | 73562 | | | | Osseous survey, Infant | 76065 | | |
| | Thoracic Spine, min 4 views | 72074* | | | | Knee, Complete | 73564 | | | | JT Survey, single view | 76065* | | |
| | Thoracolumbar Spine | 72080 | | | | Standing Knees | 73565 | | | | Radiologist reading (Consultation on X-Ray made elsewhere) | 76140 | | |
| | Spine, Scoliosis, Complete | 72090* | | | | Tibia / Fibula | 73590 | | | | | | | |
| | Lumbosacral Spine, 2 views | 72100 | | | | Lower Extremity, Infant | 73592 | | | **9.** | **WRITE IN** | | | |
| | Lumbosacral Spine complete w/ obliques | 72110* | | | | Ankle, 2 views | 73600 | | | | RT CASH $ 100.00 | | | |
| | Lumbosacral Spine complete w/ bending views | 72114* | | | | Ankle, 3 views | 73610* | | | | | | | |
| | Lumbosacral Spine /bending views only/ | 72120 | | | | Foot, 2 views | 73620* | | | | | | | |
| | Pelvis, AP | 72170* | | | | | | | | | | | | |

DIAGNOSIS: PAIN

I CERTIFY THAT I AM NOT PREGNANT

LMP ___   SIGNATURE ___

CONDITION RELATED TO:
( ) ILLNESS  (✓) ACCIDENT  ( ) PREGNANCY  ( ) OTHER

TECHNICIAN SIGNATURE: ___

HOW DID INJURY OCCUR: ___   DATE: ___

## INSTRUCTION TO PATIENT

1. COMPLETE UPPER PORTION OF THIS FORM.
2. SIGN AND DATE - GIVE TO RECEPTIONIST.
3. UPON COMPLETION OF VISIT, GIVE FORM TO CASHIER AND MAKE PAYMENT AT THE TIME. WE WILL PROCESS IT AND BILL YOUR INSURANCE CARRIER.

| | |
|---|---|
| TOTAL TODAY'S FEE | $ 100.00 |
| ADJUSTMENT | |
| SUBTOTAL | |
| PT. CO-PAYMENT / PYMT. | |
| BALANCE | $ 100.00 |
| AMT. BILLED PT | 0 |

# Guam Adult-Pediatric Clinic

612 N. MARINE DRIVE, SUITE #8,
DEDEDO, GUAM 96929
PHONE: 671-633-GAPC (4272)

❏ Don Preston, MD ~ Internal Medicine
❏ Alix Chenet, MD ~ Internal Medicine
❏ Antonio Apellanes, MD ~ Pediatrics
❏ Marina Apellanes, MD ~ Pediatrics

## REFERRAL FORM

DATE: _____

PATIENT'S NAME: _____ Aguinante, Pedro Jr _____

DATE OF BIRTH: _____ PATIENT'S NO. _____ INSURANCE: _____

FROM (Attending Physician): _____ Preston _____

TO (Consulting Physician): ___ MRI ___   649-3777 / 647-2175

REASON FOR CONSULT: ___ 58 yo ♂ with neck pain x 3 mos, ___
___ also c/o x-ray for MRI of c-spin x lb AMP. ___
___ ___
___ ✓ ___

## REPORT

FINDINGS: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

DIAGNOSIS

_____

RECOMMENDATIONS:

_____

_____

_____

_____

_____

SIGNATURE (Consultant) _____ Date: _____

X-Ray No: 21152

Patient Name: AGRAVANTE, PEDRO          D.O.B.: 10/5/46

Examination: C-SPINE, 4VS.               Date: 8/2/05

Relevant Diagnosis: PAIN

Requesting Physician: DR. PRESTON

Findings:

AP, lateral and oblique views of the cervical spine were obtained. There is mild
straightening of the normal lordotic curvature at the lower cervical spine. The vertebral
bodies are normal in height. Small marginal osteophytes are noted at C-5,6 and 7. There
is mild narrowing of the disc spaces of C-5-6 and C-6-7. There is moderate
encroachment into the neuroforamina bilaterally at C-5-6 and C-6-7 and to a lesser degree
at C-3-4 on the left.

Impression:

Mild to moderate lower cervical spondylosis with disc space narrowing as described
above.

Interpreting Radiologist:

_____

**D. MICHAEL MUDD, M.D.**              **VINCENT LIZAMA, M.D.**
                                        VLjb 8/2/05

# Guam Adult-Pediatric Clinic

612 N. MARINE DRIVE, SUITE #3.
DEDEDO, GUAM 96929
PHONE: 671 633-GAPC (4272)

☐ Don Preston, MD – *Internal Medicine*
☑ Alix Chenet, MD – *Internal Medicine*
☐ Antonio Apellanes, MD – *Pediatrics*
☐ Marina Apellanes, MD – *Pediatrics*

## REFERRAL FORM

DATE: _8/09/00_

PATIENT'S NAME: _Pedro Agrawal_

DATE OF BIRTH: _____ PATIENT'S NO. _____ INSURANCE: _SP_

FROM (Attending Physician): _Chin_

TO (Consulting Physician): _Dr Hayashida   777-0795_

REASON FOR CONSULT: _Ct w hx lt shld Rtle Cup - ? Tear   are lenurd, Swelfen   = ? Articalpel_

## REPORT   _hy fe Eualof_

FINDINGS: _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

DIAGNOSIS:

RECOMMENDATIONS:

_____

_____

_____

_____

SIGNATURE (Consultant) _____ Date: _____

## GAPC PROGRESS NOTES

**Patient Name:** _Cartwright, Robin F._  **Patient #** _21132_  _15900_

**Date** _9/08/04_  **DOB** _____  **Bill #** _____

**Chief complaint** _acdt - nck pn_

**History of Present illness-**
(Location, quality, severity,
duration timing, context,
modif. Factors, assoc. signs)

_5740 ô p acdnt 7/1/02 in_
_JM - rqd flwwill dncrtd rvc pain (btr. ng)_
_Pt fild claim in court c nts sv rela wk._
_pn bck lp sr xr._

### Review of Systems

| | | | | | |
|---|---|---|---|---|---|
| Constitutional | normal | abnormal | MS | normal | abnormal |
| Eyes | normal | abnormal | Skin/breast | normal | abnormal |
| ENT | normal | abnormal | Neurologic | normal | abnormal |
| CV | normal | abnormal | Psychiatric | normal | abnormal |
| Respiratory | normal | abnormal | Endocrine | normal | abnormal |
| GI | normal | abnormal | Blood/lymph | normal | abnormal |
| GU | normal | abnormal | Allergy/Immune | normal | abnormal |

### Past/Family/Social history

**Medicine allergies** _NKDA_  **marital status** _____  **Medications** _NVA_

**Smoker** _____  **Alcohol use** _____

**Exercise presently** _____  **Past surgeries** _____  **Family history** _____

### Physical Exam

**BP** _14/80_  **Pulse** _80_  **Temp.** _98.19°_  **RR** _20_  **weight** _140#_

**Coded by** ✗MSE  __SOE

| Constitution | Appearance | normal | abnormal |
|---|---|---|---|
| **Eyes** | Conjunctiva/lids | normal | abnormal |
| | Pupils/ iris | normal | abnormal |
| | Fundus exam | normal | abnormal |
| **ENT** | Inspect ears/nose | normal | abnormal |
| | Exam TM/canals | normal | abnormal |
| | Exam hearing | normal | abnormal |
| | Inspect-exam nares | normal | abnormal |
| | Inspect lips/teeth/gums | normal | abnormal |
| | Exam oral cavity | normal | abnormal |
| **Neck** | Exam neck | normal | abnormal |
| | Exam thyroid | normal | abnormal |
| **Respiratory** | Assess resp. effort | normal | abnormal |
| | Percussion chest | normal | abnormal |
| | Palpation chest | normal | abnormal |
| | Breath sounds | normal | abnormal |
| **CV** | Palpate heart | normal | abnormal |
| | Auscultate heart | normal | abnormal |
| | Exam Carotid artery | normal | abnormal |
| | Exam abd. Aorta | normal | abnormal |
| | Exam femoral artery | normal | abnormal |
| | Exam pedal pulses | normal | abnormal |
| | Exam edema/varicose | normal | abnormal |
| **Breasts** | Inspect | normal | abnormal |
| | Exam breasts | normal | abnormal |
| **Lymphatics** | Neck | normal | abnormal |
| | Axilla | normal | abnormal |
| | Groin | normal | abnormal |
| | Other | normal | abnormal |

| GI | Exam Abd. | normal | abnormal |
|---|---|---|---|
| | Exam liver/spl. | normal | abnormal |
| | Exam hernia | normal | abnormal |
| | Exam anus/rect. | normal | abnormal |
| **GU(male)** | Ex. Scrotum/test. | normal | abnormal |
| | Exam penis | normal | abnormal |
| | Exam prostate | normal | abnormal |
| **GU(female)** | Ex. Peri./vagina | normal | abnormal |
| | Ex. Urethra | normal | abnormal |
| | Ex. Bladder | normal | abnormal |
| | Exam cervix | normal | abnormal |
| | Exam uterus | normal | abnormal |
| | Exam adnexa | normal | abnormal |
| **MS** | Ex. Gait/station | normal | abnormal |
| | Ex. Digits/nails | normal | abnormal |
| | Ex.Joints/m/bone | normal | abnormal |
| | Ex. ROM | normal | abnormal |
| | Ex. Stabl./laxity | normal | abnormal |
| | Ex.M.tone and str | normal | abnormal |
| **Skin** | Inspect skin | normal | abnormal |
| | Exam. Skin | normal | abnormal |
| **Neurologic** | Ex. Cranial n. | normal | abnormal |
| | DTR's | normal | abnormal |
| | Sensation | normal | abnormal |
| **Psychiatric** | Jdgment/insight | normal | abnormal |
| | Orientation | normal | abnormal |
| | Memory | normal | abnormal |
| | Mood/affect | normal | abnormal |

**Additional PE for Single Organ System Exam**

**Lab Data**  **Analysis/Plans**

_① neck pain → sxprsxn, JCt xr, chn effct_
_may need mri for C4 dsc dsesn._

# GUAM ADULT-PEDIATRIC CLINIC
## 612 N. Marine Drive, Suite #8, Dededo, Guam
### Phone: 671-633-GAPC (4272)/Fax: 671-633-2FAX (2329)

No. 18200

| ☐ APPT. /TIME | ☐ WALK IN | DATE: | | CHECK IN TIME: |
|---|---|---|---|---|

| PATIENT'S LAST NAME | FIRST | M.I. | BIRTHDATE | SEX<br>( ) MALE ( ) FEMALE |
|---|---|---|---|---|

| PATIENT'S SOC. SEC. # | MAILING ADDRESS | | HOME NUMBER |
|---|---|---|---|

| RELATION TO SUBSCRIBER | PT EMPLOYER | WORK NUMBER |
|---|---|---|

| PRIMARY INSURANCE | INSURANCE ID NO. | EFF. DATE | CO-PAY |
|---|---|---|---|

| SECONDARY INSURANCE | INSURANCE ID NO. | EFF. DATE | CO-PAY |
|---|---|---|---|

I authorize the release of my medical information/records for services rendered by Guam Adult-Pediatric Clinic including physician's services and supplies to my insurance carrier for payment medical benefits. I am responsible for co-payments, deductibles and other charges not paid by my insurance. I am aware that Guam Adult-Pediatric Clinic may refer any unpaid charges and related fees therefrom to a collection agency to pursue payment.

PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE: _____ Date: _____

| DESCRIPTION | CODE NEW | CODE EST | FEE | DESCRIPTION | CODE | FEE | DESCRIPTION | CODE | FEE |
|---|---|---|---|---|---|---|---|---|---|
| **OFFICE VISITS** | | | | Irregular periods | 626.4 | | Lidocaine 1% | J2000 | |
| Problem focused, minor | 99201 | 99211 | | Lumbago | 724.2 | | Phenergan 50 mg | J2550 | |
| Expanded prob. foc. minor | 99202 | 99212 | | Lupus, systemic | 710.0 | | Benadryl 50 mg. | J1200 | |
| Detailed, low complex. | 99203 | 99213 | | Menopause assoc. symptoms | 627.2 | | Rocephin 250 mg. | J0696 | |
| Comprehensive, mod. comp | 99204 | 99214 | | Menstrual disorder | 626.9 | | Solumedrol 125 mg. | J2930 | |
| Comprehensive, high comp. | 99205 | 99215 | | Migraine, unspecified | 346.90 | | Kenalog ___ mg. | J3301 | |
| **PREVENTIVE CARE EXAMS** | | | | Mitral valve disorder | 424.0 | | Bicillin 1.2 LA | J0570 | |
| Adoles (12-17 Yrs.) Exam | 99384 | 99394 | | Murmur, heart | 785.2 | | Bicillin 1.2 CR | J0540 | |
| Adult (18-39 Yrs.) Exam | 99385 | 99395 | | Nasopharyngitis, acute | 460 | | Depo Provera 150 mg. | J1055 | |
| Adult (40-64 Yrs.) Exam | 99386 | 99396 | | Obesity, unspecified | 278.00 | | Toradol 15 mg. | J1885 | |
| Adult (65+) Exam | 99387 | 99397 | | Otitis media | 382.9 | | I & D Abscess simple | 10060 | |
| **OTHER PROCEDURES** | | | | Palpitations | 785.1 | | I & D of cyst | 10040 | |
| | | | | Panic attack | 300.01 | | Rep lac excl face 2.5 cm/less | 12001 | |
| **DIAGNOSIS** | ICD-9 | | | PAT | 427.0 | | Rep lac excl face 2.6-7.5 cm | 12002 | |
| Abdominal pain, loc. ___ | 789.___ | | | Peptic ulcer disease | 533.90 | | Repair lac. 2.5 cm/less (face) | 12012 | |
| Abscess | 682.___ | | | Pharyngitis/Strep | 462/034.0 | | Repair lac 2.6 - 5 cm (face) | 12013 | |
| Allergic reaction | 995.3 | | | Pneumonia | 486 | | Exc lesion-5cm or less | 11400 | |
| Allergic rhinitis | 477.9 | | | Prostate Cancer | 185 | | Exc lesion-6cm or less | 11401 | |
| Asthma / exac | 493.9___ | | | Psoriasis,except arthropathic | 696.1 | | Excision 1.1 cm-2 | 11402 | |
| Atrial fibrillation | 427.31 | | | Pyelonephritis, NOS | 590.80 | | Skin tags removal | 11200 | |
| Breast mass/lump | 611.72 | | | Rash of skin, unspecified | 782.1 | | Therapeutic injection | 90782 | |
| Bronchitis, acute/chronic | 466.0 | 491.9 | | Renal failure, acute/chronic | 584.9/585 | | IM injection of antibiotic | 90788 | |
| Chest pain, unspecified | 786.50 | | | Rheumatoid arthritis | 714.0 | | Arthrocentesis/injection steroid | 20610 | |
| CAD | 414.01 | | | Rheumatic heart disease | 398.90 | | EKG | 93000 | |
| Cancer, Breast | 174.9 | | | Seizure disorder | 780.39 | | Rhythm Strip | 93040 | |
| Cancer, Prostate | 185 | | | Shortness of breath | 786.05 | | Stress test | 93015 | |
| Cardiomyopathy | 425.4 | | | Sinusitis, acute/chronic | 461.9 | 473.9 | O2/Breathing therapy | A4618 | |
| CHF | 428.0 | | | Syndrome, Carpa Tunnel | 354.0 | | Spirometry | 94010 | |
| Contraceptive management | V25.09 | | | Syndrome, Rotator cuff NOS | 726.10 | | Nebulizer | 94664 | |
| COPD | 496 | | | Tendinitis, NOS | 726.90 | | Nebulizer, Subsequent | 94665 | |
| CVA | 436 | | | Thyroid nodule | 241.0 | | Pulse oximetry | 94760 | |
| Dermatitis, unspecified | 692.9 | | | Urticaria, unspecified | 708.9 | | Hearing test | 92551 | |
| Diabetes Mellitus/NIDDM | 250.00 | | | URI | 465.9 | | Removal of cerumen | 69210 | |
| NIDDM UnControlled | 250.02 | | | UTI | 599.0 | | Infusion therapy | 90780 | |
| IDDM Uncontrolled | 250.03 | | | Vaginitis/vulvovaginitis | 616.10 | | Therapeutic/diagnostic | 90784 | |
| Dizziness/Vertigo | 780.4 | | | | | | **LABORATORY** | | |
| Gastroenteritis, acute | 558.9 | | | **IMMUNIZATIONS** | | | Occult blood | 82270 | |
| GERD | 530.11 | | | Hep Vac B (Adult) | 90746 | | Urine pregnancy test | 81025 | |
| Heart Murmur, NOS | 785.2 | | | MMR | 90707 | | Urinalysis, dipstick | 81002 | |
| HTN (Ben., Mal., Unspe.) | 401.___ | | | TD (adult) | 90718 | | Blood sugar (accucheck) | 82962 | |
| Hypercholesterolemia | 272.0 | | | Pneumovax | 90732 | | **SUPPLIES** | | |
| Hypertriglyceridemia, pure | 272.1 | | | Influenza | 90657/8/9 | | Vaginal supplies/PAP | Q0091 | |
| Hyperlipidemia | 272.2 | | | PPD | 86580 | | Preparation kit IV | A4914 | |
| | | | | | | | NSS 500 ml solution | J7040 | |
| | | | | | | | Gauze dressing | A6216 | |
| | | | | | | | Other supplies | 99070 | |

Diagnosis

ICD-9 Codes

1. _____ 713.1
2. _____
3. _____
4. _____

| | | |
|---|---|---|
| TOTAL FEE | | |
| PLUS .2% GOV'T. SURCHARGE | | |
| PT. CO-PAYMENT | | |
| PT. CO-PAYMENT BALANCE | | |
| TOTAL DUE FROM PATIENT | | |
| RECEIPT NO. | | |

PHYSICIAN'S OR AUTH PERSON'S SIGNATURE ___ NEXT APPT. DATE: ___ TIME: ___ MD

# Guam Adult-Pediatric Clinic

612 N. Marine Drive, Suite #8, Dededo, Guam 96929
Phone: 671-633-GAPC (4272)

## Imaging Lab
## Request Form

❏ **Don Preston, MD** – *Internal Medicine*
❏ **Alix Chenet, MD** – *Internal Medicine*
❏ **Antonio Apellanes, MD** – *Pediatrics*
❏ **Marina Apellanes, MD** – *Pediatrics*

| Patient: Cypravinte, Pedro JR. | Address: |
| DOB: | Age: | SSN: | Tel: |
| Sex [ ] Male [ ] Female *(date of Last Menstrual Period)* | Patient Signature: |

Referring Physician / Facility:

**RELEVANT HISTORY**

57 yo ♂ with 2 yr hx neck pain.

**TYPE of EXAM:**

C-spine

~~DONALD PRESTON, M.D.~~ 9/8/04

Physician's Signature _____ Date

---

# Guam Adult-Pediatric Clinic

612 N. Marine Drive, Suite #8, Dededo, Guam 96929

Phone: 671-633-GAPC (4272)

| NAME: Pedro cyhavinte |
| ADDRESS: | PLAN: |

☒ **Don Preston, MD** – *Internal Medicine*    ❏ **Antonio Apellanes, MD** – *Pediatrics*
❏ **Alix Chenet, MD** – *Internal Medicine*    ❏ **Marina Apellanes, MD** – *Pediatrics*

| | NAME OF MEDICATION | STRENGTH | QUANTITY | DIRECTION | REFILLS |
|---|---|---|---|---|---|
| Rx | Naprosyn | 500 mg | #120 | one qd – bid with food prn pain | (5) |
| Rx | | | | | |
| Rx | | | | | |
| Rx | | | | | |

SIGNATURE: DONALD PRESTON/M.D.    DATE: 9/8/04

Generic Substitution authorized
unless checked ❏

# Guam Adult-Pediatric Clinic

612 N. MARINE DRIVE, SUITE #8,
DEDEDO, GUAM 96929
PHONE: 671-633-GAPC (4272)

☑ **Don Preston, MD** ~ *Internal Medicine*
☐ **Alix Chenet, MD** ~ *Internal Medicine*
☐ **Antonio Apellanes, MD** ~ *Pediatrics*
☐ **Marina Apellanes, MD** ~ *Pediatrics*

# REFERRAL FORM

DATE: _____

PATIENT'S NAME: _Cojralvanc , Pedro_

DATE OF BIRTH: _10·05·4_ PATIENT'S NO. _____ INSURANCE: _____

FROM (Attending Physician): _Prston_

TO ( Consulting Physician): _Dr Greg milh (chiropractor) 637-6683_

REASON FOR CONSULT: _57 yo ♂ with 2 yr hx of neck pain._

_____

_____

_____  DONALD PRESTON, M.D.

## REPORT

FINDINGS: _____

DIAGNOSIS

RECOMMENDATIONS:

SIGNATURE (Consultant): _____ Date: _____

## Guam Adult-Pediatric Clinic
612 N. Marine Drive, Suite #8, Dededo, Guam 96929
Phone: 671-633-GAPC (4272)

TEL: (Home) _632 - 4400_

(Work) _632 - 4400_

PATIENT: _Oprocunk, Peder_

NUMBER: _2132_

DOB: _10·05·46_

DOCTOR: _____

_pt in Cydserin of
JAL_

# PROBLEM LIST

## MEDICAL PROBLEMS

1. _I. Chronic roN pain_
2. _D XR - OTP, & dire_
3. _____
4. _____
5. _____

6. _____
7. _____
8. _____
9. _____
10. _____

## PAST SURGERIES

1. _____
2. _____
3. _____

4. _____
5. _____
6. _____

## HOSPITALIZATIONS

1. _____
2. _____
3. _____

4. _____
5. _____
6. _____

## IMMUNIZATIONS (YEAR)

Tetanus: _____

Pneumovax: _____

Flu: _____

Polio: _____

Others: _____

_____

| PROCEDURES | | | | | | | |
|---|---|---|---|---|---|---|---|
| Physical | | | | | | | |
| PAP | | | | | | | |
| Mammogram | | | | | | | |
| Chest X-ray | | | | | | | |
| UGI/BaE | | | | | | | |
| IVP | | | | | | | |
| | | | | | | | |

**ALLERGIES**

**Specialties**
Internal Medicine
Occupational Medicine
Orthopaedics
Sports Medicine

**Services**
Arthroscopic Surgery
Orthopaedic Surgery
Independent Medical Evaluations
Independent Record Reviews
Impairment Ratings
Case Merit Analysis
Expert Testimony



# HONOLULU SPORTS
# MEDICAL CLINIC, INC.

932 Ward Ave. Suite 460, Honolulu, Hawaii 96814
Tel (808) 521-6564 Fax (808) 521-1173

**CHET NIERENBERG, M.D.**
**ROBERT L. SMITH, M.D.**
**PETER E. DIAMOND, M.D.**
**JAMES F. SCOGGIN III, M.D.**
**GEORGE H. SEBERG, M.D.**
**JON H. SCARPINO, M.D.**
**STEPHEN L. DEMETER, M.D., M.P.H.**

November 27, 2006

David Ledger, Esq.
Carlsmith Ball LLP
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagatna, Guam 96932-5027

RE:                 AGRAVANTE, PEDRO
Case:             *Pedro & Corita Agravante v. Japan Airlines International Co., Inc.*

Civil Case No.:      CIV04-00036
Date of Injury:      7/20/02
Date of Review:   11/21/06

Dear Mr. Ledger:

Thank you for referring the records of Mr. Pedro Agravante for an Independent Medical Records Review.

According to the available records, Mr. Agravante is a 60-year-old male who was involved in an incident aboard a Japan Airlines flight on 7/20/02.

Following a summary of the available medical records, I will discuss the issues addressed in your cover letter. The conclusions and opinions offered herein are based on a review of the available medical records only. No physical examination was performed.

## REVIEW OF RECORDS:

Records available for review included the following:

- Guam Adult-Pediatric Clinic (Alix Chenet, M.D.)

**EXHIBIT "G"**

RE:   AGRAVANTE, PEDRO

- Diagnostic studies

Review of these records includes, but is not limited to, the following:

| | |
|---|---|
| 9/8/04<br>(Unknown provider.)<br>Guam Adult-Pediatric<br>Clinic | 57 yo ♂ after accident 7/20/02 on JAL (illegible).<br><u>Review of systems</u>: Normal constitutional.  Abnormal MS,<br>neurologic.  Pain down both arms.<br><u>Physical exam</u>: BP 140/80, pulse 80, temp 98.9, RR 20, wt<br>140#.  Abnormal neck exam.  Gait normal. Sensation and<br>mood/affect normal.<br><u>Analysis/Plan</u>: Neck pain → Naprosyn.  May need MRI.<br><br>(Author's Note: Handwritten notes for the most part are<br>illegible.) |
| 8/3/05<br>(Unknown provider.)<br>Guam Adult-Pediatric<br>Clinic | <u>Diagnosis</u>: Neck pain. |
| 8/9/05<br>Alix Chenet, M.D.<br>Guam Adult-Pediatric<br>Clinic | <u>Diagnosis</u>:<br>1.  Neck pain.<br>2.  HTN.<br>3.  Rt Shoulder (illegible). |
| 8/9/05<br>Alix Chenet, M.D.<br>Referral Form | <u>To consulting physician</u>: Dr. Hayashida.<br><u>Reason for consult</u>: Pt with Rt shoulder rotator cuff ? tear<br>and cervical, (illegible) with ? radiculopathy for evaluation. |

<u>Diagnostic reports</u> are reviewed as follows:

| | |
|---|---|
| 8/2/05<br>X-rays Cervical Spine<br>LMR, X-ray Pro | <u>Cervical spine x-rays</u>, read by Vincent Lizama, M.D., as:<br><u>Findings</u>: AP, lateral and oblique views of the cervical<br>spine were obtained.  There is mild straightening of the<br>normal lordotic curvature at the lower cervical spine.  The<br>vertebral bodies are normal in height.  Small marginal<br>osteophytes are noted at C-5, 6 and 7.  There is mild<br>narrowing of the disc spaces of C-5-6 and C-6-7.  There is<br>moderate encroachment into the neuroforamina bilaterally<br>at C-5-6 and C-6-7 and to a lesser degree at C-3-4 on the<br>left. |

RE:   AGRAVANTE, PEDRO

| 8/2/05<br>X-rays Cervical Spine<br>(cont.) | Impression: Mild to moderate lower cervical spondylosis<br>with disc space narrowing as described above. |
|---|---|
| 8/12/05<br>X-rays Right Shoulder<br>LMR, X-ray Pro | Right shoulder x-rays, read by D. Michael Mudd, M.D., as:<br>Findings: There are no osseous or articular abnormalities.<br>There are no soft tissue calcifications.<br>Impression: Negative. |

## REVIEW OF IMAGING STUDIES:

Cervical spine films, dated 8/2/05, show marked degenerative disc disease changes at both C5-6 and 6-7, with some disc space narrowing and primarily anterior osteophyte formation, with a 2-3 mm anterior subluxation of C7 on C6, and markedly narrowed neural foramina on the left oblique view. These are chronic degenerative changes, and are not indicative of acute trauma.

X-rays of the right shoulder, dated 8/12/05, show some degenerative joint disease of the right acromioclavicular joint and signs of calcification around the tuberosity of the humerus, suggestive of a chronic tendinitis. There is no evidence for acute trauma on these plain films of the shoulder.

## ASSESSMENT:

According to the medical records available for review, the diagnoses are:

1. Neck pain, most likely secondary to degenerative disc disease, without documentation of acute injury in 2002.
2. Possible right shoulder impingement tendinitis superimposed on degenerative joint disease of the acromioclavicular joint, without any evidence for shoulder trauma from the subject incident.

## DISCUSSION:

The available medical records document initial treatment on 9/8/04, approximately 2 years following the subject incident. There is no medical documentation of treatment earlier than 2 years following the incident, and no credible history of trauma involved in the original incident, which is not specifically enumerated or described in the medical

RE:   AGRAVANTE, PEDRO

records.  In any event, the examination in September 2004 does not document any specific neurologic findings and gives as the assessment "Neck pain."

Follow-up visits on 8/3/05 and 8/9/05 document complaints of continuing neck pain as well as right shoulder pain.  No details of the physical examination of the shoulder are offered in the available medical records.

### SUMMARY:

According to the available medical records, Pedro Agravante is a 60-year-old male presenting with roentgenographic evidence for essentially degenerative joint disease at the neck and the right shoulder, and without any evidence for acute trauma on the plain films.

Given the lack of initial documented trauma, the lack of symptoms requiring treatment until 2 years following the subject event, and essentially degenerative findings on plain films, it is my opinion, to a reasonable degree of medical probability, that the subject incident in 2002 is not causally related to the current symptoms.

It is virtually impossible that an acute disc injury occurring in 2002 would not require treatment or produce symptoms until 2004.  Moreover, the x-ray findings are of chronic, degenerative, long-term changes, and involve multiple levels rather than any single level, such as would be expected with acute trauma.

I would be happy to review any further records available, particularly any in the interval between 2002 and the initial visit in September 2004.

The above analysis is based upon the information obtained from the available medical records.  It is assumed that the material provided is correct.  If further information becomes available at a later date, an additional service, re-evaluation, or addendum report may be requested.  Such information may or may not change the opinions expressed in this report.

The opinions in this report are specific to this case only and should not be generalized to other cases.

Unless otherwise noted, the opinions have been expressed to a reasonable degree of medical probability.

RE: AGRAVANTE, PEDRO

Treatment recommendations are advisory in nature only. No specific treatment or surgeries are recommended.

Unless specifically stated, this report does not restrict employability.

The opinions and recommendations are totally independent of the requesting agency.

These opinions do not constitute *per se* a recommendation for specific claims or administrative functions to be made or enforced, unless otherwise stated.

Thank you again for allowing me to review the records of Mr. Agravante. If you have any other questions regarding this evaluation, please feel free to contact me at the Honolulu Sports Medical Clinic.

Sincerely,

Peter E. Diamond, M.D.
Board Certified,
American Board of Orthopedic Surgery
American Board of Independent Medical Examiners

PED:lnm

1        IN THE DISTRICT COURT OF GUAM

2    PEDRO P. AGRAVANTE, JR.    ) CIVIL NO. CIV04-00036
     and CORITA B. AGRAVANTE,   )
3                               )
                                )
4              Plaintiffs,      )
                                )
5    vs.                        )
                                )
6    JAPAN AIRLINES             )
     INTERNATIONAL CO. LTD.,    )
7                               )
               Defendant,       )
8    _____)

9

10

11

12            VIDEOTAPED DEPOSITION OF

13            DR. PETER ELLIOTT DIAMOND

14

15   Taken on behalf of the Defendant Japan Airlines

16   International Co., Ltd., at Honolulu Sports Medical

17   Clinic, Inc., 932 Ward Avenue, Suite 460, Honolulu,

18   Hawaii, commencing at 9:07 a.m. on Thursday,

19   February 22, 2007, pursuant to Notice.

20

21

22

23

24   BEFORE:    SHARON L. ROSS, CSR No. 432

25

```
 1 │ APPEARANCES:
 2 │
 3 │ For Defendant:
 4 │
 5 │            DAVID LEDGER, ESQ.
 6 │            Carlsmith Ball LLP
 7 │            Bank of Hawaii Building, Suite 401
 8 │            134 West Soledad Avenue, P. O. Box BF
 9 │            Hagåtña, Guam  96932-5027
10 │
11 │
12 │ Videographer:   Robert Whitman
13 │
14 │
15 │
16 │
17 │
18 │
19 │
20 │
21 │
22 │
23 │
24 │
25 │
```

```
 1                    I N D E X

 2  EXAMINATION BY:                    PAGE

 3       MR. LEDGER........................   5

 4

 5                  E X H I B I T S

 6  NO.   DESCRIPTION                   PAGE

 7  A    Notice of Taking Deposition of

 8       Peter E. Diamond, M.D., to take

 9       testimony for trial...............   5

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      PROCEEDINGS

 2             THE VIDEOGRAPHER:  This is the deposition of

 3   Dr. Peter Diamond in the matter of Pedro Agravante and

 4   Corita Agravante versus Japan Airlines International

 5   Company, Limited.

 6             We are located at the Honolulu Sports Medicine

 7   Clinic in Honolulu, Hawaii.

 8             My name is Robert Whitman, certified legal video

 9   specialist.

10             Will counsel please state their name?

11             MR. LEDGER:  Yes, this is David Ledger for

12   Japan Airlines International.

13             THE VIDEOGRAPHER:  Today is February 22nd in

14   the year 2007; and we are on the record at 9:07 a.m.

15             Would the court reporter please swear in the

16   deponent?

17                 DR. PETER ELLIOTT DIAMOND,

18   called as a witness at the instance of the Defendant,

19   being first duly sworn to tell the truth, the whole

20   truth and nothing but the truth, was examined and

21   deposed as follows:

22             MR. LEDGER:  Okay.  To the court reporter,

23   you were provided with a notice of the deposition, is

24   that correct --

25             THE REPORTER:  Yes.
```

```
 1                MR. LEDGER:  -- from my office?

 2                THE REPORTER:  Yes.

 3                MR. LEDGER:  I would like to attach the

 4   notice of the deposition as an exhibit, which would be

 5   Exhibit A.  And I believe that will be the only paper

 6   exhibit that we'll have.

 7                THE REPORTER:  Okay.

 8                MR. LEDGER:  You're sworn, Doctor?

 9                THE WITNESS:  I'm sworn.

10                MR. LEDGER:  You've been sworn in.

11                         EXAMINATION

12   BY MR. LEDGER:

13     Q.  Okay.  Again, just for the record, could you

14   state your full name, please?

15     A.  Peter Elliott Diamond.

16     Q.  And, Dr. Diamond, what is your special area of

17   expertise or your practice speciality?

18     A.  I'm an orthopedic surgeon.

19     Q.  And how many years have you practiced as an

20   orthopedic surgeon?

21     A.  About 26 years, actually.

22     Q.  Do you have any board certifications?

23     A.  Yes, I'm board certified in orthopedic surgery

24   and also in Independent Medical Evaluations.

25     Q.  And could you discuss each of those briefly?
```

1   What's the significance of having a board certification?
2      A.   Yeah.   Board certification is a voluntary extra
3   certification that you do after residency or after
4   special training.
5          In the case of the orthopedic boards, this is a
6   test that you're given two years after you go into
7   practice that has both written and oral components.   You
8   have to be recommended in order to take the test.   There
9   is a significant failure rate.   And certification is the
10  final goal, if you will, of the training process for
11  orthopedic surgeons.
12         As regards the IME --
13     Q.   Who -- so, let me interrupt you just briefly.
14     A.   Yeah.
15     Q.   When you said you have to -- you can -- there
16  needs to be a recommendation --
17     A.   Yes.
18     Q.   -- to take the certification exams --
19     A.   For the American Board of Orthopedic Surgery,
20  yes.
21     Q.   -- who does the recommendation come from?
22     A.   The chairman of the department of orthopedic
23  surgery where you train.   There are recognized certified
24  training programs throughout the United States.   And the
25  professor or the chairman of the department has to

1  recommend the resident.

2      In other words, just finishing the residency is

3  not sufficient.  You need a recommendation -- or you

4  did, at least, at the time that I took them, to take the

5  test.

6      Q.  And for you, where was the residency and where

7  was the subsequent recommendation from the chairman of

8  the department?

9      A.  Yeah, it was from the University of Pittsburgh;

10  and that's where I did my residency.

11      Q.  Okay.  And the second one that you mentioned, the

12  American Board of Independent Medical Examiners, what is

13  that?

14      A.  Yeah.  That's a different certification,

15  different board; and that is specifically with reference

16  to doing Independent Medical Evaluations and doing what

17  are called permanent impairment ratings.

18      This is a relatively younger board, if you will,

19  than the American Board of Orthopedic Surgery

20  established by a national group of independent medical

21  examiners to provide an attempt at establishing a

22  national standard for doing IME exams and permanent

23  impairment ratings.

24      In order to sit that test, you have to take a

25  certain amount of continuing medical education credits,

1  basically.  You have to then sit a -- as I recall, it's

2  a four- to six-hour exam specifically with reference to

3  doing Independent Medical Evaluations and doing

4  permanent impairment ratings.  And then you become a

5  diplomate of the board.

6      Q.  Of the board.  Okay.

7      A.  Assuming you pass the test.

8      Q.  For both the American Board of Orthopedic Surgery

9  and the Board of Independent Medical Examiners, is your

10 certification in each of those current?

11     A.  Yes, it is.

12     Q.  Describe your current practice environment here

13 in Honolulu.  What do you do, and what office are you

14 involved with?

15     A.  Okay.  I practice out of the Honolulu Sports

16 Medicine Clinic, which is a private office, a group of

17 orthopedic surgeons, sports-oriented general

18 practitioners and an occupational medical doctor, all of

19 whom share common facilities and billing.  Although,

20 we're each independent providers within that context.

21     My practice currently is about -- 50 percent of

22 my time is devoted to clinical practice, which includes

23 office outpatient visits and surgery; and about 50

24 percent of my time is dedicated to doing Independent

25 Medical Evaluations and permanent impairment ratings.

1    Q.   When you do surgery, what hospital -- hospital or

2  hospitals do you have privileges?

3    A.   I'm at -- on staff -- active staff at Queen's

4  Medical Center.

5    Q.   In Honolulu?

6    A.   In Honolulu.

7    Q.   Okay.   The last thing, just on your background

8  and training and education, where did you attend medical

9  school?

10    A.   I went to the University of Cincinnati Medical

11  School, graduated from that, did my internship at the

12  University of Vermont Hospitals in Burlington, Vermont

13  and did my residency at University of Pittsburgh.

14    Q.   Okay.   Now, regarding the Independent Medical

15  Examinations performed in the context of lawsuits such

16  as this one, what is the breakdown as far as the people

17  that come to you and request this sort of service in the

18  legal field, plaintiffs and defendants or claimants and

19  insurance companies?   Can you elaborate on that?

20    A.   I think what you're getting at is I get -- I'm

21  asked to do these exams by a variety of people.   Some of

22  them are insurance adjusters who want me to comment on

23  the quality of the care, the direction of care of

24  patients who aren't necessarily getting better at the

25  rate that they think that they should be.   Some of them

1  are plaintiffs' attorneys who want to clarify what's
2  going on with their clients; and some of them are
3  defense attorneys who, again, want to know what's going
4  on with a given patient.

5      In terms of the breakdown, I've never really
6  counted it up. I would say that I see probably -- 75
7  percent of the IMEs that I'm asked to do are requested
8  at least by defense attorneys and about 25 percent by
9  plaintiffs' attorneys.

10     What I have been told, when asked this recently,
11 actually, in court after responding with those
12 percentages, the plaintiffs' attorney in that case came
13 up to me and said that he felt that I would be surprised
14 that a higher percentage than 25 percent are actually
15 requested by the plaintiffs' attorneys where the
16 plaintiff -- I don't like to use the word "negotiate"
17 but basically negotiates with the defense attorney as to
18 which doctor is going to do the evaluation. Although
19 the defense attorney is requesting it, my name is
20 brought up by the plaintiffs' side in at least 50
21 percent of the cases that I end up seeing.

22     And as I said, I really have no access to the
23 veracity of that or the accuracy of that other than
24 saying that at least 25 percent of the ones that I
25 actually do are formally requested by plaintiffs'

1   attorneys.

2       Q.  As far as the elaboration that you just gave, do

3   you perceive that as being related to plaintiffs'

4   attorneys respecting your ability to be fair and

5   objective?

6       A.  That would be my hopeful perception, yeah.  I

7   think that's what it reflects.

8       Q.  So, in other words, the -- a defense attorney may

9   recommend you as an examining physician to perform an

10  IME; and in many instances your understanding is that

11  the plaintiff's attorney accepts that recommendation or

12  goes along with it?

13      A.  Yes, that's my understanding.

14      Q.  Okay.  In this -- shifting gears a little bit

15  here, Doctor, in this particular instance, Japan

16  Airlines, our client, has asked you to evaluate a

17  personal injury claim by Pedro Agravante?

18      A.  Yes.

19      Q.  Is that correct?

20      A.  That's correct.

21      Q.  All right.  And you've not been asked to evaluate

22  any injury claim for Corita Agravante?

23      A.  That's correct.

24      Q.  Okay.  And what -- what were you told about the

25  nature of the personal injury claim that Mr. Agravante

1 | was making?

2 | A. What I was told is -- basically I was given what

3 | we call a cover letter, which is a letter from the

4 | attorney's office, describing what is asked of me.

5 | In other words, I received a letter that said

6 | that the patient was claiming injuries with reference to

7 | a specific incident, the date of which was 7-20-02. I

8 | was asked to review the medical records on this patient

9 | with specific reference to the injury and to comment on

10 | that.

11 | Q. And what were the facts of the underlying

12 | incident which gave rise to Mr. Agravante's claim? What

13 | were the mechanics of the incident? What happened?

14 | A. Yeah. Well, again, my understanding of the

15 | mechanics is based on the cover letter from you, from

16 | your office, rather than any independent knowledge.

17 | And, in fact, there really is no documentation within

18 | the medical records of the mechanics of the specific

19 | injury.

20 | But my understanding is he was a passenger on an

21 | aircraft taking off at Narita Airport in Japan and that

22 | that was the mechanism of the injury, that he had been

23 | injured in the course of this routine takeoff.

24 | Q. Is there anything you remember about the

25 | particular takeoff and how Mr. Agravante was relating

1  how the airplane took off to the claim of injury that he
2  was making?

3     A.  Again, referring to the cover letter, what I was
4  told, he was claiming that he was injured when the plane
5  made a sudden acceleration on takeoff as opposed to a
6  gradual acceleration on takeoff.

7     Q.  Okay.  Do you have any -- any particular details
8  about, you know, the mechanism of the takeoff?

9     A.  Yeah.  Again, from the cover letter, it was
10 described to me as what's called a static takeoff where
11 the pilot keeps his feet on the brakes, rolls up the
12 engine to 75 percent power and then releases the brakes
13 rather than gradually accelerating.

14        Of course, the acceleration is still probably as
15 gradual since you've got a heavy aircraft that's going
16 from a stop.  So, really the static refers to the fact,
17 I think, that you're starting with a 75 percent engine
18 power rather than starting with idling engine power.

19    Q.  You're a pilot, is that right, Dr. Diamond?

20    A.  I was at one time a pilot, yeah.  I held a
21 private pilot's license.  So, I'm roughly familiar with
22 takeoffs and procedures; but I certainly don't claim any
23 expertise that way.

24    Q.  Okay.  But the point is:  In general terms, the
25 aircraft taking off in the manner it did, you have some

1  familiarity with the mechanism of that based on your

2  experience in flying airplanes?

3      A.  Yes.

4      Q.  Okay.  And I know you have your chart and your

5  records with you, and you're free to refer to those in

6  answering questions because --

7      A.  Okay.

8      Q.  -- we don't expect you to memorize what you did

9  in this case.

10        Is there anything else about the underlying facts

11  that you're aware of?  I think you've pretty well

12  covered it but --

13      A.  You mean -- when you say "the underlying facts,"

14  you mean the underlying history prior -- or history of

15  the injury?

16      Q.  No.  Again, staying with the actual -- the

17  aircraft takeoff.

18      A.  Okay.  Okay.

19      Q.  I think you've covered --

20      A.  Yeah, that's basically what I'm aware of.  I'm

21  not aware of any specific abnormalities, if you will, of

22  that takeoff --

23      Q.  Okay.

24      A.  -- or claims of them.

25      Q.  When this case was referred to you by my office,

1  you mentioned there was a cover letter describing the --

2  what happened --

3      A.  Yes.

4      Q.  -- what the claim was based on.

5          Did we also provide you with Mr. Agravante's

6  medical records?

7      A.  Yes, I was provided with a group of medical

8  records referent to Mr. Agravante.

9      Q.  Did those records also include X-ray films?

10     A.  Yes, it did.

11     Q.  In conjunction with your work on this case, after

12  you reviewed the medical records and evaluated the claim

13  being made and the medical records, did you -- did you

14  prepare a report of your findings?

15     A.  Yes, I did.

16     Q.  And what is the -- what is the date of your

17  report?

18     A.  November 27th, 2006.

19     Q.  Okay.  What I'd like to do now, Dr. Diamond,

20  is if you have your report in front of you -- just make

21  that handy so that you can refer to it; and I'm going to

22  go over some of the specifics --

23     A.  Okay.

24     Q.  -- of the findings as stated in your November

25  2006 report.

1    The first is there's -- one of the medical
2  records that you referenced in your report is a report
3  dated September 8th, 2004.  And the report comes -- that
4  medical record, not report, that medical record comes
5  from Guam Adult-Pediatric Clinic.  Do you see the
6  reference to that record?
7    A.  Yes, I do.
8    Q.  What you excerpted from that particular medical
9  record is -- there's a reference to "Review of systems:
10 Normal constitutional."
11    What's your understanding of the meaning of those
12 terms?
13    A.  I'm hesitating because I -- this is not something
14 that I usually put in a review of systems and is
15 probably a convention more of the internists, in
16 general, than it would be a surgeon.
17    But what I take that to mean is that the
18 constitute -- when he says "constitutional," I assume
19 what he means is the general medical systems, the
20 cardiovascular system, the pulmonary system, the central
21 nervous system are normal, in other words, that there
22 has been no complaint referent to any of those systems.
23    Constitutional is really a pretty vague term.
24 So, it's hard for me to be more specific.
25    He goes on to say, "abnormal MS," which I, again,

1  assume means musculoskeletal system.

2      Q.  With respect to the -- staying with that same

3  medical record, September 8th, 2004, there's a reference

4  to a physical exam and the blood pressure, pulse and

5  temperature are reported; but there's -- there's a

6  reference to a "gait," G-A-I-T -- "gait normal"?

7      A.  Yes.

8      Q.  What is a gait, and what's the significance of a

9  normal finding?

10     A.  Gait is the way you walk, basically.  It's the

11  cadence, the rhythm.

12         It's really quite complicated -- or we make it

13  quite complicated as orthopedic surgeons because it

14  breaks down into literally hundreds of different

15  movements all incorporated in a fluid mechanism.

16         But from this point of view, what he's saying is

17  the patient is not walking with a limp.  I think that's

18  the simplest way of describing it.

19     Q.  Not walking with a limp?

20     A.  Not walking with a limp.

21     Q.  Not walking with a limp.

22     A.  In other words, walking normally.  It actually

23  goes beyond a limp because in discussing gait, often

24  you're talking about patterns of movement, not just of

25  the legs but of the rest of the body.

1    And so, for instance, a patient with Parkinson's

2 disease may not be limping, per se, but has a typical

3 Parkinsonian gait pattern, if you will.

4    A patient with other neurologic diseases will

5 have a typical gait pattern that really would not be

6 described by a layman as a limp but is a specific

7 constellation of movements from the head, really, all

8 the way down to the feet.

9    But what he's saying is that the patient had a

10 normal gait, so, precluding that kind of neurologic

11 problem or musculoskeletal problem.

12    Q.  So, a very simple process, at least as far as lay

13 persons are concerned, simply walking?

14    A.  Yeah.

15    Q.  But what you're saying is that a normal walk is

16 very revealing of the person's general overall health;

17 is that right?

18    A.  I'm not sure I'd state it quite as strongly as

19 you've stated it.  I would say that a good neurologist,

20 neurosurgeon or orthopedic surgeon, physiatrist, people

21 with a specific interest in the musculoskeletal system

22 and the neurologic system, can infer a lot about the

23 patient's health from the way they walk, yes.

24    Q.  The -- another reference to the same record,

25 September 8th, 2004, is "sensation and mood/affect

1  normal." Are you able to interpret what that means?

2     A.   Yeah.   What he's saying -- that's -- he's talking

3  about the neurologic evaluation, the neurologic physical

4  exam.   And he's saying -- when he says sensation is

5  normal, he's saying that there's no sensory deficits.

6  In other words, the patient is not numb, has no focal

7  areas of numbness in whatever areas he examined; and he

8  doesn't really specify what areas.

9        Mood is self-explanatory.   It's exactly what you

10  would expect from a lay interpretation of that word.

11       And affect actually refers to the way a patient

12  presents himself and it's really kind of a scientific

13  way or a technical way of saying mood, but it's a little

14  bit more than mood.   Affect is, if you will, how

15  responsive a patient is when you talk to them.

16       We talk about a flattened affect in patients

17  with -- again, Parkinson's disease is a good example.

18  And what that means is the patient sort of presents as

19  dead emotionally.   A flattened affect is a patient that

20  just sits there and stares at you and doesn't laugh,

21  doesn't cry, doesn't -- just is inert.

22       And so, when he says the affect is normal, he's

23  saying the patient presented in a normal fashion,

24  basically.

25     Q.   In discussing this particular record,

1  September 8th, 2004, you've mentioned neurologic exams

2  or doctors that would be doing neurological work --

3     A.  Right.

4     Q.  -- and doctors that would be doing orthopedic

5  work?

6     A.  Right.

7     Q.  Can you differentiate between those two

8  specialties?  What does the orthopedic specialty

9  involve, and what does the neurologic specialty involve?

10     A.  Yeah.  There's a lot of overlap, really, between

11  those areas; but as an orthopedic surgeon, you're

12  concerned basically with the injuries of the

13  musculoskeletal systems.  So, you're concerned with

14  injuries to the bones and the muscles and the ligaments

15  of the patient's body.

16        Now, those, obviously, with the care -- actually,

17  throughout the body those are associated closely with

18  nerves.  So, if you break a bone, for instance, you can

19  break a bone in such a manner as to tear -- literally

20  tear a nerve or bruise a nerve.

21        So, as an orthopedic surgeon, you become familiar

22  with neurologic evaluations of a greater level of

23  sophistication than you would, say, as a general

24  practitioner.

25        A neurologist, on the other hand, focuses on the

1 neurologic system, the brain, the spinal cord and the

2 peripheral nerves, with more of an area of expertise, I

3 think, with problems of the central nervous system,

4 meaning the brain and the -- well, meaning the brain,

5 basically, than, say, an orthopedic surgeon.

6 And the difference between a neurologist and a

7 neurosurgeon is a neurologist is a medical doctor with

8 an interest in the neurologic system. A neurosurgeon is

9 a surgeon who operates on the neurologic system.

10 And as I said, there's a lot of overlap in those

11 areas. Neurosurgeons will operate on spines.

12 Orthopedic surgeons will operate on spines, but

13 neurologists don't do any surgery.

14 Q. So, your comments with respect to the

15 significance of a normal gait, being able to walk in a

16 normal fashion, you commented on that from the

17 perspective as an orthopedic surgeon?

18 A. That's correct.

19 Q. Are you able to comment on the significance of a

20 normal gait from a neurologic aspect?

21 A. Yes. Again, normal gait assumes a normal

22 neurologic exam within -- with a certain level of lack

23 of sophistication. In other words, it's not -- how --

24 if you have some neurologic deficits, it's not going to

25 affect your gait necessarily.

1          In other words, there's some neuro -- I'm not

2     sure I'm being very clear here, forgive me -- there's

3     some neurologic problems that will be reflected

4     immediately in gait.  There's some that are not obvious

5     with gait.  So, a gait analysis is not the sine qua non,

6     if you will, the absolute indicator of whether or not

7     there's a neurologic problem.

8          On the other hand, if you ask me, is it likely

9     that a patient with a spinal cord injury, for instance,

10    will have a normal gait pattern, the answer is no.

11    Usually you can pick up something in the gait pattern

12    that implies a spinal cord or nerve root injury.

13    Q.  Okay.  I'm going to switch from that particular

14    record to one referred to at the bottom of Page 2 of

15    your report; and it's dated August 2nd, 2005, X-rays of

16    cervical spine.

17    A.  Yes.

18    Q.  Did you review that particular X-ray?

19    A.  Yes, I did.

20    Q.  Okay.  And on the -- on the following page,

21    Page 3 of your report, there's a section labeled

22    "Impression."

23         And if you have your report in front of you,

24    could you read -- could you read that to make sure that

25    the terms are pronounced correctly?

1    A.   Okay.   You mean at the top of the page, the

2   8/2/05 impression?

3    Q.   Yes.

4    A.   Okay.   Yeah, the top of the page, "8/2/05, X-rays

5   cervical spine; Impression:   Mild to moderate lower

6   cervical spondylosis with disc space narrowing as

7   described above."

8        So, this is in reference to and part of the

9   radiologist's report on those films.

10    Q.   Could you elaborate on what that impression --

11   what does that mean?   What are we to glean from that?

12    A.   Right.   Cervical spondylosis means -- is another

13   way of saying arthritis or what most people would

14   consider arthritis.   It's wear-and-tear changes that are

15   visible on X-ray.   And it includes disc space narrowing,

16   but it's not limited to disc space narrowing.   It also

17   includes joint changes, arthritic changes in the joint,

18   and bone spurs.   So, it's kind of an overall impression.

19        The disc space narrowing is described in the body

20   of the report; and he notes it at two levels, at the

21   C5-6 and 6-7 level, in his report.   And disc space

22   narrowing refers to the space between the vertebral

23   bodies.

24        You can't see the physical disc on an X-ray; but

25   what you can see is the black space, if you will,

1 between the white bone above and the white bone below.

2 And what happens, as a disc becomes old and dries out,

3 is that that disc space narrows down.  And the more

4 severely narrowed it is, the drier and the more worn out

5 the disc is assumed to be.

6     Q.  You referenced in your answer to "his."  You're

7 referring to the radiologist that initially reviewed

8 this film?

9     A.  That's correct.  That's Dr. Lizama.

10    Q.  And then you reviewed Dr. Lizama's analysis of

11 the film?

12    A.  Yeah.  I read Dr. Lizama's analysis of the film,

13 and I looked at the films myself.

14    Q.  Okay.  So, you have -- the impression from the

15 August 2nd, 2005, X-ray is essentially a narrowing of

16 the space between certain discs and the presence of

17 arthritis; is that right?

18    A.  Arthritic changes, yes.

19    Q.  Arthritic changes.  Okay.  Is there anything in

20 there that indicates some injury from a sudden traumatic

21 event?

22    A.  No, there isn't.

23    Q.  The next -- the next film -- the next X-ray film

24 that we gave you and you reviewed is dated August 12th,

25 2005.  And you have your interpretation of the

1  radiologist's findings; is that correct?

2      A.  Yeah, I have -- the radiologist's report is

3  reproduced at the top of the page.

4      Q.  Okay.  And what did that say, the radiologist's

5  report?

6      A.  That was read by Dr. Michael Mudd, and he read it

7  as follows:  "There are no osseous or articular

8  abnormalities.  There are no soft tissue

9  calcifications."

10     Q.  And what was the impression by Dr. Mudd?

11     A.  The impression was negative --

12     Q.  Negative.

13     A.  -- meaning that it was a normal exam.

14     Q.  Okay.  Now, for the -- let's go back to the

15  findings.  Can you elaborate on that, the -- the

16  conditions that were observed by Dr. Mudd?

17         And that would be -- if you refer to your report

18  on Page 3, it's the -- it's the -- you see the word

19  "findings" that are underlined?

20     A.  Yes.

21     Q.  And then can you -- can you read that sentence

22  again?

23     A.  Sure.  "There are no osseous or articular

24  abnormalities."

25     Q.  And what does that mean in lay terms?

1    A.   It means the bone's not broken, and the joint is

2    intact.   It's in -- when -- the joint is not narrowed

3    similar to what we were talking about earlier with the

4    degenerative discs.

5         The joint space is -- when you have arthritis,

6    what happens is cartilage wears away.   When cartilage

7    wears away, you have a narrowing of the joint space

8    because you can't see cartilage on a plain X-ray.   All

9    you can see is the space that is there between the two

10   bones.

11   Q.   And for -- this X-ray was of a right shoulder

12   X-ray?

13   A.   Correct.

14   Q.   And so, how do you -- your description of how you

15   would evaluate the space between discs in the cervical

16   spine, obviously, it's -- it doesn't apply exactly to

17   evaluating a shoulder injury?

18   A.   Right.

19   Q.   So, how would you come to the conclusion that

20   there were no articular abnormalities when you're

21   looking at a shoulder X-ray?

22   A.   Yeah, you would look at the joint space.   And

23   there's several joints that are visible on the average

24   shoulder X-ray.

25        The shoulder is referred to as the shoulder

```
 1  girdle because it's a series of joints rather than a
 2  single joint.  Most people -- and probably most
 3  radiologists -- will focus on the major joint, which is
 4  the joint between the arm and the socket -- the
 5  ball-and-socket joint.  And that's technically called
 6  the glenohumeral joint, but there are other small joints
 7  that are sometimes visible on the same X-ray.
 8      Q.  Where it says -- staying with this same X-ray --
 9  "There are no soft tissue calcifications" --
10      A.  Right.
11      Q.  -- what does that mean?
12      A.  What he's commenting on is in cases of shoulder
13  tendonitis, very often you will see calcification,
14  meaning white spots or white areas, in the soft tissues
15  around the bone.  So, it's a bone density whiteness that
16  you see; but it's not actually bone.  It's calcium
17  within the soft tissues and usually within the tendons.
18      Q.  As far as Dr. Mudd was concerned, the findings
19  were negative --
20      A.  Right.
21      Q.  -- is that correct?
22      A.  He did not see any.
23      Q.  Okay.  And you did your own independent analysis
24  of what was depicted in the X-ray films; is that right?
25      A.  Yes, I did.
```

1    Q.   Okay.  And can you -- can you go through those

2  for us, first, the -- starting in the same chronological

3  order, the cervical spine films that were dated

4  August 2nd, 2005, what was your interpretation of those

5  films?

6    A.   Okay.  I felt that it showed marked degenerative

7  disc disease changes at both C5-6 and 6-7.  Basically,

8  I'm saying I agree with what the radiologist said.  I

9  just felt that it was a little bit more significant than

10 what his report implied by calling it "mild to

11 moderate."

12      And this is a subjective thing.  And the reason I

13 said it was -- although the disc space narrowing was

14 mild to moderate, there was quite a bit of anterior

15 osteophyte formation, which means spurs.  And spurs on

16 this patient, as I recall, were prominent at those two

17 levels, at C5-6 and 6-7.

18      And that just implies a long-standing chronic

19 process.  You don't get a spur being formed overnight.

20 It takes years and years usually to develop.

21   Q.   Is that -- I was going to ask you to explain, if

22 you would, again, in -- sort of in lay terms, chronic

23 degenerative changes.  So, chronic meaning occurring

24 over a long period of time?

25   A.   Over a long period of time, and degenerative

Case 1:04-cv-00036   Document 116-8   Filed 04/23/2007   Page 33 of 39

1  meaning wear-and-tear kind of changes, the kind of
2  changes that are seen.

3    Q.  And are the findings from this August 2nd, 2005,
4  X-ray by you -- what was your opinion with regard to the
5  presence of any acute trauma?

6    A.  Again, there was nothing in those films to
7  indicate an acute trauma.  There was no sign of a
8  fracture of the spine.  There was no sign of a disc
9  location or a subluxation -- a significant subluxation.

10       And I just qualified that because he had two or
11 three millimeters of subluxation.  Now, subluxation is
12 when a joint or two bones slide on each other more than
13 is normal, but not enough to actually get out of joint,
14 not actually dislocate.

15       And the fact is:  In most spines, and certainly
16 in most degenerative or arthritic spines, you will
17 commonly see two millimeters, three millimeters of
18 subluxation.  So, there's a little bit of play in the
19 joint that you don't have in a normal joint or -- yeah,
20 basically that's what I'm saying.

21       So, as opposed to an acute trauma where you
22 have -- for instance, a facet dislocation -- a
23 unilateral facet dislocation in the neck, which means
24 that the joint, instead of just being -- having a little
25 bit of play in it, it has so much play that it actually

1  slips off; and the two halves, if you will, of the joint
2  are no longer in contact.

3      That's what you see in major acute trauma, and
4  that was not the case in this patient.

5      Q.  Well, to put it in lay terms, to distinguish
6  between a chronic degenerative change and acute trauma,
7  would a fair interpretation be that the chronic
8  degenerative change occurs over a long period of time;
9  and when a doctor, a medical doctor, refers to an acute
10  trauma, would it be fair to say that the doctor is
11  referring to a specific event?

12      A.  Specific injury, yes.

13      Q.  A specific injury?

14      A.  Yes.

15      Q.  Okay.  And how about the X-ray of the right
16  shoulder dated August 12th, 2005?  What was your
17  interpretation of that film?

18      A.  Basically I -- I'm not going to disagree with the
19  overall reading of Dr. Mudd, which was that it was a
20  negative film, meaning it did not show any signs of
21  acute injury or acute trauma, no fracture, no
22  dislocation.

23      I did think there was some degenerative joint
24  disease, though, some arthritis, not in the main joint
25  of the shoulder but in the acromioclavicular joint.  And

1  that's the joint where the collarbone joins the shoulder

2  blade.  And it's part of the shoulder girdle.

3       So, it's part of the shoulder joint when an

4  orthopedic surgeon talks about a shoulder joint.  It's

5  probably not what most people think of as a shoulder

6  joint because it's not the ball and socket.

7       So, he does have a little bit of arthritic change

8  in that joint; and that's normal for somebody in that

9  age group.  It's not unusual for people in that age

10  group to have it.

11       I also thought I saw a little bit of

12  tendonitis -- excuse me -- a little bit of calcification

13  within the tendons around the greater tuberosity, which

14  is part of -- the ball part of the ball-and-socket

15  joint; and calcifications in that area are real common

16  in patients with chronic rotator cuff tendonitis.

17       And sometimes with acute tendonitis, with a

18  sudden flare-up of tendonitis, you'll see calcium being

19  deposited in the tendons; and you can see that on some

20  X-rays.  But, again, it's not something that indicates a

21  specific injury.  It's not seen usually with -- it's not

22  as if a piece of the bone has been fractured off.

23    Q.  Staying with your November 27, 2006 report, in

24  the section underneath where you have stated the review

25  of the X-rays --

1    A.   Yes.

2    Q.   -- which we've just finished, you have -- the

3  next section is -- you've labeled it "Assessment"?

4    A.   Yes.

5    Q.   Can you elaborate on that?  What was your

6  assessment?

7    A.   Assessment -- basically, I'm trying to establish

8  what the diagnoses are in this patient.  And this is

9  based entirely on the review of all of the records, just

10  not parroting the diagnosis of whatever the treating

11  doctor was.

12        And based on that -- so, based on a review of the

13  records of treatment that I had available to me and the

14  X-rays that I had available to me, I came up with two

15  diagnoses.  One was "Neck pain, most likely secondary to

16  degenerative disc disease without documentation of acute

17  injury in 2002"; and the other was "Possible right

18  shoulder impingement tendonitis superimposed on

19  degenerative joint disease of the acromioclavicular

20  joint, without any evidence for shoulder trauma from the

21  subject injury."

22        By that, what I'm saying is that the patient's

23  complaints of neck -- of shoulder area pain that were

24  alluded to in the 8-9-05 note by Dr. Chenet are most

25  likely on the basis of a tendonitis, based entirely on

1  my review of the X-rays. And that may or may not be
2  accurate, but that's -- that's what was available from
3  the medical records.

4     Q.  And so, distinguishing, again, from degenerative
5  changes and this -- both in the neck and the shoulder,
6  did your assessment or your diagnosis -- you've -- well,
7  let me ask it this way:  And No. 1 is "neck pain, most
8  likely secondary to degenerative disc disease without
9  documentation of acute injury in 2002," okay?

10    A.  Yes.

11    Q.  What's the significance of the 2002?  Are you
12 referring to the takeoff of the airplane in 2002?

13    A.  Correct.  I'm referring to the fact that there's
14 no documentation in the records that I have of treatment
15 for neck pain, actually, prior to 2004.

16    Q.  Prior to 2004?

17    A.  Right.

18    Q.  Okay.

19    A.  So that there's no documentation of treatment at
20 the time of the injury.

21    Q.  Okay.  So, the first -- well, we'll get to that
22 in a minute.  Let me elaborate on that in a minute --

23    A.  Okay.

24    Q.  -- but -- but before we do that, let me finish
25 this thought.

1   In -- in the assessment numbered two where you

2 discuss "possible right shoulder impingement

3 tendonitis" -- and, again, you say -- you conclude by

4 saying "without any evidence for shoulder trauma from

5 the subject incident"?

6  A. Right.

7  Q. What's the subject -- again, the subject incident

8 is what?

9  A. Is the one in 2002.

10  Q. Okay. I have a -- before we get to summarizing

11 the opinions that you formed --

12  A. Uh-huh.

13  Q. -- in this case, I have a few specific

14 questions --

15  A. Okay.

16  Q. -- for you. The available medical records that

17 you were provided with and you reviewed show initial

18 treatment -- the first initial treatment on

19 September 8th, 2004, which is a little more than --

20 assuming July 2002 for the airplane incident --

21  A. Uh-huh.

22  Q. -- so, the first medical records available to you

23 were a little more than two years after the claimed

24 incident; is that -- is that right?

25  A. That's correct, yes.

1    Q.  Okay.  Did you see -- amongst the records that we

2   obtained and provided to you, was there any indication

3   that Mr. Agravante sought any medical care prior to

4   September 2004?

5    A.  There's no documentation of that in the records

6   that I have.

7    Q.  And in the records that you did review, there

8   was -- there was one reference to a 2002 flight on Japan

9   Airlines; is that correct?

10    A.  Yes, it is.

11    Q.  All right.  But was there any reference to a

12   specific injury as a result of having flown on Japan

13   Airlines in 2002?

14    A.  No.

15    Q.  And in the -- again, in the records that we

16   obtained and provided to you, in any of those records,

17   not only the ones that we've discussed during your

18   testimony here but -- I take it you reviewed all of the

19   medical records that we gave you?

20    A.  That you gave me, yes.

21    Q.  All right.  And in any of those records, was

22   there any reference to an acute injury claimed to have

23   been caused by the flight on Japan Airlines in 2002?

24    A.  The closest to that is that initial visit that I

25   think we already talked about, the one on 9-8-04 at Guam

1  Adult-Pediatric Clinic, in which the physician states,
2  "57-year-old male after accident 7-20-02 on JAL."
3  That's it.
4      Q.  And is there any elaboration on what that
5  accident was?
6      A.  Not -- no, not that I could read.
7      Q.  Sort of put on your treating physician hat for a
8  moment, if you will.  When a patient makes an
9  appointment with you and comes in to see you because
10 they have some medical problem, I mean, would you expect
11 them to elaborate in great detail as to what happened
12 and what their complaints are?
13     A.  I don't know that I would expect them to
14 spontaneously; but it would be a very important part of
15 the evaluation to get that detail, yes.
16     Q.  And none of that detail was present in the August
17 2004 record; is that correct?
18     A.  That's correct.
19     Q.  Okay.  And, I mean, in your experience as a
20 treating physician treating patients for 26 years, is it
21 your impression or opinion that, generally speaking,
22 people that have an injury are motivated to tell you
23 about the injury?
24     A.  Sure, yes.
25     Q.  Okay.  And what I'd like to do at this point --

```
 1    it's called the "Summary" or opinions and ask you to go
 2    through the opinions that you have formed as a result of
 3    the work that you did in this -- in this matter.  And,
 4    again, you can -- you can refer to the opinions as
 5    they're written --
 6        A.   Okay.
 7        Q.   -- in your report, but we'll be -- obviously
 8    we're taping them and recording them.  So, they'll be
 9    verbal --
10        A.   Okay.
11        Q.   -- when your testimony is presented to the court
12    and the jury.
13        A.   Uh-huh.
14        Q.   Go ahead.  Yeah.
15        A.   So, repeat your question then?
16        Q.   Yeah, the -- on Page 4 of your November 20 --
17    November 2006 report, you have written a number of --
18        A.   A summary.
19        Q.   -- a summary of opinions.
20        A.   So, you want me to just go through that summary?
21        Q.   Yes --
22        A.   Okay.
23        Q.   -- because your report will not --
24        A.   Right.
25        Q.   -- be before the court or the jury, only your
```

1  testimony will be.

2     A.  Okay.  What I said in the summary, basically, is

3  that he -- and, again, this is all based on my review of

4  the records and my review of the X-rays -- is that from

5  what I can tell from that, the patient is a "60-year-old

6  male presenting with roentgenographic evidence for

7  essentially degenerative joint disease at the neck and

8  the right shoulder and without any evidence for acute

9  trauma on the plain films."

10     Q.  What was that one -- what was that one word -- I

11  can't pronounce it -- in the second sentence beginning

12  with "R"?  Can you read that?

13     A.  Roentgenographic.  That just means X-ray.

14     Q.  X-ray.  Okay.

15     A.  We always -- we never use a simple word when a

16  complicated one can just as easily be used.

17     Q.  Okay.

18     A.  And I went on to say that "Given the lack of

19  initial documented trauma" -- in other words, there's no

20  major trauma or even minor trauma that I was aware of

21  from the documentation that I reviewed -- given that,

22  given "the lack of symptoms requiring treatment until

23  two years following the subject event" and given the

24  fact that the X-rays show basically degenerative

25  changes, long-term changes, it was my opinion, to a

1 reasonable degree of medical probability, "that the

2 subject incident in 2002 is not causally related to the

3 current symptoms."

4    Q. Okay. Just to be -- just to be sure, "causally

5 related," is that a term that you and I are --

6    A. It means it didn't cause.

7    Q. Okay.

8    A. That the event in 2002 was not the cause of his

9 symptoms in 2004.

10    Q. Okay. And then the last one -- the last opinion

11 that you've articulated in your report, if you could

12 give that verbally for the -- for your testimony.

13    A. Yeah. What I said was that it's virtually

14 impossible that a patient could have an acute disc

15 injury in 2002 and then not have any symptoms until

16 2004. I mean, it just -- some delay between injuring a

17 disc and the onset of the symptoms is possible. By

18 "some delay," I mean a couple days, four days, maybe a

19 week, but not two years.

20    Q. Okay.

21    A. It just doesn't happen that way.

22    Q. And where you're -- where the -- what's your

23 opinion with respect to whether the X-rays bear that

24 out?

25    A. Yeah. Again, there are some things that you

1  expect the X-rays to show with a major trauma to the
2  neck.  And we talked about those, fractures and
3  dislocations and subluxations.  And none of that was
4  evident.

5       The other thing that I commented on in my report
6  is that the changes in this patient were multi-level.
7  In other words, it wasn't just at one level.  And
8  usually when you are injured -- when, for instance, you
9  rupture, say, an acute -- you have an acute disc injury
10 in the neck, it's usually one level.  It's not usually
11 at multiple levels.

12      And multiple levels, again, tend to reflect a
13 chronic long-term change rather than an acute change.
14 Now, that's not written in stone; but, again, as a
15 general rule and to a reasonable degree of medical
16 probability, you can make that statement.

17 Q.  By multiple levels, you're referring to multiple
18 levels of the spine?

19 A.  Yes, that's correct.

20 Q.  Okay.  All of the opinions that you've summarized
21 here and throughout your testimony, the standard that
22 you use here in Hawaii is a reasonable degree of medical
23 probability; is that correct?

24 A.  Yes, that's correct.

25 Q.  Okay.  And everything that you've said in terms

1  of expressing opinions and diagnosis, have you applied

2  that standard?

3      A.  Yes, I have.

4      Q.  Okay.  Then on -- if you could look at Page 5 of

5  your -- of your November 2006 report, there's -- it's

6  the -- what I'll call the third paragraph down; but it's

7  actually a single sentence.  It begins with the word

8  "The opinions."  Could you read that, please?

9      A.  Yeah.  What I say is "The opinions and

10 recommendations are totally independent of the

11 requesting agency."

12     Q.  What does that mean?

13     A.  By which I mean that the opinions are based on

14 the medical evidence and the physical evidence and not

15 on the expectations of the requesting agency.

16             MR. LEDGER:  Okay.  Well, that -- we're

17 going to -- we'll conclude your testimony.  And as I

18 explained to you before we began, this testimony was

19 taken in lieu of calling you to appear in person in the

20 District Court of Guam in this trial, which is scheduled

21 to commence in March of this year.

22         So, just to confirm that, you've -- you've given

23 this testimony with that understanding; is that right?

24             THE WITNESS:  Yes, that's correct.

25             MR. LEDGER:  Okay.  So, I think we'll

```
 1   conclude.
 2        Again, if the court reporter would just attach
 3   the notice of the deposition and we'll just make a note
 4   that there's been no appearance by either of the
 5   plaintiffs or other legal counsel.
 6        So, with that, we'll finish.  Thank you, Doctor.
 7             THE WITNESS:  Thank you.
 8             THE VIDEOGRAPHER:  The time is now 9:56 a.m.
 9   We're going off the record, and this concludes today's
10   deposition.
11             (Diamond Exhibit A marked.)
12             (Signature waived.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                    C E R T I F I C A T E

2    STATE OF HAWAII                    )

3                                       )    SS:

4    CITY AND COUNTY OF HONOLULU   )

5        I, SHARON ROSS, Notary Public, State of Hawaii, do

6    hereby certify:

7        That on Thursday, February 22, 2007, at 9:07 a.m.,

8    appeared before me DR. PETER ELLIOTT DIAMOND, the

9    witness whose deposition is contained herein; that prior

10   to being examined he was by me duly sworn;

11       That the deposition was taken down by me in machine

12   shorthand and was thereafter reduced to typewriting

13   under my supervision; that the foregoing represents, to

14   the best of my ability, a true and correct transcript of

15   the proceedings had in the foregoing matter.

16       I further certify that I am not an attorney for any

17   of the parties hereto, nor in any way concerned with the

18   cause.

19       DATED this 4th day of March, 2007, in Honolulu,

20   Hawaii.

21

22

23                              SHARON ROSS, CSR NO. 432
                                Notary Public, State of Hawaii
24                              My Commission Expires:  4/8/09

25
```

# B I O M E D I C A L    F O R E N S I C S

To:     **Elyze McDonald, Esq.**
        **CARLSMITH BALL LLP**
        **Bank of Hawaii Building, Suite 401**
        **134 West Soledad Ave.**
        **PO Box BF**
        **Hagatna, Guam 96932-5027**

Re:     **Pedro Agravante, et al. v. Japan Airlines International Co., Ltd. File # 10/06 - 1998**

Date:   **December 27, 2006**


## INTRODUCTION

Following our correspondence on December 10, 2006, I was asked to perform a BioMedical analysis of the incident involving the injury of Pedro Agravante in the Pedro Agravante, et al. verses Japan Airlines International Co, Ltd. matter. In addition to other analyses, I was asked to assess the likelihood of a cervical spine extension injury sustained by Pedro Agravante in the July 20, 2002 incident. The scope of the research here does not include: 1) medical diagnosis, prognosis or treatment, or 2) analysis of the force experienced by Mr. Agravante from putting his hand and foot out to stop the food cart.

The BioMedical Engineering analytical process includes a review of physical evidence, the medical records, as well as other documents including depositions. The findings are based on facts contained in the documents reviewed, as well as research and experience. The principles of BioMedical Engineering are utilized to determine the causation of trauma within the parameters of this incident.

The following report outlines the analysis of the "static take off" incident with the claim of cervical spine extension injury ("whiplash") to Pedro Agravante. Findings are specific to the parameters of the analyses here, and should not be generalized.

Dr. Peter Diamond examined the available medical records and concluded there was "no medical documentation of treatment earlier than 2 years following the incident, and no credible history of trauma involved in the original incident, which was not specifically enumerated or described in the medical records." Dr. Diamond opines "to a reasonable degree of medical probability, that the subject incident in 2002 was not causally related to the current symptoms." [11/27/06, 8-3]

This is a preliminary report. The report contained herein represents preliminary findings and opinions to a reasonable degree of engineering certainty based on facts available and analyses performed at the time of publication. The right is reserved to continue the analyses and amend or modify the opinions as new information and data become available through the discovery process.

**EXHIBIT "I"**

## BIOMEDICAL ENGINEERING OVERVIEW

BioMedical Engineering studies the effect of forces and motions on bones, joints, and other systems and structures of the body. The field utilizes mechanical laws derived from physics and engineering to study the principles of the action of forces and their effects on biological tissues. BioMedical Engineering is an integrated interdisciplinary field, focused on the cause or mechanics/kinematics of trauma, rather than the diagnosis, prognosis, or treatment of injuries. BioMedical Engineers utilize scientific/engineering principles and datum to describe the mechanical cause of trauma diagnosed by health care providers.

Based on the known facts in this case, cumulative findings of medical records, and legal documents concerning the circumstances leading up to Pedro Agravante's injury, the BioMedical Engineering work focuses on the mechanics of cervical spine extension and the G forces involved in the "static take off" data provided from Captain Masuhara's handwritten notes on the date of the incident, and JAL's flight simulator analysis. [5-2, 8, and 9]

## RECORDS REVIEWED

Findings are subject to change when additional information becomes available.

1.  Incident Report

2.  Plaintiff's Responses to Defendant Japan Airlines to Interrogatories

3.  Letter from Plaintiff to Ms. MacDonald dated 5/22/06

4.  Plaintiff's Pro Se Answers to Interrogatories

5.  JAL correspondence, flight as well as simulator data, and runway diagram

6.  Medical records from LMR, X-ray Pro and Guam Adult-Pediatric Clinic

7.  Plain Film X-rays of Shoulder and C-spine dated 8/2/05 and 8/12/05

8.  IME Report by Dr. Diamond dated 11/27/06

9.  Statement of Reliability on JAL Flight Simulator Software

10. Color copies of (3) photos of aircraft seats

## INCIDENT

On July 20, 2002, Pedro Agravante boarded Japan Airlines Flight 981 bound for Guam. The aircraft was on the runway awaiting instructions from the tower. Captain Masuhara throttled the engines of the aircraft preparing for take off with the brakes on for approximately 5 seconds. Mr. Agravante stated "I bent forward to observe around [sic] feeling very scared and worried." The aircraft's brakes were released and the aircraft began to move forward. Mr. Agravante maintains that "This sudden motion caused me to slam hard backwards into my seat." [Pltf's Resp. to ROGS, 2-4]

## REVIEW OF MEDICAL RECORDS

### RADIOLOGICAL

| 8/2/05 | C-Spine 4 views | 6-1 |
|---|---|---|
| | LMR, X-ray Pro | |
| | AP, lateral and oblique views were obtained. There is a mild straightening of the normal lordotic curvature at the lower cervical spine. The vertebral bodies are normal in height. Small marginal osteophytes are noted at C5-, 6 and 7. There is mild narrowing of the disc spaces of C5-6 and C6-7. There is moderate encroachment into the neuroforamina bilaterally at C5-6 and C6-7 and to a lesser degree at C3-4 on the left. Impression: Mild to moderate lower cervical spondylosis with disc space narrowing as described above. | |

<u>CLINICAL</u>

| 9/08/04 | Guam Adult-Pediatric Clinic. | 6-10? |
| | Hx of Present Illness: 57 yo male after accident " 20/02 on JAL. [illeg.] with radial nerve | |
| | pain. Pt filed claim in court and wants [illeg.]. | |
| | Review of systems: Normal constitutional. Abnormal MS, neurologic. Pain down both arms. | |
| | PE: Abnormal neck exam. Gait normal. Abnormal joint and bone exam. Sensation normal | |
| | at bilateral U/E. Motor affect normal. | |
| | A & P: Neck pain – > Naprosyn. May need MRI for CS disc. [illeg.]. | |
| | Diagnosis: Neck Pain  723.1 | |
| 8/03/05 | Guam Adult-Pediatric Clinic | 6-3 |
| | Diagnosis: | |
| | 1. Neck Pain 723.1 | |
| 8/09/05 | Guam Adult-Pediatric Clinic | 6-4 |
| | Diagnosis: | |
| | 1. Neck Pain 723.1 | |
| | 2. HTN 401.1 | |
| | 3. Rt Shoulder 840.9 | |
| 8/5/05 | Guam Adult-Pediatric Clinic - Alex Chenet, M.D. | 6-9 |
| | To Consulting physician: Dr. Hayashida | |
| | Reason for consult: Pt with Rt shoulder rotator cuff? Tear and cervical. [illeg.] with ? | |
| | radiculopathy for evaluation. | |
| No Date | Guam Adult-Pediatric Clinic - Dr. Don Preston | 6-12 |
| | Referral Form | |
| | To consulting physician: Dr. Greg Miifin (Chiropractor) | |
| | Reason for consult: 57 yo male with 2 yr hx of neck pain. | |

## FINDINGS

Based on the information provided as outlined in this report, literature review, and my experience and education, there are three bottom line findings.

1. **Cervical spine movement is within normal range of motion, and hyperextension is unlikely.**

   a. The padded first class seats are vertically adequate for the 50th percentile male. [Backaitis] The top of the seat is likely superior to the superior pinna thereby preventing cervical spine extension.

   b. For perspective, the magnitude of accelerations in motor vehicle rear impact collisions are compared. This is not to presume rear impacts are equal or even comparable in magnitude to the low levels of acceleration here; however, the magnitude of acceleration is helpful as an illustrative tool for comparison.

      Trauma is statistically unlikely.
      Human subjects volunteered for a study of 364 rear impacts of up to 10 mph change in velocity with peak g's to the head of up to 9.1 g's.
      - The most severe injury was minor neck discomfort lasting one week in a 6'1" 33yo ♂ subjected to 4 rear impacts (3.2-8.0 mph ΔVs, inadequate head restraint) and 4 frontals (4.8-8.7 mph ΔVs) all in the same day. [Neilsen]

2. **The static take-off would not impart accelerations greater than those of activities of daily living.**

   a. Mr. Agravante states that "This sudden motion caused me to slam hard backwards into my seat." The accelerations from a "static take off" are in fact within g's experienced in activities of daily living.

      Peak aircraft g's equal 0.41 g's
      Maximum g's experienced by aircraft equal .41 g's, which occurs 13 seconds after rest with aircraft at maximum thrust. [Flight Simulator Data, 5-9]
      The reliability of this flight simulator data has been substantiated by Shinichi Sugamoto and Tsutomu Mabuchi from Japan Airlines Simulator Engineering Company, Ltd. [Statement of Reliability, 9-1]
      Estimated peak g's of occupant's head equal 1.23 g's

      The accelerations are within activities of daily living.
      Estimated peak accelerations of the head equal 1.23 g's which is less than:
      - Sitting Down (2.5 g)
      - Sneezing (2.9 g)
      - Hop off a step (8.1 g)
      - Plop in a Chair (10.1 g) [Allen]

   b. For perspective, the average vehicle acceleration from 0 mph to 30 mph equals approximately 0.54 g's. [EAS] This is greater than the peak g's generated by the static take-off of the aircraft.

   c. It is noteworthy to point out that Mr. Agravante was the only passenger out of 133 passengers on board the flight to Guam claiming cervical spine extension injury from the static take-off.

3.  **Cervical torque is less than human dynamic tolerances of 35 ft. lbs. in extension and 44 ft. lbs. in flexion. [Mertz]**

Basis: Torque calculation on the cervical spine compared with dynamic tolerance in extension and flexion utilizing the flight simulator data.

**RESEARCH REVIEWED**

1.  Allen, M.E., "Acceleration Perturbations of Daily Living," J.B. Lippincott Company, Spine, Volume 19, 1994.

2.  Mertz, H.J., and Patrick, L.M., "Strength and Response of the Human Neck," SAE Paper 710855.

3.  Ewing, C., and Thomas, D., "Human Head and Neck Response to Impact Acceleration," Navel Aerospace Medical Research Laboratory, August 1972.

4.  Yamada, "Strength of Biological Materials," 1970.

5.  Panjabi, M., "Mechanism of Whiplash Injury," Elsevier Science Ltd., Clinical Biomechanics, Vol. 13, 1998.

6.  Mertz, H.J. and Patrick, L.M., "Investigation of Kinematics and Kinetics of Whiplash," SAE Paper 670919.

7.  Neilsen, G.P., et al, "Low Speed Rear Impact Test Summary – Human Test Subjects," Accident Reconstruction Journal, September/October 1996.

8.  Szabo, T.J., et al, "Human Occupant Kinematic Response to Low Speed Rear-End Impacts," SAE 940532.

9.  Watts, et al, "Low Speed Automobile Accidents," Lawyers & Judges Publishing Company, 2nd Ed., 1999.

10. GEBOD.

11. Expert AutoStats.

12. Backaitis, S.H., and Mertz, H.J., "Hybrid III: The First Human-Like Crash Test Dummy," SAE 1994.

## REQUEST FOR ADDITIONAL INFORMATION

Lastly, the following address your request for information:

- Laura Liptai, Ph.D.  C.V. (exhibit 1)

- Compensation is $300/hr and $350/hr (for deposition/trial time)

- List of cases at trial/deposition (exhibit 2)

- Flight Simulator Data (exhibit 3)

- Exhibits: supplemented at a later date

- Data relied upon (see records reviewed and research reviewed,  as well as the balance of report)

Laura L. Liptai, Ph.D.
BioMedical Engineer
Mechanical Engineer

# Exhibit 1

# B I O M E D I C A L  F O R E N S I C S

*Laura L. Liptai, Ph.D.*
*BioMedical Engineer and Mechanical Engineer*

*Technical Consulting in:*
*Mechanism and Causation of Trauma • Impact Biomechanics • Accident Reconstruction*

---

## Education

**Ph.D., 1996 ~ BioMedical Engineering – University of California at Davis**
*Mathematical Modeling of Side Impact Head Dynamics*

**M.S., 1993 ~ BioMedical Engineering – University of California at Davis**
*Occupant Protection Design Improvement*

**M.B.A., 1985 ~ Engineering Project Management – University of Southern California**
*Robotic Motor Usage*

**B.S., 1983 ~ Mechanical Engineering – University of California at Davis**
*Awarded Third Place in National Competition for Human Powered Vehicle Design*

**Ergonomics/Human Factors, 1981 ~ Royal Academy of Denmark, D.I.S.**

## Academic Appointments & Positions

**Anatomy and Histology ~ UCD School of Medicine, 1994**

**Mechanical/Machine Design ~ UCD School of Engineering, 1993**

## Clinical Experience

**Radiology and Neuroradiology, UCD Medical Center, 1995-1996**
*Magnetic Resonance Imaging Rotation, 1996*
*Computerized Tomography Rotation, 1995*

**Forensic Pathology, UCD Medical Center, Coroner's Office, 1993**

**Orthopedic Trauma, UCD Medical Center, 1992**

**Physical Medicine & Rehabilitation – Spine Injury Clinic, UCDMC 1992**

**Santa Clara Coroner's Office, Forensic Pathology/Autopsy Periodic Volunteer, 2002 – 2003**

CALIFORNIA  1660 SCHOOL STREET • SUITE 103 • MORAGA, CA 94556 • (925) 376-1240 • Fax (925) 376-1243
FLORIDA  7380 SAND LAKE ROAD • SUITE 500 • ORLANDO, FL 32819 • (407) 455-8187 • Fax (407) 351-1901

Case 1:04-cv-00036    Document 116-4    Filed 04/23/2007    Page 19 of 35

## Honors

**Chairman of Engineering Sciences, American Academy of Forensic Sciences (AAFS) ~ 2005-2006**
*The AAFS has o000 members representing all 50 United States, Canada and 50 other countries worldwide. The AAFS is the most prestigious forensic science organization in the world. Elected Chairman of Engineering Sciences, including mechanical, electrical, materials, civil, physics, etc.*

**Diplomate, International Institute of Forensic Engineering Sciences (IIFES) ~ 2005**
*The International Institute of Forensic Engineering Sciences, Inc. is an independent board that certifies professionals with a specialty in the forensic engineering sciences. An IIFES certification indicates that an individual has been determined by his or her peers to be technically competent, forensically experienced, dedicated to ethical work, and professionally correct.*

**National Forensic Engineering Task Force, American Society of Testing and Materials (ASTM) ~ 2006-2007**
*Selected as one of twelve engineers nationally to determine the direction of future engineering standards. Organized in 1898. ASTM International is one of the largest voluntary standards developing organizations in the world, representing producers, users, consumers, government, and academia from over 100 countries, publishing technical documents that are a basis for manufacturing, management, procurement, codes, and regulations.*

**First Chairman of BioMedical Engineering, International E-30 Technical Standard Guides and Practices, American Society of Testing and Materials ~ *Chicago, IL. 2003; Dallas, TX 2004***

**National Engineering Honor ~ Tau Beta Pi, 1995**
*Elected for Distinguished Achievement in Engineering Scholarship*

**National Biological Sciences Research Honor ~ Phi Sigma, 1995**
*Awarded by the University of California for Research in the Biological Sciences*

## Research, Committees & Publications

**Journal of the National Academy of Engineers ~ 2005**
*Forensic Engineering Analysis of Head Impacts within a Vehicle Subject to Side Impact.*

**Faculty of American Academy of Forensic Science, Student Section, Co/Chairman of Engineering**
*~ Chicago, IL. 2003; Dallas, TX. 2004; New Orleans, LA. 2005; Seattle, WA. 2006; San Antonio, TX. 2007 (pending)*

**Chairman "European Technical Research Conference," Society of Forensic Engineers and Scientists, Technical Program ~ *Paris, France. 2002***

**Co-Established Trauma Research Group, UCD Medical Center ~ 1996**

**American Academy of Forensic Sciences, Engineering Section, *Awards Committee* ~ 2000-2002, 2003-2004; *Ethics Chairman* ~ 2004-2005**

**American Back Society, Clinical Committee, Neurological Diseases and Injuries ~ 1998**

**Full Scale Automotive Crash Testing at CalTrans Highway Patrol High Speed Test Track ~ 1992-1996**
*CalTrans Materials, Engineering and Testing Services Volunteer, Structural Materials Branch, West Sacramento, CA*

**Mathematical Modeling & Human Body Simulation, Research Guest, Armstrong Laboratories ~ 1995**
*Wright Patterson Air Force Base, Dayton, OH*

**Human Biomechanics & Simulation Standards Committee, SAE ~ 1996**

**Articulated Total Body Model User's Group Executive Committee ~ 1995-1996**

**Ford Motor Company Side Air Bag Full-Scale Sled Cadaver Testing ~ 1994**
*Wayne State University, Bioengineering Center, Detroit, MI*

**Occupant Restraint Technology & Injury Assessment Testing with the Hybrid III Dummy ~ 1992-199?**
*University of California, Davis, CA*

**Technical Program Chairman, BioMedical Engineering Section, AAFS Annual Meeting ~**
*Dallas, TX 2004*

**Journal of Biomechanics ~ 1994**
*Martin, B. and Liptai, L., et al., Relationship Between Mass and Acceleration for Impact on Padded Surfaces. Studied the biomechanical differences of varied surfaces in the prevention of head injury in adults and children.*

## BioMedical & Mechanical Consulting Experience

**BioMedical Forensics ~ 2003-Present**
*Mechanism & Causation of Injury, Impact Biomechanics, Accident Reconstruction Engineering*

**L.L. Liptai BioMedical Engineering ~ 1996 – 2003**
*BioMedical Engineering, Product Liability, Accident Reconstruction and Mechanical Engineering*

**Technical Consultant with Anatomist Lawrence M. Elson, Ph.D. ~ 1996 – July 1998**
*Injury Causation, Mechanics of Injury, BioMedical Engineering, Medical Education & Anatomical Basis of Medicine/Surgery.*

**Liptai Engineering ~ 1983 – 1996**
*BioMedical Engineering, Accident Reconstruction, Product Liability*

**Bechtel, Engineering Intern ~ 1982 – 1983**

## Seminars, Symposia & Lectures

"Variations in Evidentiary Standards and Engineering Standards Analysis," American Academy of
Forensic Sciences ~ Author/Speaker with Joe S. Cecil, Ph.D., J.D., Judicial Research Council,
Washington, D.C., *Seattle, WA, 2006*

"BioMedical Engineering Analysis of Pedestrian Obstacles and Recovery/Fall Mechanics,"
International Academy of Forensic Sciences ~ Author/Speaker, *Hong Kong, 2005*

"Forensic Engineering Analysis of Passenger Vehicle A-Pillar Impact With Tractor-Trailer: Full Scale Crash Tests," International Academy of Forensic Sciences -- Author/Speaker, *Hong Kong, 2005*

"Biomedical Engineering Analysis of Brain Injury," American Academy of Psychiatry and the Law ~ Author/Speaker, *Chicago, IL, 2006*

"Forensic Engineering Analysis of Pedestrian Trauma Using BioMedical and Accident Reconstruction Methods," National Academy of Forensic Sciences -- Author/Speaker, *Boston, MA, 2006*

"BioMedical Engineering Analysis of Brain Injury," for Registered Nurses ~ Author/Speaker, *Walnut Creek, CA, 2006*

"Tutorial and Panel on Engineering Evidence and Lay Testimony," American Academy of Forensic Sciences ~ Author/Speaker, *New Orleans, LA, 2005*

"Forensic Engineering Analysis of Head Impacts Within a Vehicle Subject to Side Impacts," National Academy of Forensic Engineers ~ Author/Speaker, *San Diego, CA, 2005*

"Experimental Analysis of Pediatric Brain Injury Causation Utilizing Scientifically Proven Quantitative Measures," International Mechanical Engineering Congress & Exposition ~ Author, *Anaheim, CA, 2004*

"Decoupling of Lagrangian Equations of Motion to Improve Computational Efficiency and Application to Multi-Body Constrained BioMedical Engineering Systems," American Academy of Forensic Sciences -- Author/Speaker, *Dallas, TX, 2004*

"Head Impact by Golf Ball: Digital Data Acquisition and Analysis Compared to Alternative Methodologies, American Academy of Forensic Sciences ~ Speaker, *Dallas, TX, 2004*

"Accident Reconstruction of 14-Passenger Catastrophic Rollover and Analysis of How Occupant Restraints Could Have Prevented Five Fatalities and Four Serious/Severe Traumas Including Analysis of Pediatric Restraint Usage," American Academy of Forensic Sciences -- Speaker, *Dallas, TX, 2004*

"BioMedical Engineering: Physical Evidence as the Silent Witness," American Academy of Forensic Sciences ~ Speaker, *Dallas, TX, 2004*

"Cranial Trauma Quantification on the Basis of Hertzian Contact Theory," *Invitation by the Turkish Government, declined invitation due to Iraqi conflict. ~ 2003*

"Trauma Causation of a Survivable Open Book Fracture/Crush to the Pelvis," Society of Forensic Engineers and Scientists -- Author/Speaker, *Solvang, CA, 2003*

"Brain Protection in Helmet Analysis," and "Causal Assessment of Slip and Fall Trauma," Greater Sacramento Area Chapter of Nurses -- Author/Speaker, *Sacramento, CA, 2003*

"Technical Analyses and Report Writing," Society of Forensic Engineers and Scientists ~ Author/Speaker, *Oakland, CA, 2003*

"Analysis of Internal Fixation Failure of a Three-Dimensional Joint," American Academy of Forensic Sciences -- Author/ Speaker, *Reno, NV, 2000*

"Orthopedic Implant Failure," American Academy of Forensic Sciences ~ Author/ Speaker, *Reno, NV,* *2000*

"Etiology of Peripheral Neuropathies," Society of Forensic Engineers and Scientists ~ Author/Speaker, *Yosemite, CA, 2000*

"Causation of Lumbar Spine Pathology," Society of Forensic Engineers and Scientists ~ Author/Speaker, *Yosemite, CA, 2000*

"Brain Injury Etiology," Northern California Fraud Investigators Association Conference ~ Author/Speaker, *Monterey, CA, 2000*

"BioMedical Assessment of Rollover Collisions," Society of Automotive Engineers Topical Technical Workshop (TOPTEC) ~ Author/Speaker, *San Diego, CA 1999*

"Brain Injury Biomechanics," and "Crash Testing with Dummies," Northern California Trauma Conference for Trauma Surgeons and other HCPs ~ Author/ Speaker, *Sacramento, CA, 1999*

"Head Trauma," Northern California Trauma Conference for Trauma Surgeons and other HCPs ~ Author/Speaker *Sacramento, CA, 1998*

"Analysis of Flying Harness System," American Academy of Forensic Sciences ~ Author/Speaker, *San Francisco, CA, February, 1998*

"Biomechanics of Side Impact Trauma," Society of Forensic Engineers and Scientists ~ Author/Speaker, *Carmel, CA, 1997*

Chairman of Technical Program: Annual Articulated Total Body User's Group Conference ~ *with Wright Patterson Air Force personnel, Phoenix, AZ, February, 1996*

"Head Trauma," Northern California Fraud Investigators Association Conference ~ Author/Speaker *Monterey, CA, April, 1996*

"Head Trauma and Brain Injury," Forensic Pathology Department, UCD Medical Center, Coroner's Office ~ Lecturer, *Sacramento, CA, 1993*

*Professional Associations (Past & Present)*

American Back Society

American Society of Testing and Materials

Association for the Advancement of Automotive Medicine

Advanced Highway Maintenance Construction Technology Research Group
*Affiliated via doctoral research advisor 1995 – 1997*

American Academy of Forensic Sciences

American Society of Mechanical Engineers

American Society of Safety Engineers

Articulated Total Body User's Group

National Academy of Forensic Engineers

Society of Automotive Engineers

Society of Forensic Engineers and Scientists

Tau Beta Pi – National Engineering Honor Society

UCD Medical Center Orthopedic Research Group
*Affiliated via qualifying committee faculty / research group director 1995 – 1996*


## Continuing Education & Professional Development

Crash Data Retrieval Specialist – Certification
*Certified to utilize the Vetronix Crash Data Retrieval (CDR) System and software to retrieve and analyze vehicular "black box" data: for example, speed at impact, braking behavior, occupants restrained or unrestrained, etc.*
*April 2003*

Diagnosis & Treatment of Neck and Back Pain: Integrated Approach
*Stanford University School of Medicine and American Back Society. San Francisco, CA. December, 1997*

Armed Forces Institute of Pathology: Basic Forensic Pathology
*Department of the Army. Center for Advanced Medical Education. Rockville, MD. October, 1997*

Head and Neck Injury Symposium
*Troy, MI. September, 1994*

Biomechanics of Impact Trauma
*Associated for the Advancement of Automotive Medicine. Chicago, IL. December, 1996*

Occupant Protection Emerging Topics & Technologies
*Tempe, AZ. May, 1998*

Airbag Design & Performance
*SAE. Costa Mesa, CA. August, 1997*

High Speed Rear Impact
*SAE. Tempe, AZ. October, 1997*

Side Impact Design Considerations for Safer Vehicles
*SAE. Tempe, AZ. May, 1998*

The Biomechanics of Impact and Its Relationship to Crash Performance Standards
*Chicago, IL. 1996*

**Articulated Total Body Model Colloquium**
*Phoenix, AZ, 1990 and Dayton, OH, 1995*

**Injuries, Anatomy, Biomechanics & Federal Regulations**
*Irvine, CA, 1995*

**Rear Impact Collision TOPTEC**
*Irvine, CA, 1994*


*Philanthropic Endeavors*

**Boy Scouts of America**
*2000*

rev. 5  200

# **Exhibit 2**

## Sworn Testimony for Laura Liptai, Ph.D.
## As of December 22, 2006

**2006:**

Trials:
1. Garcia v. Paramount Citrus.
2. Ortega v. McKae
3. Sur v. Leung.
4. Scott v. Richter Ratner Construction.
5. Nunn v. City of San Francisco.

Depositions:
1. Phillips v. Gomez.
2. Carillo v. McDonald
3. Hurd v. Hall
4. Hayes v. Jones.              Bonifay, Florida
5. Ochsenfeld v. U-Haul.
6. Gregerson v. Charles Schulz Museum, et al
7. Scott v. Richter Ratner Construction, et al.
8. Tamura v. Sharma
9. Lewinstein v. Home Depot, et al.
10. Cademarti v. Dollar Rent-a-Car.
11. Dutta v. Coker
12. Thurman v. Layton
13. Kearney v. Auto Owners Insurance Co

**2005:**

Trials:
1. Kurtzman v. Reinders
2. Holland v. Mineral King
3. Pierce, Barry v. Golden Gate
4. Khaimskaya v. City and County of San Francisco.
5. Miles v. Ellis, City of Oakland
6. Thomas v. Carroll
7. Martin v. Schultz-Sullivan
8. Ortega v. Denny's Restaurant
9. Parineh v. Lam

Depositions:
1. Feliciano v. Dunlop.
2. Schwartz v. Williams
3. Lee, O'Daniels, Gill vs. Burlington Northern Santa Fe
4. Holland v. Mineral King

5. Lynch v. Jelly Belly Candy.
6. Khaimskaya v. City and County of San Francisco.
7. Martin v. Schultz-Sullivan
8. O'Neill v. USAA
9. Alfano v. Ft. Bragg Electric.
10. Medwadowski v. City and County of San Francisco.
11. Grady v. City of Oakland.
12. Miles v. Ellis, City of Oakland
13. Nickola vs. Burlington Northern Santa Fe
14. Garcia v. Paramount Citrus.
15. Ortega v. Denny's Restaurant
16. Wall v. Jansen
17. Allsup v. Washington, USAA                    Tallahassee, Florida
18. Maistrellis v. DeSoto Cab Company
19. Glennon v. Penske Leasing
20. Page v. Simpson Lumber.
21. Chang v. PacBell.
22. Glasby v. Porter
23. Koonce v. MV Transportation

California State Court venues except where noted.

# Exhibit 3

Sheet 1

Case     No.3
Thrust   TO1
Flaps          5
Takeoff  Standing
PF       Khono

| Time (sec) | 2c.vis.3 Longitudinal Acceleratio n(g) | 12o.vis.3 Brake Position(deg) | 1c.vis.3 Ground Speed(kt) | 8c.vis.3 Lateral Acceleratio n(g) | 5c.vis.3 Normal Load Factor(g) | 6o.vis.3 Heading (deg) | 3c.vis.3 Pitch Attitude( deg) | 7o.vis.3 Roll Attitude( deg) | 9o.vis.3 EngineN 1(%) | 11c.vis.3 P.Alt (ft) |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 14.0785 | 0.1274 | 0 | 1 | 156 | -0.202 | 0.009 | 26.9 | 199.4 |
| 1 | 0 | 14.0661 | 0.1274 | 0 | 1 | 156 | -0.202 | 0.009 | 28 | 199.4 |
| 2 | 0 | 16.8559 | 0.1274 | 0 | 1 | 156 | -0.203 | 0.009 | 29.6 | 199.4 |
| 3 | 0 | 17 | 0.1274 | 0 | 1 | 156 | -0.204 | 0.009 | 31.6 | 199.4 |
| 4 | 0 | 17 | 0.1274 | 0 | 1 | 156 | -0.206 | 0.009 | 35.4 | 199.4 |
| 5 | 0 | 15.0602 | 0.1274 | 0 | 1 | 156 | -0.21 | 0.009 | 41.5 | 199.4 |
| 6 | 0 | 14.1766 | 0.1274 | 0 | 1 | 156 | -0.218 | 0.009 | 53.8 | 199.4 |
| 7 | 0 | 11.6482 | 0.1277 | 0 | 1 | 156 | -0.234 | 0.009 | 66.6 | 199.4 |
| 8 | 0 | 6.1639 | 0.1274 | 0 | 1 | 156 | -0.237 | 0.009 | 69.4 | 199.4 |
| 9 | 0.1301 | 0.9762 | 1.58 | -0.014 | 1 | 156 | -0.139 | 0.014 | 69.9 | 199.4 |
| 10 | 0.168 | 0.0748 | 4.099 | -0.001 | 1 | 156 | -0.158 | 0.013 | 77.7 | 199.4 |
| 11 | 0.2747 | 0.0748 | 8.5 | 0.001 | 1 | 156 | -0.119 | 0.005 | 92.6 | 199.4 |
| 12 | 0.3662 | 0.0748 | 14.337 | 0 | 1 | 155.9 | -0.087 | 0.004 | 102.8 | 199.4 |
| 13 | 0.391 | 0.0748 | 22.148 | 0 | 1 | 155.9 | -0.058 | 0.005 | 105.7 | 199.4 |
| 14 | 0.3883 | 0.0748 | 29.114 | 0 | 1 | 155.9 | -0.059 | 0.005 | 106.4 | 199.4 |
| 15 | 0.3821 | 0.0748 | 36.982 | 0 | 1 | 155.9 | -0.06 | 0.004 | 106.6 | 199.4 |
| 16 | 0.3764 | 0.0748 | 43.75 | 0.001 | 1 | 156 | -0.062 | 0.004 | 106.7 | 199.4 |
| 17 | 0.3716 | 0.0748 | 51.386 | -0.001 | 1 | 156 | -0.594 | 0.009 | 106.7 | 199.4 |
| 18 | 0.3665 | 0.0748 | 57.979 | -0.002 | 1 | 156 | -0.058 | 0.013 | 106.7 | 199.4 |
| 19 | 0.3614 | 0.0748 | 65.41 | -0.004 | 1 | 155.9 | -0.055 | 0.02 | 106.7 | 199.4 |
| 20 | 0.3569 | 0.0748 | 71.825 | -0.005 | 1 | 155.9 | -0.055 | 0.027 | 106.8 | 199.5 |
| 21 | 0.3522 | 0.0748 | 79.064 | -0.007 | 1 | 155.8 | -0.055 | 0.035 | 106.8 | 199.5 |
| 22 | 0.3474 | 0.0748 | 85.313 | -0.007 | 1 | 155.7 | -0.055 | 0.044 | 106.8 | 199.5 |
| 23 | 0.3425 | 0.0748 | 92.355 | -0.003 | 1 | 155.6 | -0.559 | 0.038 | 106.8 | 199.5 |
| 24 | 0.3372 | 0.0748 | 98.425 | 0.002 | 1 | 155.6 | -0.057 | 0.032 | 106.8 | 199.8 |
| 25 | 0.3318 | 0.0748 | 105.252 | 0.005 | 1 | 155.7 | -0.059 | 0.03 | 106.8 | 199.8 |

*Sheet 2*

Case No.9
Thrust Max
Flaps 5
Takeoff Standing
PF Khono

| Time (sec) | 2c.vis.9 Longitudinal Acceleration (g) | 12c.vis.9 Brake Position (deg) | 1c.vis.9 Ground Speed (kt) | 8c.vis.9 Lateral Acceleration (g) | 5c.vis9 Normal Load Factor (g) | 8c.vis.9 Heading (deg) | 3c.vis.9 Pitch Attitude (deg) | 7c.vis.9 Roll Attitude (deg) | 9c.vis.9 Engine N1 (%) | 11c.vis.9 P.Alt (ft) |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 0 | 13.9499 | 0.1443 | 0 | 1 | 159 | -0.202 | 0.009 | 26.4 | 199.4 |
| 1 | 0 | 13.9499 | 0.1443 | 0 | 1 | 156 | -0.202 | 0.009 | 27.4 | 199.4 |
| 2 | 0 | 13.9499 | 0.1443 | 0 | 1 | 156 | -0.203 | 0.008 | 28.7 | 199.4 |
| 3 | 0 | 13.9499 | 0.1443 | 0 | 1 | 156 | -0.203 | 0.009 | 30.3 | 199.4 |
| 4 | 0 | 13.6934 | 0.1443 | 0 | 1 | 156 | -0.205 | 0.009 | 33.2 | 199.4 |
| 5 | 0 | 13.6441 | 0.1443 | 0 | 1 | 156 | -0.207 | 0.009 | 37.9 | 199.4 |
| 6 | 0 | 13.1294 | 0.1443 | 0 | 1 | 156 | -0.213 | 0.009 | 46.4 | 199.4 |
| 7 | 0 | 11.0505 | 0.1444 | 0 | 1 | 156 | -0.226 | 0.009 | 61 | 199.4 |
| 8 | 0 | 6.3156 | 0.1444 | 0 | 1 | 156 | -0.234 | 0.009 | 87.4 | 199.4 |
| 9 | 0.1123 | 2.084 | 0.7114 | 0.01 | 1 | 156 | -0.175 | 0.013 | 67.9 | 199.4 |
| 10 | 0.1686 | 0.3528 | 3.1211 | 0 | 1 | 156 | -0.165 | 0.006 | 77.8 | 199.4 |
| 11 | 0.2742 | 0.3527 | 7.4911 | 0 | 1 | 156 | -0.111 | 0.003 | 93 | 199.4 |
| 12 | 0.3803 | 0.3501 | 13.3848 | 0 | 1 | 156 | -0.083 | 0.005 | 104.4 | 199.4 |
| 13 | 0.4096 | 0.3501 | 21.5171 | 0 | 1 | 155.9 | -0.0502 | 0.005 | 108.3 | 199.4 |
| 14 | 0.4094 | 0.3308 | 28.8376 | 0 | 1 | 155.9 | -0.048 | 0.003 | 109.4 | 199.4 |
| 15 | 0.4033 | 0.3308 | 37.1317 | 0 | 1 | 155.9 | -0.05 | 0.002 | 109.7 | 199.4 |
| 16 | 0.3981 | 0.3308 | 44.2776 | 0.001 | 1 | 155.9 | -0.05 | 0.001 | 109.8 | 199.4 |
| 17 | 0.3953 | 0.3275 | 52.3676 | 0.001 | 1 | 155.9 | -0.048 | -0.001 | 110.2 | 199.4 |
| 18 | 0.3923 | 0.3275 | 59.3962 | 0.002 | 1 | 156 | -0.042 | -0.002 | 110.8 | 199.4 |
| 19 | 0.3877 | 0.3274 | 67.3517 | 0.002 | 1 | 156 | -0.037 | -0.004 | 110.7 | 199.4 |
| 20 | 0.3828 | 0.3274 | 74.2264 | -0.002 | 1 | 156 | -0.034 | 0.006 | 110.7 | 199.5 |
| 21 | 0.3777 | 0.3274 | 81.9821 | -0.006 | 1 | 156 | -0.034 | 0.017 | 110.7 | 199.5 |
| 22 | 0.3724 | 0.3274 | 88.6753 | -0.01 | 1 | 156 | -0.032 | 0.029 | 110.7 | 199.5 |
| 23 | 0.3668 | 0.3274 | 96.2135 | -0.01 | 1 | 156 | -0.032 | 0.041 | 110.7 | 199.6 |
| 24 | 0.3616 | 0.3274 | 102.7075 | -0.01 | 1 | 156 | -0.318 | 0.046 | 110.7 | 199.6 |
| 25 | 0.3559 | 0.3274 | 110.0149 | 0.004 | 1 | 156 | -0.033 | 0.012 | 110.7 | 199.6 |

IN THE U.S. DISTRICT COURT OF GUAM

CIVIL CASE NO. 04-00028

ROBERTO J. DEL ROSARIO and
MELANIE DEL ROSARIO,

      Plaintiffs,

vs.

JAPAN AIRLINES INTERNATIONAL
CO., LTD.,

      Defendant.

           UNSWORN STATEMENT OF REIKO ASATANI

              September 14, 2005
           2-4-11 Higashi-Shinagawa
               Tokyo, Japan
           1:16 p.m. - 2:37 p.m.

1   A   Yes, they are correct.
2   Q   And on that particular flight you were the
3 chief purser?
4   A   That's correct.
5   Q   And how many flight attendants were on
6 that flight?
7   A   Eight including myself.
8   Q   Do you remember the takeoff on that day?
9   A   Yes.
10   Q   Was there anything unusual about that
11 takeoff?
12   A   No.
13   Q   It wasn't particularly more steep than
14 normal?
15   A   No.
16   Q   Now, there was an incident that occurred
17 in which my client claims he was injured. Do you
18 remember that incident?
19   A   Yes, I recall it.
20   Q   Can you tell me what you remember about
21 the incident?
22   A   Okay. We were going down the runway on
23 the way to takeoff just before taking off and the
24 sound of a door -- there was the sound of a door.
25   Q   When you say the sound of a door, do you

1 mean a slamming or banging sound?
2   A   That's correct.
3   Q   And after the slamming or banging of that
4 door, what happened next?
5   A   After the plane left the ground, there was
6 the sound -- there was a banging sound.
7   Q   And then after the banging sound, did
8 something happen? Did the carts come out into the
9 aisle?
10   A   That's right.
11   Q   And how many carts was it?
12   A   I learned this afterwards, but there was
13 three.
14   Q   Did you see the carts moving down the
15 aisle?
16   A   I don't have a good recollection of that.
17   Q   So you don't remember if you saw the carts
18 moving or not?
19   A   That's correct.
20   Q   Did you hear the carts hit anything?
21   A   Yes, I did.
22   Q   Can you tell me what the sound was?
23   A   The sound of something hard striking
24 something hard.
25   Q   Now, the cart's metal, correct?

1   A   That's correct.
2   Q   Was it striking something else metal or
3 was it striking a chair? Was it striking a person?
4   A   It was something else that was made of
5 either metal or plastic, some facility but object in
6 the plane. Metal or plastic.
7   Q   Do you know if one or more of those carts
8 hit my client?
9   A   Yes. I learned that afterwards.
10   Q   Was it one cart or more than one cart?
11   A   That was one cart, I think.
12   Q   And how do you know that the cart hit my
13 client?
14   A   Because after the sound occurred, after a
15 little bit of time, we took off and I went to where
16 the passenger was, which means going to where the
17 passenger was where the cart was.
18   Q   Was the cart touching my client at the
19 time you went up to him?
20   A   No, I don't know about that.
21   Q   When you first saw my client after the
22 incident, where was the cart in relation to where he
23 was?
24   A   I think it was next to his left leg.
25   Q   Feel free to drink at any time.

1   A   Thank you.
2   Q   The incident happened right at the
3 beginning of takeoff, correct?
4   A   That's correct.
5   Q   Did you get up immediately or did you wait
6 a few minutes until the plane leveled off?
7   A   Not until after it leveled off. I don't
8 know how many moments after it was, though some
9 number of minutes.
10   Q   And so you went and saw my client, you saw
11 the cart sitting next to him, what happened next?
12   A   Immediately I said to the passenger, "I'm
13 so sorry. Are you okay?"
14   Q   I'm sorry because I have to back up for a
15 moment. I forgot to ask you that for all of our
16 questioning today you are agreeing to tell the truth
17 as to what you remember?
18   A   Yes.
19   Q   And to tell the truth to all answers to
20 all my questions?
21   A   I swear.
22   Q   And as to the questions you have already
23 answered, those things you answered today have all
24 been the truth?
25   A   That is correct.

**Word Index**

AMERICAN REALTIME COURT REPORTERS
U.S. (561) 279-9132    JAPAN 044-739-4682
Case 1:04-cv-00036   Document 116-4   Filed 04/23/2007   Page 33 of 35

the duty manager.

Q This was in Japan or in Guam?

A In Japan.

Q Was this Mr. Takada?

A I don't remember whether or not it was Mr. Takada.

Q So you don't remember the person's name?

A I don't remember.

Q What did you and that person discuss?

A That there was an accident with a cart and the passenger was injured and that I wrote a report, another report, a CAF I would also write.

Q You told him you would write that after you left the meeting with him?

A I said that I told him as part of that discussion.

Q Besides this person, did you talk to anyone else about the incident?

A I also spoke in flight with the person who was with that person, that passenger.

Q And who was that person?

A I don't know the name but I think it was his friend.

Q Could that be Pedro Agravante?

A I think it was.

---

Q Did Mr. Agravante claim to be a witness to the incident?

A Yes.

Q Did anyone else there claim to be a witness to the incident?

A No, they did not.

Q So no one else told you they saw what happened?

A Nothing.

Q So, do you mean no one or nothing?

A No, no one told me that.

Q What did Mr. Agravante tell you?

MR. LEDGER: Subject to hearsay objection.

MR. GORMAN: Sure.

MR. LEDGER: You may answer.

A Mr. Agravante, right?

Q Right.

A He said for me to make a proper report and tell the company about that accident.

Q Did he tell you he saw the accident happen?

MR. LEDGER: Subject to the same objection, any questions asking the witness to repeat what Mr. Agravante may have said.

MR. GORMAN: That's fine.

MR. LEDGER: You may answer it.

A I did not hear the words that he said "I saw it."

Q What words did you hear?

A As I said before, "Without fail, make a report to the company of this accident."

Q I'm handing you what's marked as Exhibit 6. Have you ever seen that document before?

A No.

Q I'm handing you what's marked as Exhibit 5. Have you ever seen this document before?

A Yes, I have.

Q Is that your handwriting on the document?

A Yes, it is.

Q I'm handing you what's marked as Exhibit 4.

A Okay.

Q That's the passenger illness injury report you were talking about earlier?

A Yes, it is.

Q And I'm sorry, Exhibit 5 is the service irregularity message report you talked about earlier?

A It is.

Q Besides Ms. Fujiwara, besides the captain

---

and besides Mr. Agravante, was there anyone else on the plane that you talked to about the incident?

A I think I talked to two or three other crew members.

Q Other flight attendants?

A Yes.

Q Do you remember their names?

A I do not recall the names.

Q Did anyone else on the flight claim to be injured because of the incident?

A No.

Q Besides the manager you spoke to after you got off the flight -- after you returned to Tokyo, was there anyone else you talked to?

A No.

Q What about any of the gentlemen in the room, did you ever speak to them about the incident?

A Yes.

Q When did you speak to any of them?

A In January of this year, when we came to Tokyo, to Japan.

Q So you spoke with Mr. Ledger?

A Yes.

Q Were you alone in the room or was someone else in the room?

me" --

A  Okay.

Q  I'll read it: The passenger said to me, quote, I am all right but please report the incident to your company, end quote. Do you remember writing that?

A  Yes, I do.

Q  And when you say "the passenger," do you mean Mr. Del Rosario?

A  Was it -- it was the person who was injured.

Q  Correct. That's my client's name.

A  Yes, it is.

Q  So he said this to you?

A  That's correct.

MR. GORMAN: I don't know if that clears it up for you.

MR. LEDGER: I have to do a couple questions when we are finished.

BY MR. GORMAN:

Q  If you could please skip down now to where it says "we issued SIM" --

A  Okay.

Q  -- what is SIM?

A  Service irregularity message.

32

Q  And then it says "and ask KI to take care of the passenger." Who is KI?

A  Ground staff.

Q  So KI is the ground staff?

A  That's correct.

Q  And that would be the ground staff in Guam?

A  That's correct.

Q  And that would be someone that works for JAL?

A  That's correct.

Q  Did you ever talk to my client again after he left the plane in a wheelchair?

A  No, I did not.

Q  And I just need to ask again, you have answered truthfully to all the questions presented today?

A  That's right.

MR. GORMAN: I don't have any further questions.

MR. LEDGER: Okay. I have to ask questions.

CROSS EXAMINATION

BY MR. LEDGER:

Q  Ms. Asatani, I need to ask you some

33

questions about what is Exhibit Number 11. You understand?

A  Yes.

Q  And I will also need to ask you a couple of questions about things that you have said when you answered Mr. Gorman's questions.

A  Okay.

Q  Now, earlier when Mr. Gorman was asking you questions, he asked you if Mr. Del Rosario said anything to you. Do you remember that question?

A  Yes, I do.

Q  And I believe your answer was to the effect that Mr. Del Rosario didn't say anything to you.

A  Yes. All he said was, "I'm okay." That's what I said.

Q  Now, when Mr. Gorman was asking you questions about another passenger, Mr. Agravante, do you remember that?

A  Yes, I do.

Q  And one of the things that you remembered that Mr. Agravante said, according to what you have said here today, was that Mr. Agravante said to you "Please report the incident to your company."

A  Okay.

Q  Now, on Exhibit Number 11, it says, "The passenger said to me 'I am all right, but please report the incident to your company.'"

Now, did Mr. Del Rosario say to you "I am all right"?

A  Yes.

Q  Did Mr. Agravante, not Mr. Del Rosario, say, "Please report the incident to your company"?

A  No.

Q  Who said to you, "Please report the incident to your company"?

A  Mr. Agravante and -- both of them.

Q  Both of them. Both of them said that to you?

A  Yes, that's correct.

Q  Did both of them say to you, "I am all right"?

A  The guy who was injured.

Q  The guy who was injured, Del Rosario, Mr. Gorman's client?

A  That's correct.

Q  He said to you, "I am all right"?

A  Yes.

Q  And Mr. Del Rosario also said please report to my company?