PEDRO P. AGRAVANTE, JR., Pro se
and CORITA B. AGRAVANTE, Pro se
P.O. Box 22281
Guam Main Facility
Barrigada, Guam 96921
Phone no. 671. 646-8453/4537
Cell Phone no. 671.788-7291



**FILED**
DISTRICT COURT OF GUAM
MAY 14 2007
MARY L.M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| PEDRO P. AGRAVANTE, JR.<br>CORITA B. AGRAVANTE<br><br>Plaintiffs<br><br>vs.<br><br>JAPAN AIRLINES INTERNATIONAL CO., LTD.<br><br>Defendant | CIVIL CASE NO. CIV04-00036<br><br>PLAINTIFFS AGRAVANTE OPPOSITION TO DEFENDANT JAPAN AIRLINES INTERNATIONAL CO., LTD'S MOTION FOR SUMMARY JUDGMENT; DISCUSSION OF MEMORANDUM OF POINTS AND AUTHORITIES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 56; DECLARATION OF SERVICE |

## DISCUSSION OF MEMORANDUM OF POINTS AND AUTHORITIES

I. INTRODUCTION

Summary Judgment in this case is not proper in favor of "JAL" on claims asserted by the Plaintiffs Agravante because the Trial scheduled on June 26, 2007 at 9:00 a.m will discuss issues of material fact and will be presented by the litigating parties in totality of the case in order for the members of the Jury and the court to give proper judgment. This case concern is not an ordinary and routine incident that occurred on board an international flight from Japan to Guam. Instead, it can be viewed as an isolated case that the concerned issues are inherent in this case and have not previously discussed in the past.

For example; the causation part of the **accident** focuses in the manner the pilot operated the aircraft when it took-off at Narita Airport, Japan on July 20, 2002 and Defendant "JAL" has overlooked the importance of the computerized telemetry data and information that it had erased in its aircraft computer file, **a key evidence in this action in Court**.

To justify this, the Defendant JAL Second Motion to extend the Scheduling Order Deadlines (Docket no. 65) filed on November 15, 2006 had mentioned "JAL" previously moved the Court to extend in order to permit sufficient time <u>to locate diffucult-to-find aircraft Flight Take-Off-data.</u> In this Motion, the Defendant "JAL" admitted one of the reasons such data is rare is that the flight in question was in 2002, and under normal circumstances, "JAL" retains the flight data for only 6 months.

Now, Defendant "JAL" is basing and centering all its efforts in this case from the telemetry data and information from a certain Captain named Hideo Masuhara who had surprisingly entered the data of 4 years ago in his personal diary. Defendant "JAL" puts its neck on the line to produce information and data from this diary through a Simulator to substitute for the evidence that was lost. An act that has questions of legality. Plaintiffs Agravante have requested in Court in their Trial Brief, IV. EVIDENTIARY ISSUE, page 12 of 13 " the court should not allow the information and data generated by a Simulator to replace the computerized data that was erased and permanently lost. These subject issues of material fact are interrelated, therefore isolating some issues for Summary Judgment will not serve both parties intentions and it is not proper.

The Warsaw Convention, Art. 17 and interpretative cases provide rules of decision, such as citing Olympic Airways v. Husain, 540 U.S. 644 (2004). The Supreme Court reviewed the "Accident" requirement of Article 17 of the Convention, which set forth the requirement of liability on the part of the air carrier when a passenger asserts a claim. In particular, the passenger must establish that an accident within the meaning of Article 17 caused the incident or injury. While referring to Air France v. Saks, 470 U.S. 392 (1985), the Supreme Court majority clearly stated that an accident is an, "**unexpected**

or **unusual event** or **happening** that is external to passenger" and is not due to "the passenger's **own internal reaction** to the usual, normal operation of the aircraft". Olympic Airways, 540 U.S. At 654-55 emphases added. This citings are correct and are also applicable to this case CIV04-00036. The Defendant "JAL" own interpretion and applicability of the citings to Plaintiffs Agravante's was ignored. It did not properly identify the actual cause **of the accident, the static takeoff**. An "event" like; an overhead bin collapsing, runaway food carts, failure to render first aid, slip-and-fall on a spilled beverage, a hot beverage, caused by cabin attendant negligence. To interpret it, you must identify 3 interacting elements;

1) the causation (Static takeoff), 2) the injured (Plaintiff Agravante) and 3) negligence (the pilot).

2) In an overhead bin collapsing: the causation (the luggage), the injured (passenger), negligence (cabin attendant)

3) The causation (slip and fall on spilled beverage), 2) the injured (passenger), negligence (the cabin attendant)

These interacting elements of the above scenarios are completely the same, therefore Plaintiff Agravante **accident** qualifies or fit to the citings previously mentioned.

In comparison to other members of the crew, the Pilot has greater responsibility than these other Japan Airlines crew members because he is the head of the team that provide safety and protection for the well-being of all ticketed passengers on board of JAPAN AIRLINES, flight no JO 981, on July 20, 2002. and for the Plaintiff Agravante having injured, even to the slightest degree, the pilot or any flight crew is responsible for his injury. " JAL" as a common carier from Japan to Guam was obligated to provide the highest degree of care to its passengers. The pilot and his crew have the fiduciary responsibility to make sure that Plainitff Agravante leave his point of departure (Japan) in his present condition and arrive to his destination (Guam) as he was in his present condition.

Narita Airport is an international airport with more than 8,000 feet runway. As Captain Antonio Tuano a veteran pilot of 24 years, flying B-747-200, B-747-400, AIRBUS A-330-300, will testify at

Trial "static takeoff" is not allowed at Narita Airport. As "JAL" pilot is fully aware he is flying in full gross weight which means, full passenger's, full cargo and full fuel. To choose to fly the aircraft by static takeoff is an error of judgement and irresponsible and intentional. This will cause **accident** on board, like runaway carts dislodge from the holding panel hitting a passenger or a passenger like Plaintiff Agravante injuring his spinal cord because of the manner the aircraft was flown. Anything and everything that happened on board the aircraft JAL JO 981 on July 20, 2002 is an "Accident" that is within the meaning of the applicable law. (Warsaw Convention Art. 17). "the carrier shall be liable for damages sustained in the event of death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft, or in the course of any of the operations of embarking or disembarking".

The injury Plaintiff Agravante so sustained was caused by "**unexpected or unusual event or happening** to him. The negligence of the pilot is an **external** to him and not due his **own internal reaction** to the unusual, normal operation of the aircraft. A good example for a passenger to react emotionally is when he witness a passenger seating next to him is hit by a runaway cart and dies. The passenger witnessing the accident will experience **emotional trauma**, this what is called "**own internal reaction**" to the event that happened in front of him. Plaintiff Agravante did not experienced nor had seen this scenario during the flight, instead the pilot maneuver by "static takeoff" had caused him to slam hard backward to his seat giving him a strong tingling sensation from his lower back climbing to his spinal cord, back, shoulders, neck and a big headache like a whiplash. And Plaintiff Agravante felt immediate numbness in those areas. His X-ray revealed he was injured.

Other related genuine issues of material fact are as follows; **1)** that, "JAL" is trying to downplay the causation part of the **accident, the static or standing takeoff** of which both parties are in agreement that indeed, Captain Hideo Masuhara had flown the aircraft in this manner. **2)** that, many aviation accident are caused by improper operations, the starting point of aviation case, a simple consideration whether the

aircraft was properly operated.

The aircraft manufactured by Boeing 767 model, may have been designed for "static or standing takeoff" or It may have been also designed for "rolling take-off", a more gradual acceleration to reach takeoff speed. It will be impossible in the designed not to include both options. Captain Hideo Masuhara at that moment was given these options to choose. He decided to take "Static or standing take-off", and it was his personal decision to make, **an Error of Judgement** that caused the accident. 3) static or standing takeoff is not allowed for international airlines at Narita Airport, Japan as Captain Antonio Tuano will testify at Trial. Plaintiff Agravante, as an experienced traveler to Japan on business trips, had traveled about 9 times from later part of 2001 to June of 2002 on board Northwest Airlines (NW). He had never experienced NW aircraft suddenly jolted and went fast-forward and tookoff to the air in those trips. In the early part of 1990 to 1991, on business trip under TPO Guam Inc. Plaintiff Agravante had traveled to Japan 7 times on board Japan Airlines, with a Japanese Partner, Mr. Tadashi Iizuka. He had never experienced this manner of takingoff the ground from JAL. By comparison, the July 20, 2002 flight of JAL JO981 was unusual and abnormal flight.

There is a question from the Defendant JAL who took care of the Plaintiff for over 2 years after the accident? He did not seek medical treatment after his flight on JAL. Plaintiff have mentioned in his Trial Brief, page 4, the person who was taking care of him for over 2 years period was his wife. On the night of his arrival on July 21, 2002 Plaintiff Agravante started to feel the pain in his back, neck, shoulders and arms. He asked his wife to rub him with oil, alcohol and vicks vapor rub to those areas. He was relieved of pain and numbness every time his wife did this therapeutic massaging. For him, She is the best chiropractor in the family. She has done this massaging to her children and himself for years. Especially, there is nothing in the law that forbid his wife to provide personal care to members of her family. Summary Judgment is not proper on Plaintiff Corita Agravante's loss of consortium because of her efforts

as a wife to take care her injured husband. A contributing issue of material fact to present or discuss in court.

## II. ANALYSIS, DR. PETER DIAMOND'S DEPOSITION

The medical expert witness disclosure regarding Plaintiff Agravante's injury by Dr. Peter Elliot Diamond is rather not conclusive. This is base on his accepted stated standard that he used throughout his testimony in this deposition. **The standard that he use in Hawaii is all based on reasonable degree of medical probability. In layman words, his own opinion and diagnosis.** Or a one doctor's opinion.

The detail of the videotaped deposition of Dr. Peter Elliot Diamond has lack of cohesiveness or firmness and he has even revealed, Plaintiff Agravante was injured. See page 29-6 of the deposition.

As follows:

Question: And are the findings from this August 2nd, 2005 X-ray by you (pause) What was your opinion with regard to presence of any accute trauma?

Answer: Again, there was nothing in those films to indicate acute truama. There was no sign of a fracture of the spine. There was no sign of disc location or subluxation (pause) a significant subluxation.

<u>"and I just qualified that because he had two (2) or three (3) millimeter of subluxation. Now subluxation is when a joint or two bones slide on each other more than is normal, but not enough to actually get out of the joint, not actualy dislocate."</u> (A revealing statement of the injury of the spine)

" And the fact is: In most spines, certainly in most degenerative or arthritic spines, you will commonly see two millimeters, three millimeters of subluxation so, theres a little bit of play in the joint that you don't have in a normal joint or-- yeah, basically that what I am saying".
( this testimony is about the spine)

So as opposed to an acute truama where you have-- for instance, a facet dislocation- a unilateral facet dislocation in the neck, which means that the joint, instead of just being—having a little but of of play in it, it has so much play that actually slips off, and the two halves, if you will, of the joint are no longer in contact. That's what you see in major acute trauma, and that was not the case in this patient. ( this testimony is about the neck area)

What is being looked at for in Dr. Peter Elliot Diamond's deposition, was there any **major acute trauma**

happened to Plaintiff Agravante during the Flight of July 20, 2002 aboard JAL flight no JO 981? He was not looking for the injury per se Plaintiff Agravante sufferred during that flight. The case is about injury major or not, even statement of slightest injury will qualify as an injury. Dr. Peter Elliot Diamond's statement on his Depositionon February 22, 2007 revealed that Plaintiff Agravante was injured.

**Comment: Dr. Peter Diamond is being explored as to his knowledge as a private pilot**

On Page 12-24 (Q) I there anything you remember about the particular takeoff and how Mr. Agravante was relating how the airplane took off to the claim injury that he was making?

Page 13-3 (A) Again, referring to the cover letter, what was told, he was claiming that he was injured when he plane made a sudden acceleration on takeoff as opposed to a gradual acceleration on takeoff.

Page 13-7 (Q) Okay. Do you have any—any particular details about, you know, the mechanism of the takeoff?

Page 13-9 (A) Yeah, Again, from the cover letter, it was described to me as what's called static takeoff where the pilot keeps his feet on the brakes, rolls up the engine to 75 percent power and then releases the brakes rather than gradually accelerating. Of course, the acceleration is still probably as gradual since you've got a heavy aircraft thats going from stop. So, really the static refers to the fact, I think, that you're starting with a 75 percent engine power rather than starting with idling engine power.

Page 13-19 (Q) You're a pilot, is that right, Dr. Diamond?

Page 13-20 (A) I was at one time a pilot, yeah. I held a private pilots license. So I am roughly familiar with takeoffs and procedures; but certainly don't claim any expertise that way.

Page 13-24 (Q) Okay. But the point is: In general terms, the aircraft taking off in the manner it did, you have some familiarity with the mechanism of that based on your experience in flying airplanes?

Page 14-3 (A) Yes.

Page 14-4 (Q) Okay. And I know you have your chart and your records with you, and you're free to refer to those in answering questions because--

Page 14-7 (A) Okay.

Page 14-8 (Q) -- We don't want expect you to memorize what you did in this case. Is there anything else about the underlying facts that you're aware of? I think you've pretty well covered it but-

Page 14-13 (A) You mean-- when you say the "underlying facts" you mean "the underlying history prior---or history of the injury?

Page 14-16 (Q) No. Again, staying with the actual---the aircraft take-off.

Page 14-18 (A) Okay. Okay

Page 14-19 (Q) I think you've covered--

Page 14-20 (A) Yeah, thats basically what I am aware of. I am not aware of any specific abnormalities, if you will, of that take-off.

**Comment: A statement coming from amateur pilot regarding static takeoff.**

Page 16-8 (Q) What you excerpted from that particular medical record is--- there's a refence to "Review of systems" Normal constitutional." What is your understanding of the meaning of those terms?

Page 16-13 (A) I'm hesitating because I---this is not something that I usually put in a review systems and is probably a conventional more of the internist, in general, than it would be a surgeon.

But what I take to mean is that the constitute-- when he says "constitutional",

I assume what he means is the general medical systems, the cardiovascular system, the pulmonary system, the central nervous system are normal, in other words, that there has been no complaint referent to any of those systems. Constitutional is really a pretty vague (not exact or definite term) So it hard for me to be more specific. He goes on to say, "Abnormal MS," which I, again assume means

musculoskeletal system.

**Comment: Dr. Peter Elliot Diamond could not exactly make his own opinion and diagnosis based on Plaintiff Agravante's medical records. The words "I ASSUME" twice means he is not sure if his statement is true or not, or he just taking it for himself.**

Page 17-2  (Q) with respect to the --staying with that same medical record, September 8th 2004, there's a reference ti physical exam and the blook pressure, pulse and temperature are reported; but there's --there's a reference to a "gait" G-A-I T—gait normal?

Page 17-7  (A) Yes.

Page 17-8  (Q) What is gait, and what's the significance of a normal finding?

Page 17-10  (A) Gait is the way you walk, basically. Its the cadence, the rhythm. It is really complicated or we make it quite complicated as orthopedic surgeons because it breaks down into literally hundreds of different movements all incorported in a fluid mechanism. But from this point of view, what hes saying is the patient is not walking with a limp. I think that is the simplest way of decribing it.

Page 17-19  (Q) Not walking with a limp?

Page 17-20  (A) Not walking with a limp.

Page 17-21  (Q) Not walking with a limp?

Page 17-22  (A) in other words, walking normally, It actually goes beyond a limp because in discussing gait, often you're talking about pattern of movement, not just of the legs but of the rest of the body.

Page 21-14  (Q) So, your comments with respect to the significance of a normal gait, being able to walk in a normal fashion, you commented on that from the perspective as an orthopedic surgeon?

Page 21-18  (A) that's correct

Page 21-19   (Q) are you able to comment on the significance of a normal gait from a neurologic aspect?

Page 21-21   (A) Yes. Again, normal gait assumes a normal neurologic exam within—with a certain level of lack of sophistication. In other words, its not –how-- if you have some neurologic deficits, it's not going to affect your gait necessarily. In other words, there's neuro- I'm not sure I am being clear here, forgive me- there's some neurologic problems that will reflected immediately in gait. There are some that are not obvious with gait. So, a gait analysis is not the "sine qua non" if you will the absolute indicator of whether or not there's a neurologic problems. On the other hand, if you ask me, is it likely that a patient with spinal injury, for instance, will have a normal gait pattern. The answer is no. Usually you can pick up something in the gait pattern that implies a spinal cord or nerve root injury.

**Comment: According to Dr. Peter Elliot Diamond Deposition testimony, a gait analysis is not the "sine qua non"or the absolute indicator of whether or not there's a neurologic Problems. It is unlikely that a patient with spinal injury will have a normal gait pattern. The answer is no. Usually you can pick up in gait pattern that implies a spinal cord or nerve root injury. ( The response lack cohesiveness or firmness.)**

III.   **BACKGROUND**

Plaintiff Agravante have spoken to cabin attendant Reiko Asatani twice as mentioned in his Trial Brief submitted in Court on April 9, 2007. He asked her for writing pad to write his Personal Incident Report regarding the details of how the aircraft was flown. When she came back while holding a half sheet pad with JAL logo on it, she asked him how many sheet and he responded 4 sheets, and he complained, this incident is a wrongful deed and warned her 1 metal food cart may be an accident, but three carts is already a complete negligence and a violation of safety to protect JAL paying passengers. She turned her back and joined the others. The concern of this case is the pilot's flying the aircraft by

static take-off that injured the plaintiff, and not about runaway carts that injured Mr. Del Rosario. Mr. Del Rosario had his own Service Irregularity Message (Report). My personal Incident Report was received by "JAL" office in Guam, and stamped receieved on July 21, 2002, in the morning of Plaintiff's arrival in Guam.

Plaintiff Agravante testified in his deposition on March 16, 2007 and also his wife on March 14, 2007, Plaintiff Corita B. Agravante, that his wife took care of his injuries of the back, neck, legs, arms and shoulders. Although she has no medical credentials but her training for years providing therapeutic massaging to her family help to justify that she can do it. She relieved Plaintiffs pain in the neck and shoulders. Though at present time mild tremors of Plaintiff right legs and right arms, loss of coordination, cramps in the leg and fingers and hands and twitching in the left side of his face are getting worst. Plaintiff Agravante went to see Dr. Alix Chenet, internal medicine, at Guam Adult-Pediatric Clinic on April 30, 2007 and he was referred to see Dr. Carlos, and to have Cervical Spine and Lumbar Spine MRI scanning. The cost of this Scanning and to see Dr. Carlos are prohibitive, added to this, Health Insurance as usual will not provide coverage for an accident injury.

Plaintiff's injury on board JAL flight no. JO 981 on July 20, 2002 was not caused by runaway carts. It was caused by the pilot's negligence.

The reporting of damage is an integral part allowed by Warsaw Convention, Art. 29., states that: 1) the right to damages shall be extinguished if an action is not brought within 2 years, rekoned from the date on which the aircraft ought to have arrived, or from the date on which the transportation stopped.

The interpretation of this Warsaw Convention Art. 29, may differ from the opposing parties, but it sets a limitation of 2 years.

For Plaintiff Agravante, he had followed the requirements to prove his claim for damages as follows:

a) to report his right to damage upon arrival on July 21, 2002, even without the specific of the

injury. b) had his injury taken care of immediately by his wife by rubbing alcohol, oil and vicks vapor rub, and massaging the injured area for over 2 years. c) filed his formal Complaint for damages vs. "JAL" on July 20, 2004, within the statutes of limitation of 2 years. d) went to see Dr. Preston and Dr. chenet at Guam Adult-Pediatric Clinic in Dededo for his injury for further referrals. e) Had an X-ray in his injured Spinal Cord at X-ray Pro in Tamuning, f) the X-ray was provided to Dr. Peter Elliot Diamond for his expert witness disclosure and has revealed that Plaintiff Agravante was injured.

IV. **LEGAL DISCUSSION.**

    A. The Federal Rule of Civil Procedure 56, does not allow summary judgment if pleadings, depositions, and interrogatories still stands and there is genuine issue of material fact and the moving party is not entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c) Plaintiffs Agravante have evidence to carry its ultimate burden of persuation at trial. And other evidence from which a jury could find an essential element of opposing party's claim or defense.

V. **OTHER RELATED GENUINE ISSUES OF MATERIAL FACT.**

    1. Testimony by Captain Antonio Tuano, a veteran of 20 years bearing a Pilot License no. 2725272 will testify that Static takeoff is not allowed at Narita Airport for international flight.

    2. Defendant "JAL" had confirmed in their Second Motion filed on November 15, 2006, that JAL retains the flight data for only six months after the flight, a key evidence in this action in Court, is therefore permanently lost.

    3. That a substitue data and information from a certain Captain Hideo Masuhara personal diary has a question of legality and Plaintiff believe may not be admissible in Court.

    4. That Dr. Laura Liptai Expert Witness Disclosure may not be admissible in Court because her data and information was based on Captain Hideo Masuhara personal diary.

    5. The Declaration of Captain Hideo Masuhara and Naomi Nakahara Declaration under 28 U.S.C. Section 1746, may not be admissible in Court for reasons as follows;

a) The copy submitted in Court original, and should had been notarized at the U.S. Embassy in Tokyo.

b) Both status of Captain Hideo Masuhara and Naomi Nakahara are not resident of Guam and not citizen of the United States of America. For them affirming under penalty of perjury under the laws of the United States of America of any testimonies and their respective representations in this action in Court, if found not true and correct, shall be combersome to pursue. An issue of material fact to discuss in Court.

## CONCLUSION

Summary Judgment is not appropriate in JAL's favor because there are genuine issues of material fact that are important to discuss by litigating parties at trial on June 26, 2007 that the jury and the Court should hear.

Therefor, Plaintiffs Agravante respectfully request that Court deny Defendant JAL request Summary Judgment.

DATED: Hagatna, Guam. May 14th, 2007.

PRO SE:

_____
PEDRO P. AGRAVANTE, JR.
Plaintiff

PRO SE:

_____
CORITA B. AGRAVANTE's
PlaintiffS