CARLSMITH BALL LLP

DAVID LEDGER
ELYZE MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Defendant
Japan Airlines International Co., Ltd.



FILED
DISTRICT COURT OF GUAM
JUN -7 2007
MARY L.M. MORAN
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| PEDRO P. AGRAVANTE, JR. and CORITA B. AGRAVANTE, <br><br> Plaintiffs, <br><br> vs. <br><br> JAPAN AIRLINES INTERNATIONAL CO., LTD., <br><br> Defendant. | CIVIL CASE NO. CIV04-00036 <br><br> **DEFENDANT JAPAN AIRLINES INTERNATIONAL CO., LTD.'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT; DECLARATION OF HIDEO MASUHARA; DECLARATION OF SERVICE** |

## I. INTRODUCTION

Plaintiffs Pedro P. Agravante and Corita B. Agravante fail to provide the Court with any supported evidence to establish a genuine issue of material fact sufficient to avoid summary judgment. Under the Warsaw Convention, which is applicable to this case involving an alleged injury during an international flight, such evidence must show that there was an unusual or abnormal event external to the passenger that causes the passenger injury, and that the incident was something other than the passenger's unexpected interaction with normal flight conditions. However, the undisputed material facts presently before the Court show: Mr. Agravante was a passenger on Japan Airlines International Co., Ltd.'s ("JAL") flight No. 981 on July 20, 2002; the

plane's standing takeoff proceeded normally; Mr. Agravante did not report any injuries or make any personal claim or statement to JAL personnel during or after the flight; Mr. Agravante then waited two years until seeing a doctor to report any physical ailments allegedly related to the flight; there is no plausible link between Mr. Agravante's alleged injury and the takeoff of JAL Flight No. 981 on July 20, 2002; the alleged incident - as admitted by Mr. Agravante - was purely the result of his own interaction with the usual and normal operation of the aircraft.

These undisputed facts demonstrate that under the Warsaw Convention and United States Supreme Court's rulings in *Air France v. Saks*, 470 U.S. 392, 405 (1985), JAL is not liable for any harm Mr. Agravante may have sustained. Accordingly, summary judgment in its favor is proper.

## II. DISCUSSION

### A. NONMOVANT MUST IDENTIFY SPECIFIC FACTS PROVING GENUINE ISSUES REQUIRING TRIAL.

Rule 56(c) mandates summary judgment against a party who fails to identify sufficient evidence to establish the essential elements to that party's case, for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A party opposing summary judgment cannot rely solely upon the mere allegations of his pleadings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The nonmoving party must show by affidavit or other evidence specific facts that there is a genuine issue for trial. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). *See also* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). If the adverse party fails to respond to a motion for summary

judgment by setting forth specific facts in opposition, Rule 56 mandates the entry of summary judgment. Fed. R. Civ. P. 56(e).

Thus, in order to avoid summary judgment, Plaintiff was required to put forth specific facts showing that the incident at issue is an *"unusual event or happening* that is external" to him and is not due to his "*own internal reaction* to the *usual, normal operation* of the aircraft." *Air France v. Saks*, 470 U.S. 392, 405 (1985) (emphases added). As noted in the Motion, the Warsaw Convention elements are thus stated as: (1) an abnormal or unusual event on the aircraft; (2) external to the passenger; (3) that causes the plaintiff's injury. *Caman v. Continental Airlines, Inc.*, 455 F.3d 1087, 1090 (9th Cir. 2006) (citing *Saks*, 470 U.S. at 405).

In the Motion for Summary Judgment, JAL put forth facts by way of affidavit that the standing takeoff is a normal and routine method of takeoff initiated by the flight crew and controlled by the plane's flight computers. Plaintiffs agreed to this fact in their Trial Brief, and put forth no specific, supported facts disputing this point in their Opposition. Plaintiffs' sole response on this issue is that they intend to introduce trial testimony from Captain Antonio Tuano that static takeoff is "not allowed at the Narita Airport". This cursory statement fails to meet the standard required by Rule 56(e) and *Anderson*, which is that facts in opposition to a motion for summary judgment must be shown by affidavit or other supported evidence. Here, however, Plaintiff's assertion that a static takeoff is not permitted on the Narita Airport runway is not just unsupported by any evidence, but contrary to substantiated evidence. For example, there is undisputed credible evidence that, in Captain Masuhara's 28 years as a commercial transport pilot for Japan Airlines, Captain Masuhara has made approximately 50 standing takeoffs from the B Runway (the runway used on July 20, 2002), at the Narita Airport, and made countless standing takeoffs from similar runways at domestic airports throughout Japan. Masuhara Decl. (attached hereto), ¶ 4. Based on this extensive experience of conducting standing takeoffs from

several airports in Japan, including Narita, Captain Masuhara knows for a certainty that standing takeoffs are permitted, and in fact are routinely done from the B Runway at the Narita Airport. Masuhara Decl., ¶ 5. It is the Captain's discretion to utilize the plane's computer and to program and conduct a standing takeoff. Masuhara Decl., ¶ 6. Narita Airport authorities have no say in whether or not an aircraft makes a standing takeoff or a rolling takeoff. Masuhara Decl., ¶ 6. Once a pilot taxis the aircraft to the runway and receives clearance and instructions from Narita airport authorities for takeoff, command of and control over the aircraft rests solely with the pilot in command. Masuhara Decl., ¶ 6. Captain Masuhara exercised that discretion here, using the aircraft's computer to conduct a permitted and programmed standing takeoff. There was nothing unusual about the standing takeoff on July 20, 2002. Masuhara Decl., ¶ 7. In fact, a standing takeoff involves a gradual acceleration of the aircraft, and there is only a minor difference from the acceleration during a rolling takeoff. Masuhara Decl., ¶ 8. In sum, the flight crew and aircraft performed a normal and usual takeoff.

Plaintiffs' reliance on unsubstantiated cursory statements signals a lack of evidence and a failure to meet the obligations imposed by Rule 56, *Celotex* and *Anderson*. In contrast, JAL has furnished evidence that standing takeoffs are routine in the aviation industry and in Japan, they are permitted by the Narita Airport authorities, standing takeoff capability is programmed into the aircraft computer by its manufacturer, Boeing, and that there was nothing unusual about the takeoff on July 20, 2002. Therefore, there is no genuine issue of material fact that the takeoff was proper and proceeded normally.

It should be noted at this point that the Court need not examine the second and third elements under the Warsaw Convention, *i.e.*, that an event occurred external to the passenger which caused him injury. In this case, Plaintiffs are required to produce specific facts to support each of the three Warsaw Convention elements. Because there is no genuine issue of fact

showing that something unusual occurred during the flight, it is not necessary for the Court to determine whether the event was external to Mr. Agravante or caused Mr. Agravante harm.

Nevertheless, there is a lack of evidence supporting Plaintiffs' claim on either the second or third element. As to the second element, in its Motion, JAL put forth facts that nothing "external" happened to Mr. Agravante to cause him harm because the flight proceeded normally, and thus, any harm to Mr. Agravante had to have occurred as a result of his personal behavior and reaction to the usual and normal operation of the aircraft. In other words, under *Saks* there has been no "accident." As *Saks* shows, injuries are "internal" if they are reactions to normal operations of the aircraft. *Saks* cites four cases illustrating this point: *Maugnie v. Compagnie Nationale Air France,* 549 F.2d 1256, 1259 (9th Cir. 1977) (refusing to extend the term "accident" to cover routine travel procedures that produce an injury due to the peculiar internal condition of a passenger); *Abramson v. Japan Airlines Co.,* 739 F.2d 130 (3rd Cir. 1984) (sitting in airline seat during normal flight which aggravated hernia not an "accident"); *MacDonald v. Air Canada,* 439 F.2d 1402 (5th Cir. 1971) (fainting while waiting in the terminal for one's baggage not shown to be caused by an "accident"); *Scherer v. Pan American World Airways, Inc.,* 387 N.Y.S.2d 580 (1976) (sitting in airline seat during normal flight which aggravated thrombophlebitis not an "accident"). 470 U.S. at 404-05. *Abramson* and *Scherer* are particularly apropos here as those cases involved, and rejected, allegations that, as here, simply sitting in an aircraft seat and adversely reacting to normal flight gives rise to liability for the carrier. Furthermore, in this instance Mr. Agravante has ***admitted*** that his alleged adverse reaction (harm) to normal flight ***was of his own doing***. In particular, in his Trial Brief Agravante contends that the takeoff acceleration of the aircraft was of sufficient force to push him harmfully against his seatback, yet admits that this situation occurred as a result of his leaning forward out of his seat (at a time he could supposedly hear the engines roaring and after cabin

attendants had announced the usual pre-departure instructions to passengers) to converse with his travel companion (over the roar of the engines) who was seated in front of him. *See* f.n. 1 *infra*. This is precisely the type of situation where the courts have ruled, and this Court should rule, in favor of the air carrier on rationale that it is virtually impossible for the carrier to guard against limitless situations where passengers simply have an adverse reaction to normal aircraft operations as a result of their own behavior or unique personal characteristics.

As these cases and *Saks* illustrate, because the standing takeoff proceeded normally, any reaction by Plaintiff must be internal to him. Plaintiffs' only response to this argument is his unsubstantiated statement that his injuries are not due to his internal reactions. However, such unsubstantiated evidence is exactly the type of evidence that Rule 56(e) does not allow. *See* Fed. R. Civ. P. 56(e) (a party may not rest upon his mere allegations or denials in his pleadings). Without credible evidence that the aircraft operated other than normally, Mr. Agravante's reactions cannot qualify as "external."[1]

Lastly, there are no material facts showing that Mr. Agravante suffered any harm caused by the incident. Plaintiffs allege that the standing takeoff was the cause of Mr. Agravante's alleged complaints, yet provide absolutely no evidence other than self-serving accusations to support their claim. While a medical examination may provide medical evidence of an injury caused by a falling luggage or slip and fall from a spilled beverage, neither Plaintiffs' own doctors nor JAL's medical expert were able to link Mr. Agravante's present complaints to Mr. Agravante leaning forward out of his seat at the moment the plane started taking off. Again, the only evidence proffered by Plaintiff is his reliance on his allegations, which is insufficient proof

---

[1] Instead, any alleged harm was caused by Mr. Agravante leaning forward during the plane's takeoff. *See* Pl.'s Trial Brief at 2. Mr. Agravante admits to leaning forward 1 foot from the plane seat to speak with his travel companion seated three feet away, and then "slamming" backwards in his seat. Mr. Agravante's personal decision to lean forward, rather than be seated squarely within his seat against his first class seatback, while he knew the plane was undergoing takeoff, shows that Mr. Agravante's own ill-timed choice of actions, and not JAL's routine standing takeoff, was the only mistake.

4816-0889-8561.1.051729-00007                                  6.
Case 1:04-cv-00036    Document 127    Filed 06/07/2007    Page 6 of 14

under Rule 56(e).

In summary, Plaintiffs fail to provide the Court with any evidence to support any of the three elements required under the Warsaw Convention. The undisputed evidence shows that nothing unusual occurred during the flight that which caused Mr. Agravante harm. For their failure to meet each and all of the three elements, summary judgment must be granted in favor of JAL.[2]

### B. DR. DIAMOND'S DEPOSITION

#### 1. The insignificant subluxation of Mr. Agravante's spine presents no genuine issue for trial.

JAL's medical expert, Dr. Peter Diamond, states that "given 'the lack of symptoms requiring treatment until two years following the subject event' and given the fact that the X-rays show basically degenerative changes, long-term changes, it was my opinion, to a reasonable degree of probability, 'that the subject incident in 2002 is not causally related to the current symptoms.'" Mot. for Summary Judgment ("Mot."), Ex. H at 38:22 - 39:3. Dr. Diamond found no acute trauma, no sign of a fracture of the spine, and no sign of disc location or significant

---

[2] Despite what may seem a complex analysis under Warsaw and the cases interpreting it, there is underlying a large element of just plain common sense. The cases make it clear that the air carrier is not liable to the passenger with ears sensitive to the pressurized aircraft cabin, to the passenger with physical conditions not very compatible with air travel, or to the passenger who feints while waiting for luggage. On the other hand, the air carrier is liable if the carrier permits a condition to exist which causes harm to a passenger through no fault of the passenger. This is not one of those cases. Mr. Agravante was seated as the aircraft taxied to the runway. He could hear the engines roaring and feel the plane moving and as any right-thinking person would have surmised, knew that the moment of takeoff was imminent. Indeed, Mr. Agravante claims to be an experienced air traveler. By the time the aircraft was taxiing to take off it was reasonable for JAL to expect that all passengers, especially the seasoned traveler, were seated with seatbelts fastened and seatbacks and tray tables fully upright. Certainly it was reasonable for JAL to expect passengers to remain so seated and take simple personal precautions for their own well-being during the takeoff. If Mr. Agravante's leaning forward out of his seat at precisely the wrong moment caused him harm, it was of his own doing for which he must be held accountable. At this particular moment when all persons on board, including the flight crew, are seated for takeoff it is indeed an absurd contention that the flight crew would nonetheless be required to walk the aisles to ensure that each and every passenger on board was squarely seated and not leaning forward to speak to another passenger, to get a magazine out of the seat pocket, to tie his or her shoe, and so on. Instead, this was a moment when it was entirely reasonable for JAL and the cabin attendants to assume that each passenger would take responsibility for his or her own actions and do the minimum to be safely seated for takeoff.

subluxation.[3] Mot., Ex. H at 29:6-9. Plaintiffs neglect Dr. Diamond's conclusion and instead narrow in on Dr. Diamond's finding that Mr. Agravante did have two or three millimeters of subluxation, which Dr. Diamond notes is found in degenerative or arthritic spines. However, this finding of insignificant subluxation is not enough to avoid summary judgment on whether or not Mr. Agravante sustained an injury caused by an unusual or unexpected event on board Flight No. 981.

During the summary judgment phase, the judge's function is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. If the evidence is merely colorable or not significantly probative, i.e., not genuine, summary judgment may be granted. *Id.* at 249-50.

Here, there is no probative evidence - significant or otherwise - that an insignificant subluxation in Mr. Agravante's spine was caused when Mr. Agravante leaned forward out of his seat as the aircraft took off. Dr. Diamond's opinion - the only expert medical opinion in this case which is also unrebutted - clearly establishes that Mr. Agravante's present spinal condition is due to degenerative changes. There is no probative evidence in the record for a trier of fact to decide otherwise. Therefore, the insignificant subluxation of Mr. Agravante's spine, related to degenerative conditions, does not present a genuine issue for trial.

    2.    <u>Dr. Diamond's medical opinion is based on his medical qualifications, not on his pilot experiences.</u>

Dr. Diamond's expert opinion is not based on his piloting experience, but rather very clearly on his medical expertise and credentials. Dr. Diamond has practiced as an orthopedic surgeon for 26 years. Mot., Ex. H at 5:19-21. He maintains current board certifications in orthopedic surgery as well as in independent medical examinations. Mot., Ex. H at 5:22 - 8:11.

---

[3] "[S]ubluxation is when a joint or two bones slide on each other more than is normal, but not enough to actually get out of joint, not actually dislocate." Mot., Ex. H at 29:11-14.

Testimonial references to Dr. Diamond's personal experience as a pilot were aimed at showing that Dr. Diamond understood the process of standing takeoff. Mot., Ex. H at 13:7 - 14:3. In other words, to lend credibility to the expert medical opinion it was necessary to establish as clearly as possible that Dr. Diamond understood the mechanics of the incident. As a private pilot, he was fortunately possessed of unique knowledge and experience which contributed to his understanding of what actually happened. His expert opinion, however, relates solely to his medical expertise. References to Dr. Diamond's piloting background do not affect his testimony or the evidence before the Court.

       3.      <u>Dr. Diamond is allowed to rely on and interpret Mr. Agravante's medical records.</u>

An expert may testify in terms of opinion or inference and given reasons therefore without first testifying to the underlying facts or data, if his opinion is based upon sufficient facts or data, the testimony is based upon reliable principles and methods, and the expert has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702, 705. In his review of Mr. Agravante's medical records, Dr. Diamond interprets two terms used by Mr. Agravante's doctors. First, one doctor used the term "Normal constitutional" to describe Mr. Agravante's medical condition. Mot., Ex. H at 16:9-10. Dr. Diamond interprets "constitutional" as the general medical system, including the cardiovascular system, the pulmonary system, the central nervous system. Mot., Ex. H at 16:9-24. Pursuant to Rules 702 and 705, Dr. Diamond is allowed to offer his opinion of medical records and to interpret those records based on his expertise. Dr. Diamond is not required to first testify as to the underlying facts. Fed. R. Evid. 705. It should also be noted that assumptions made as to a doctor's notation of Mr. Agravante having a "normal constitutional" is not a genuine issue for trial, and thus has no effect in avoiding a motion for summary judgment.

Second, the doctors use the abbreviation "MS" which Dr. Diamond interprets to mean "musculoskeletal system." Again, Dr. Diamond's interpretation of a fellow doctor's abbreviation is not fatal to his opinion. As an experienced doctor offering expert testimony in this case, he is allowed to interpret medical records without first testifying as to the underlying data. Moreover, Plaintiff does not explain how Dr. Diamond's interpretation creates any triable issues so as to defeat summary judgment.

### 4. Plaintiff's Review of Dr. Diamond's Testimony Regarding Gait Analysis

Plaintiffs call Dr. Diamond's testimony as to Mr. Agravante's gait as lacking cohesiveness or firmness. Plaintiffs do not discuss how the testimony lacks cohesiveness, but rather only recites Dr. Diamond's testimony. A review of the testimony does not show any lack of cohesion. Plaintiffs' argument in this regard does not present any genuine issue of fact so as to defeat the motion for summary judgment.

### C. DECLARATIONS OF CAPTAIN HIDEO MASUHARA AND NAOMI NAKAHARA ARE NOT INADMISSIBLE UNDER 28 U.S.C. § 1746.

Contrary to Plaintiffs' assertion, there is absolutely no authority that foreign citizens are unable to submit sworn declarations submitted under penalty of perjury of the laws of the United States. 28 U.S.C. § 1746 imposes no such requirement and to the contrary facilitates such declarations. Section 1746 provides the required language to give force and effect of unsworn declarations made under penalty of perjury. Looked at another way, under Plaintiff's argument, foreign citizens would never be able to submit affidavits or declarations under penalty of perjury of the laws of the United States, and therefore, foreign defendants and foreign corporate officers could never defend themselves even after being sued in a United States Court.

Thus, Plaintiffs' argument is without merit and the submitted Declarations should be held valid in support of the Motion for Summary Judgment.

4816-0889-8561.1.051729-00007
10.
Case 1:04-cv-00036   Document 127   Filed 06/07/2007   Page 10 of 14

## III. CONCLUSION

Rule 56 prescribes that when there is an absence of a genuine issue of material fact, summary judgment is proper. During the summary judgment phase, the judge's function is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. If the evidence is merely colorable or not significantly probative, i.e., not genuine, summary judgment may be granted. *Id.* at 249-50. The Memorandum in support of this Motion and this Reply establish that there is no genuine issue for a jury and that a reasonable jury could reach but one conclusion, judgment for JAL.

Under the Warsaw Convention, and established Supreme Court and Ninth Circuit precedent, to prevail in this case, Plaintiffs must *prima facie* establish that an "accident" resulting from some unusual event during the flight caused Mr. Agravante harm, and that his personal interaction with routine flight was not at fault. In this case, however, there are undisputed and substantiated facts showing that nothing unusual on Flight No. 981 caused an "accident", that any harm to Mr. Agravante on that flight was due to his own ill-timed decision to lean out of his seat during the normal course of events, and that the takeoff did not cause Mr. Agravante any harm. The undisputed factual record leaves no issue of fact for the trier of fact to determine, nor could a reasonable trier of fact reach any decision other than for JAL, thereby warranting summary judgment in favor of JAL.

DATED: Hagåtña, Guam, June 7, 2007.

CARLSMITH BALL LLP

ELYZE J. MCDONALD
DAVID LEDGER
Attorneys for Defendant
Japan Airlines International Co., Ltd.

CARLSMITH BALL LLP

DAVID LEDGER
ELYZE MCDONALD
Bank of Hawaii Bldg., Suite 401
134 West Soledad Avenue, P.O. Box BF
Hagåtña, Guam 96932-5027
Tel No. 671.472.6813

Attorneys for Defendant
Japan Airlines International Co., Ltd.

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| PEDRO P. AGRAVANTE, JR. and CORITA B. AGRAVANTE,<br><br>Plaintiffs,<br><br>vs.<br><br>JAPAN AIRLINES INTERNATIONAL CO., INC.,<br><br>Defendant. | CIVIL CASE NO. CIV04-00036<br><br>**DECLARATION OF HIDEO MASUHARA** |

I, HIDEO MASUHARA, declare under penalty of perjury and pursuant to 28 U.S.C. Section 1746 (1) that the following statements are true and correct:

1. I have personal knowledge of the facts stated in this declaration except as otherwise indicated.

2. I would testify competently as to these facts if called by the Court.

3. I am a captain for Japan Airlines International Co., Ltd., and have been a commercial airline pilot for 28 years.

4. During the 28 years I have been a commercial pilot for Japan Airlines I have made approximately 50 standing takeoffs from the B Runway at Narita, Japan. Also, I have made countless standing takeoffs from similar runways at domestic airports in Japan.

5. As noted above at Paragraph 4, in my 28 year career as a commercial airline pilot for Japan Airlines I have made approximately 50 standing takeoffs from the B Runway at Narita, Japan and based on this personal experience can say with absolute certainty that standing takeoffs are permitted, and in fact are routinely done from the B Runway at Narita Airport.

6. Narita Airport authorities have no say in whether or not an aircraft makes a standing takeoff or a rolling takeoff because that decision is made only by the pilot in command of the aircraft. Once the pilot has taxied his or her aircraft to the runway and has received clearance and instructions from airport authorities for takeoff, command of and control over the aircraft rests solely with the pilot in command.

7. As I have previously sworn in an earlier Declaration to this Court, there was nothing unusual or unexpected about the standing takeoff of my 767 aircraft on July 20, 2002, during Flight No. 981. Standing takeoffs are routine in the aviation industry and are usual, normal, and expected operation of the aircraft.

8. Even with a standing takeoff, the takeoff roll in my 767 aircraft is a gradual acceleration of the aircraft and the difference from the acceleration during a rolling takeoff is very minor. The purpose of the standing takeoff is for the aircraft to reach its takeoff speed in a little less time and using less runway than when doing a rolling takeoff.

9. I declare under penalty of perjury under the laws of the United States America Guam that the foregoing is true, correct and complete.

DATED: May 18, 2007.

_____
HIDEO MASUHARA

2
Case 1:04-cv-00036   Document 127   Filed 06/07/2007   Page 13 of 14

## DECLARATION OF SERVICE

I, Elyze J. McDonald, hereby declare under penalty of perjury of the laws of the United States, that on the 7th day of June 2007, I will cause to serve, via certified mail with return receipt requested, a true and correct copy of DEFENDANT JAPAN AIRLINES INTERNATIONAL CO., LTD.'S REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT; DECLARATION OF HIDEO MASUHARA; DECLARATION OF SERVICE upon Pro Se Plaintiffs Agravantes as follows:

> PEDRO P. AGRAVANTE
> CORITA B. AGRAVANTE
> Post Office Box 22281
> Guam Main Facility
> Barrigada, Guam 96921

Executed this 7th day of June, 2007 at Hagåtña, Guam.

*/s/ Elyze J. McDonald*
ELYZE J. MCDONALD