DISTRICT COURT OF GUAM

TERRITORY OF GUAM

PEDRO P. AGRAVANTE, JR. and
CORITA B. AGRAVANTE,

Plaintiffs,

vs.

JAPAN AIRLINES INT'L CO., LTD.,

Defendant.

Civil Case No. 04-00036

**ORDER RE MOTION FOR SUMMARY JUDGMENT**

This matter came before the court for a hearing on the Defendant, Japan Airlines Int'l Co., Ltd.'s Motion for Summary Judgment. The Defendant contends there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Having considered the parties' arguments and submissions, as well as relevant caselaw and authority, the Court hereby **GRANTS** the Defendant's motion and issues the following decision.

**BACKGROUND**

This action was filed on July 20, 2004. The Plaintiffs allege negligence on the part of the Defendant, resulting in injuries sustained by Mr. Aggravante while on board a flight from Japan to Guam. Mrs. Aggravante has also brought a loss of consortium claim against the Defendant.

On July 20, 2002, Plaintiff, Mr. Agravante was a first class passenger on JAL flight no. 981 from Narita, Japan to Guam. Mr. Agravante was sitting in seat 2G. This is an aisle seat in the center

section of the cabin. Mr. Agravante's traveling companion was Mr. Robert Del Rosario, who was seated in 1H, an aisle seat on the right side of the aircraft. The men had been in Japan on a business trip. Mr. Agravante claims that as the plane was preparing for takeoff, he leaned forward to speak to Mr. Del Rosario. *See* Motion, Exhibits A, B at response No. 5. Mr. Agravante claims that he heard rattling sounds, and that the aircraft then moved forward to takeoff. *Id.*

Mr. Agravante asserts that when the aircraft engaged in a "static takeoff," also known as a standing takeoff, the acceleration pushed him back against his seat and caused a back injury. *See* Plaintiff's Trial Brief, Docket No. 115, at p. 2. According to flight No. 981's Captain, Hideo Masuhara,[1] the Boeing 767 plane he piloted to Guam is designed for standing takeoffs which are controlled by a computer installed by the aircraft manufacturer. *See* Motion, Exhibit C at ¶ 5. A standing takeoff is one where the flight crew taxis to the takeoff location, sets the aircraft breaks and sets the engines to pre-determined power setting (70%N1), and then releases the brakes. Once the breaks are released the aircraft's computer systems controls the takeoff roll and acceleration and commencement of flight. *Id.* There is no pilot or manual control at this point. *Id.* Apparently, standing takeoffs are considered routine in the aviation industry, and are usual, normal, and expected operations of the aircraft. *Id.*, at ¶ 7.

Expert opinion offered by JAL shows that the force imparted by the plane's acceleration was less than a number of daily activities such as sneezing, hopping off of a step, and plopping down in a chair.[2] *See* Motion, Exhibit I, attached thereto.

While the takeoff appears to have been a normal, routine takeoff, during the takeoff, three food carts dislodged from the galley storage cabinet. One of the carts struck Mr. Del Rosario on his

---

[1] Captain Masuhara has been a commercial pilot for 28 years and has accumulated approximately 5920 hours in a Boeing 767 aircraft, the type of aircraft used for Flight No. 981. *See* Motion, Exhibit C, at ¶¶ 3-4.

[2] JAL retained Dr. Laura Liptai as an expert to perform a BioMedical analysis of Mr. Agravante's claim. After examining JAL flight simulator and aircraft data, post-incident medical records, expert medical opinion, discovery responses, and the Incident Report, Dr. Liptai calculated that the static takeoff would impart acceleration force less than that which is imported by a number of activities of daily living. *See* Motion, Exhibit I.

left knee and ankle.[3] A second cart hit the armrest of the seat 1G directly across from Mr. Del Rosario and likewise stopped there. The third run-away cart ran into the other two carts and stopped there. No food cart came anywhere near the Plaintiff.[4]

On the following day, JAL received an Incident Report, wherein the Plaintiff described the incident with the carts. The Plaintiff wrote:

> The plane was on standbye [sic] waiting for the control tower for a 'GO' signal. The plane suddenly jolted and went fast forward, and at the same time a big banging scary sound can be heard coming from the front of the airplane where food were prepared, then 3 large metal food handling trays rolled out, dislodged from its holding panels running out onto the passengers seats, hitting or striking seat nos. 1 G and 1 H, damaging the right side of seat no. 1 G and hitting the left foot of one (1) passenger, Mr. Robert J. Del Rosario who was seating [sic] in 1 H.

It took 5 minute [sic] for 3 attendants to take out the 3 trays from the alley [aisle].

*See* Motion, Exhibit E attached thereto.

In his response to an interrogatory the Plaintiff claims he experienced slight numbness and pain in his arm, shoulders, lower back and neck 24 hours after the flight. *See* Motion, Exhibits A, B, response to no. 10, attached thereto. The Plaintiff however makes no mention of any injuries he suffered or experienced in his Incident Report. In fact, the only injuries complained of concern Mr. Del Rosario. "Result: Passenger Robert J. Del Rosario suffered fractured left foot, complaining about pain, shortness of breathing, nervous & frighten by the incident." *See* Motion, Exhibit E attached thereto. During the flight, the Plaintiff spoke to the lead Flight Attendant Reiko Asatani. He expressed his concern over the cart incident and Mr. Del Rosario, but again made no mention of the takeoff, pain he was suffering from or any sort of accident involving himself. *See* Motion, Exhibit J (Unsworn Statement of Reiko Asanti) at 22:17-25, 23:1-25, 24:4-6, 33:10-15, attached thereto. During his deposition, the Plaintiff stated that the Incident Report memorialized what

---

[3] Mr. Del Rosario filed a lawsuit against JAL, and ultimately settled the lawsuit for $175,000. Mr. Del Rosario has since disavowed the settlement and has demanded a sum in the order of $1,000,000. On motion by JAL this court has enforced the settlement. Mr. Del Rosario has appealed the court's ruling to the Ninth Circuit.

[4] "But none of these runaway carts had struck and injured me." *See* Plaintiff's Trial Brief, Docket 115, at p. 3.

happened on the flight, and that he filled it out in order to express accurately what happened on the flight. *See* Motion, Elyze McDonald Declaration ("McDonald Decl."), at ¶ 5, attached thereto.

Although the Plaintiff claims to have experienced pain within 24 hours following the flight, he did not seek medical care until two years later. Accordingly, there is no documentation of his injuries immediately after the incident or even shortly thereafter. Before he sought medical treatment, the Plaintiff had his wife treat his injuries. *See* Motion, Exhibits A and B, response to 10, attached thereto. The Plaintiff's wife however, is a bookkeeper and does not have any medical credentials or training. *See* Motion, McDonald Decl. at ¶ 5, attached thereto. The Plaintiff agrees that his wife has no medical credentials, however, because she has provided "therapeutic massaging to her family" for years, he believes she is justified in providing treatment. *See* Opposition, p. 11.

In September 2004, the Plaintiff saw Dr. Donald Preston and Dr. Alix Chinet. At that time x-rays were taken. *See* Motion, Exhibits A and B, response to no. 10, attached thereto. Neither of these doctors indicated there was any causal link between the flight in question and the Plaintiff's pain. *See* Motion, Exhibit F, attached thereto; Plaintiff's Trial Brief, Docket No. 115, at pp. 5-6.

JAL hired medical expert Dr. Peter Diamond to review the Plaintiff's case, medical reports and X-ray films. Dr. Diamond found that the x-rays show marked degenerative disc disease changes (which means changes occurring over a long period of time) not indicative of acute trauma linked to a single incident. *See* Motion, Exhibit G, attached thereto. Dr. Diamond noted that Dr. Preston's initial exam states that the Plaintiff has a normal gait, which means he is not walking with a limp and likely does not have a spinal cord injury, and that he has no sensory deficits. *See* Motion, Exhibit H at 17:2-25; 19:4-8; 22:8-10, attached thereto. Dr. Diamond's review of the Plaintiff's x-rays revealed that the Plaintiff's symptoms are indicative of arthritis, and "wear-and-tear changes" in the spine and joints. *Id.* at 23:4-18; 24:14-18; 25:4-13. The arthritic, wear-and-tear changes were not due to a sudden traumatic event but again were conditions that developed over long periods of time. *Id.* at 24:19-22.

Dr. Diamond also observed the development of spurs on the Plaintiff's spine. *See* Motion, Exhibit H at 28:1-29:2, attached thereto. Spurs occur over years and years and do not occur over night. *Id.* In general, Dr. Diamond found "nothing in those [x-ray] films to indicate an acute

trauma. There was no sign of a fracture of the spine. There was no sign of a disc location or a subluxation – a significant sublaxation." *Id*. at 29:6-9; 29:21-30:4. Instead, Dr. Diamond found that the Plaintiff suffered from tendonitis. *Id*. at 32:22-25.

> [T]here's no major trauma or even minor trauma that I was aware of from the documentation that I reviewed – given that, given 'the lack of symptoms requiring treatment until two years following the subject event' and given the fact that the X-rays show basically degenerative changes, long-term changes, . . . my opinion, to a reasonable degree of medical probability, 'that the subject incident in 2002 is not causally related to the current symptoms.

*Id.* at 38:18-39:3

> [T]he event in 2002 was not the cause of his symptom in 2004.

*Id.* at 39:8-9.

> [I]ts virtually impossible that a patient could have an acute disc injury in 2002 and then not have any symptoms until 2004. I mean, it just – some delay between injuring a disc and the onset of the symptoms if possible. By 'some delay,' I mean a couple of days, four days, maybe a week, but not two years.

*Id.* at 39:13-19.

## DISCUSSION

The Defendant, JAL now moves this court for summary judgment. Summary judgment is appropriate when the evidence, read in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party opposing summary judgment cannot rest on conclusory allegations, but must set forth specific facts showing that there is a genuine issue for trial. *Leer v. Murphy*, 844 F.2d 628, 631 (9th Cir. 1988). Moreover, to defeat a summary judgment motion, the nonmoving party must come forward with evidence sufficient to establish the existence of any disputed element essential to that party's case, and for which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 102 S.Ct. 2548 (1986).

Article 17 of the Warsaw Convention makes air carriers absolutely liable for injuries sustained by a passenger "if the accident which caused the damage so sustained took place on board an aircraft or in the course of any of the operations of embarking or disembarking." 49 Stat. 3000. A plaintiff may recover damages for claims within Article 17's scope if: (1) an accident has

occurred, in which (2) the passenger suffered death, wounding or any other bodily injury, and (3) the accident occurred either on board the aircraft or in the course of embarking or disembarking from the plane. *See Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 535-536 (1991). In moving for summary judgment, JAL argues that the Plaintiff's injuries were not caused by an "accident" within the meaning of Article 17 of the Warsaw Convention and additionally, there is no causal link between the alleged accident and the Plaintiff's injuries.

### *A. Whether There was an Accident.*

An accident, for the purposes of Article 17, is "an unexpected or unusual event or happening that is external to the passenger." *Air France v. Saks*, 470 U.S. 392, 405 (1985). In *Saks*, the Supreme Court held that there was no Article 17 "accident" when plaintiff's deafness resulted from the routine and expected operation of the airplane's pressurization system. "When the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident." *Id.* at 406.

In this case, the evidence is undisputed that the plane's takeoff was normal and expected. There is no indication that the standing takeoff was abnormal or unusual. Captain Masuhara, a 28-year veteran flying commercial aircrafts, with over 6000 hours in a Boeing 767, stated that the aircraft takeoff was according to industry standard and JAL policy. *See* Motion, Exhibit C at ¶¶ 3-7, attached thereto. The Plaintiff states that at trial testimony will be provided by one, Captain Antonio Tuano, that a static takeoff is not allowed at Narita Airport, and to do so would be a pilot error of judgment. As noted, the party opposing summary judgment cannot rest on conclusory allegation, but must set forth specific facts showing that there is a genuine issue for trial. *Leer v. Murphy*, 844 F.2d 628, 631 (9th Cir. 1988). In this instance, there is no affidavit and no declaration supporting the Plaintiff's position. In contrast, the Defendant presents a declaration from Captain Masuhara wherein he states that "[d]uring the 28 years I have been a commercial pilot for Japan Airlines I have made approximately 50 standing takeoffs from the B Runway at Narita, Japan . . . [I] can say with absolute certainty that standing takeoffs are permitted, and in fact are routinely done from the B Runway at Narita Airport.. *See* Reply, attached Declaration of Hideo Masuhara ("Masuhara Decl.") at ¶¶ 4 and 5. Nonetheless, if the court was to give the Plaintiff the benefit of the doubt on this issue

and construe the standing takeoff as an accident, the court would still have great difficulty in ruling against JAL in this instance.

### B. Whether the Accident "Caused" Plaintiff's Injury.

The mere occurrence of an accident, does not lead to liability under the Warsaw Convention. Rather, the accident must have "caused the damage . . . sustained." 49 Stat. 3000. In *Saks*, the Supreme Court stated that, "[a]ny injury is the product of a chain of causes, and we require only that the passenger be able to prove that some link in the chain was an unusual or unexpected event external to the passenger." 105 S.Ct. 1346. The Court went on to state that Article 17 "cannot be stretched to impose carrier liability for injuries that are not caused by accidents." *Id.* Here, the Plaintiff's claim for damages depends upon an extremely attenuated chain of causation if not actually a nonexistent chain. Two years after the supposed "accident" the Plaintiff sought medical treatment. However, no doctor has indicated that the pain the Plaintiff is suffering from was caused from an accident that occurred two years ago on flight no. 981. Questions of proximate cause are ordinarily treated as questions of fact. *See e.g.*, *Fustok v. Conticommodity Services,* 618 F.Supp. 1082, 1087 (S.D.N.Y. 1985). Nonetheless, the question of proximate cause may be one for the court where there are intervening causes, or where reasonable jurors could reach only one conclusion regarding the issue of proximate cause. *See Kroon v. Beech Airlcraft Corp.,* 628 F.2d 891, 893 (5th Cir. 1980).

In this case, reasonable persons could conclude only that the purported "accident," the standing takeoff on flight no. 981, was in no sense the proximate cause of Plaintiff's injuries. Upon review of the record, the allegation of proximate cause cannot withstand even cursory scrutiny. For example, although the Plaintiff claims that the standing takeoff was the proximate cause of his injuries, it is undisputed that two years passed before any medical treatment was sought. Moreover, the Plaintiff failed to file an Incident Report alleging such an accident even though he was capable of filing such a report concerning Mr. Del Rosario and the run-away carts. Even more troubling is the probability that the Plaintiff's injury is the result of a degenerative disease that developed over the course of years. Plaintiff's own medical evidence casts significant doubt that the Plaintiff suffered an accident aboard flight no. 981.

To establish proximate cause, the Plaintiff must demonstrate a close relationship between cause and effect. This requirement is not satisfied by the mere assertion of a chain of causation without evidentiary support. Here, the Plaintiff has failed to come forward with any admissible evidence showing a genuine issue that should be submitted before a jury. To order otherwise, would be a waste of judicial resources.[5] "The Warsaw Convention . . . imposes a form of absolute liability on international air carries for accidents which cause passenger injuries. Since liability under the Convention is nearly absolute, courts should be wary of reckless invocation of the Convention by eager but undeserving litigants." *Margrave v. British Airways,* 643 F. Supp. 510, 515 (S.D.N.Y. 1986). Here is such an instance of an undeserving litigant. Accordingly, summary judgment is granted to JAL as to all counts, including Plaintiff, Mrs. Agravante's loss of consortium claim.

A loss of consortium is derivative. *Duenas v. Department of Public Works, Government of Guam*, 1992 WL 97213, *1, 5 (D. Guam App. Div. 1992). "Loss of consortium is a derivative claim such that 'all elements of the underlying cause must be proven before the claim can exist.'" *Barnes v. Outlaw*, 964 P.2d 484, 487 (Ariz. 1998). In this instance, the loss of consortium claim cannot survive. As the court has concluded in the above discussion, the Defendant is entitled to summary judgment on the Plaintiff, Mr. Agravante's claims. Because no underlying claims remain against the Defendant, the loss of consortium claim cannot survive.

## Conclusion

For the foregoing reasons, the court finds there is no genuine issue as to any material fact, and the Defendant is entitled to judgment as a matter of law. Accordingly, the Defendant's Motion for Summary Judgment is **Granted** as to all counts.

**So Ordered.**



**/s/ Frances M. Tydingco-Gatewood**
    **Chief Judge**
**Dated: Jul 09, 2007**

---

[5] The Plaintiff admits that his prior counsel told him that he did not believe in this case and urged the Plaintiff to withdraw his complaint. *See* Plaintiff's Trial Brief, Docket No. 115, p. 7.